UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6198-CR-HURLEY

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-

MAXIMILLIAN C. MATETICH,

      Defendant.

_____/

### GOVERNMENT'S NOTICE OF FILING THE TRANSCRIPT OF THE HEARING ON THE GOVERNMENT'S MOTION TO REOPEN THE PRETRIAL DETENTION HEARING

The United States, by and through the undersigned Assistant United States Attorney, files

this Notice of Filing the Transcript of the Hearing on the Government's Motion to Reopen the

Pretrial Detention Hearing and in support thereof states as follows:

    1.   Attached is a transcript of the hearing on the Government's Motion to Reopen the

Pretrial Detention held on August 29, 2000 in Miami. The government, having now received the

transcript of the second hearing, will be preparing its Motion for Revocation of the Magistrate's

Order as provided in Title 18, United States Code, Section 3145(a)(1).

1



2. As previously stated in its Motion for Stay, the government believes that the defendant is a flight risk because of his ties to other countries, as well as, a danger to the community because of his foreign Ecstasy importation network . The government objects to Mr. Swears as a surety. The government objects to Ms. Caravano, age 23, as a surety. She has no assets in the United States whatsoever.

3. The government requests that the release order be revoked, or in the alternative, that this Court hold a hearing de novo.

WHEREFORE, the government moves the District Court to revoke the Magistrate's Order releasing the defendant on bond, or in the alternative to set this matter for a hearing.

Respectfully submitted,

GUY A LEWIS
UNITED STATES ATTORNEY

By: *Nancy Vorpe Quinlan*
NANCY VORPE QUINLAN
Assistant United States Attorney
Florida Bar No. 0593532
500 Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 820-8711 ext 3054
Fax: (561) 820-8777

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the Government's Notice of Filing the Transcript has been delivered by fax Howard Srebnick, Esquire this 1st day of September, 2000.

*Nancy Vorpe Quinlan*
NANCY VORPE QUINLAN
Assistant United States Attorney

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,                     No: 00-6198-HURLEY

           Plaintiff,                    Miami, Florida
                                              August 29, 2000

   v.

MAXIMILLIAN MATETICH,

          Defendant (s).

_____/


TRANSCRIPT OF HEARING ON MOTION TO REVOKE BOND AND
REOPEN DETENTION HEARING
BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
UNITED STATES MAGISTRATE JUDGE.


APPEARANCES:

For the Plaintiff:            NANCY VORPE-QUINLAN,
                              Asst. U. S. Attorney
                              99 N.E. 4th Street
                              Miami, Florida  33132-2111

For the Defendant:            HOWARD SREBNICK, ESQ.



Transcriber:                  F. Levy

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida  33130

2

```
                          I N D E X

 1   WITNESS              DIRECT    CROSS    REDIR.   RECR.

 2   Randall Sweers
        By Mr. Srebnick     20
 3      By Ms. Quinlan               31

 4   Marie Caravano
        By Mr. Srebnick     46                57
 5      By Ms. Quinlan               52

 6                      E X H I B I T S

 7                                        Page

 8   Plaintiff's Exhibit No. 1            7
     Plaintiff's Exhibit No. 2           22
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

3

THE COURT: We're here on the case of United States of America vs. Maximillian Matetich.

Could I have your appearances for the record, please.

MS. VORPE-QUINLAN: Good morning, Your Honor. Nancy Vorpe-Quinlan on behalf of the United States from the West Palm Beach office of the U.S. Attorney's Office.

And sitting here at counsel table with me is Special Agent Chris Mathis (phonetic), and Special Agent Roberto Bryan (phonetic). They are the case agents assigned to the Ecstasy investigation.

THE COURT: Okay.

MR. SREBNICK: Good morning, Your Honor. Howard Srebnick, together with Heidi Shules (phonetic), on behalf of the defendant, Maximillian Charles Matetich, who is present before the Court, still in custody.

THE COURT: Okay. Mr. Srebnick, this matter was set for hearing at 11 o'clock. It's 11:45 now. There was no -- I understand that you told Pilar that you had a hearing at 10 o'clock in front of Judge Bandstra, but there was no call to chambers, no notification that you were going to be late.

The Marshals have been sitting here with this prisoner for 45 minutes. Why is that?

MR. SREBNICK: I had asked my associate to come up here at quarter to 11. Let me find out if that happened or not.

THE COURT: Okay.

4

MS. VORPE-QUINLAN:  Your Honor -- she came up and told us

that you were downstairs -- he was downstairs in mag. court, and I

advised the clerk that that's where he was.  We knew that's where he

was.  He was downstairs.

MR. SREBNICK:  In other words, when I realized that we

weren't going to be done at a quarter to 11, I asked my associate to

notify your chambers.  She must have bumped into Ms. Quinlan and then

assumed that the word would be passed on to Your Honor.

I apologize for any inconvenience.

THE COURT:  All right.  Good enough.

MR. SREBNICK:  And, also, when this matter was originally

set, I had advised Ms. Quinlan I was going to be in mag. court at 10

a.m.  I assumed it would be done by 11:00, but apparently there was a

very long calendar.  We were the last on the calendar.  I simply had

no control over that.

THE COURT:  Okay.  Our understanding was you were going

to be in mag. court at 10 o'clock for this defendant, that's why we

had him brought here instead, so we'd do the arraignment here.

MR. SREBNICK:  Okay.  Well, that's why I mentioned to

Pilar this morning that I did have other matters, in the event there

was some confusion about that.

THE COURT:  Okay.  All right, good enough.

We're here on the government's motion to reopen pretrial

detention and a motion for a Nebbia inquiry.

Let me hear from the government first.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

5

MS. VORPE-QUINLAN:  First, could I ask that the witnesses in this matter be excused.  I think that the defense has the two witnesses, Mr. Sweers and Ms. Caravano.

THE COURT:  Okay.

Do you have any objection to that?

MR. SREBNICK:  I don't join in the request, but if the Court thinks it's appropriate, I -- whatever the Court says.

THE COURT:  Okay.  I'd ask the two witnesses to please step outside.

(The clerk advises the Court that some microphones are not working.)

THE COURT:  Okay.  We need to make sure we use the podium microphone because none of the other microphones are working in the courtroom.

Okay, go ahead, Ms. Quinlan.

MR. SREBNICK:  Judge, to the extent that the government --

THE COURT:  Come up here.

MR. SREBNICK:  To the extent that the government is going to call any witnesses, then I think it would be a reciprocal rule. We would invoke the same rule.

MS. VORPE-QUINLAN:  We have an exception for case agents, I believe.

THE COURT:  For one case agent.

MS. VORPE-QUINLAN:  I don't anticipate -- all right, I'll

6

excuse Agent Bryan.

1              THE COURT:  Well, he can sit here if he's not going to be

2      a witness, but you only get on sitting at the table who's going to be

3      a witness.

4              MS. VORPE-QUINLAN:  It's hard to say what Mr. Srebnick,

5      so I'll let Agent Bryan be excused at this time-          THE

6      COURT:  Okay.

7              MS. VORPE-QUINLAN:  In the event that--he might be called

8      as a witness.

9              THE COURT:  Okay, good.

10              Mr. Bryan, if you would wait out in the hallway, please.

11              THE COURT:  All right.

12              MS. VORPE-QUINLAN:  After this Court began the detention

13      hearing on Friday, August 18th, I received a telephone call from U.S.

14      Customs.  And I received that call from Customs because I had sent

15      Mr. Srebnick's pleading, in which he had listed all the witnesses and

16      their biographical information over to Customs because my DEA agents

17      were down here, this was a joint investigation with Customs.  And so

18      I sent that pleading over.

19              In that pleading, Mr. Srebnick had listed Mr. Sweers as a

20      witness, and Customs ran those witnesses in law enforcement databases

21      as best it could.  And they came up with some information about Mr.

22      Sweers and a case number, and they pulled those reports.

23              And I'd like to give the Court some of that information

24      at this time, and I also have copies for the defense.

25

7

THE COURT:  Okay.

1

MS. VORPE-QUINLAN:  And, Your Honor, at this time I'll

2

just mark these reports as Government's Exhibit 1--

3

THE COURT:  All right.

4

MS. VORPE-QUINLAN:  -- for purposes of this hearing.

5

(Government's Exhibit 1 marked in evidence.)

6

MS. VORPE-QUINLAN:  It's a collection of reports -- for

7

the record, it's a complaint on a gentleman named Wolfgang Omee

8

(phonetic).  It's a complaint for extradition.  And then there are

9

customs reports attached all stapled together.

10

May I approach, Your Honor?

11

THE COURT:  Sure.

12

MS. VORPE-QUINLAN:  In the first document, Your Honor,

13

which is the matter of the extradition of Wolfgang Omee, if I could

14

just be brief by proceeding through the document.

15

At the bottom paragraph there, Paragraph 2 on the first

16

page, it states that Wolfgang Omee (phonetic) is the subject of an

17

arrest warrant issued on July 3, 1995 by judicial authorities in

18

Munich Germany.

19

Proceeding to Page 2, the applicant here, who is Jeff

20

Sloman of our Fort Lauderdale office, the U.S. Attorney's Office in

21

Fort Lauderdale, states in Paragraph 3:

22

"According to an investigation by authorities of the

23

requesting state, Mr. Omee established a company known as

24

Pegasus Investment Consulting Corporation on behalf of

25

8

Alexander Herman, and in the period between June 1992 and March 1993, Pegasus used various agents in Germany to offer loans.  The amount of the loan was entirely within the client's discretion.  The term was to be ten years and a day with an interest rate of 4.5 percent. The loans were granted on condition that a

deposit of 1.5 percent of the loan amount was paid in advance.

A portion of the loan amount was to be reinvested through another corporation in Miami, which was established by Wolfgang Omee.

The investment was supposed to generate enough profit by the end of the loan period to cover all the interest and redemption payments so that the person borrowing the money would end up with an interest free, redemption free loan.

As premeditated by Wolfgang Omee and others, no loan money was ever paid out to these investors.  No loan money was invested in Florida by I.C. Holding.  Only a small amount of the deposits were repaid."

Going on here, it says 129 clients paid to Pegasus a great deal of money, 7 million Deutsche marks, over 2 million in U.S. dollars, 2 million Belgian francs, and 56,000 Swiss francs.

The payments were made in cash and handed to agents who transmitted the money into accounts here in the United States.

The complaint goes on to seek the arrest of Mr. Omee and

the seizure of documents and other items of evidence, including the

forfeiture of any items that might have been purchased by Mr. Omee.

And Magistrate Judge Lurana Snow signed that warrant on

the 29th day of August 1996 with respect to Mr. Omee.

The next report pertains to Mr. Omee waiving extradition

to the United States and states that on September 13th he was

arrested in Boca Raton. On November 7th he waived extradition to

Germany.

And Agent Puff (phonetic), who is the case agent in

Germany, William Puff, has advised us that Mr. Omee received a seven-

year sentence in Germany.

The next customs report relates to two scheduled meetings

with Randy Sweers regarding a 33-foot Advance vessel, which was

seized from Mr. Omee. And in this report, Agent Puff writes that on

September 17th a vessel, a 33-foot Advance vessel, was seized that

belonged to Mr. Omee.

On October 10, 1996, at about 10 a.m. Special Agent Puff

received a telephone call from an individual  who identified himself

as Randy Sweers, and inquiring about the seized vessel.

During the interview, Sweers claimed that the vessel was

his. At the conclusion of the interview, Sweers and Puff scheduled

to meet to discuss the matter further on October 17, 1996 at 10:30.

On October 17, 1996, Agent Puff received a telephone call

from an individual identifying himself as Sweers.

Sweers stated he was unable to meet that day, and the

10

meeting was rescheduled for October 22nd at 10:30 a.m.

On October 22, 1996, Sweers failed to appear for the scheduled interview.

The next report is a report by Agent Puff detailing the substance of the telephone conversation that he had with Mr. Sweers. Agent Puff writes that on October 10, 1996 at 10 a.m. he received a telephone call from an individual identifying himself as Randy Sweers, and inquiring about the seized vessel.

Sweers stated the vessel was his, and that Omee was an investor in Florida Power Boat Brokerage, Inc.

Sweers stated that Omee loaned him, Sweers, money to purchase boats and he, Sweers, has documents to prove that he received funds from Omee, and dispensed the funds to purchase boats.

Regarding the 33-foot Advance vessel, Sweers stated that Omee paid lease for storing the vessel, and when Puff questioned Sweers regarding Florida Power Boat Brokerage, Inc., Sweers stated that Tracy Wood was the secretary for a very short time, and as of April 4, 1996 she had no interest in the company.

Sweers stated he met Omee four or five years ago when he was employed elsewhere. And he said he knew Omee from Florida Power Boat Club, Inc.

The next report is a report about this vessel which was seized, and Agent Puff writes:

"On September 17, 1996 Omee's 33-foot vessel was seized at Hide-Away Yacht Sales. During an inventory of the

vessel, there was a document titled "Sales Contract for new or Used Boat" found in a cabinet."

The contract indicated that Omee purchased the vessel for $69,475.

According to the contract, a $15,000 deposit was paid by check, and the balance was paid by cashier's check.

At the bottom of the contract was a signature above the purchaser's signature, which represents Omee's signature, and the signature above the sales contract appears similar to T. Wood, Thomas Wood, which was Omee's alias Puff learned.

Also found in the vessel was Florida Power Boat Brokerage, Inc. business cards displaying the name of Thomas Wood, Omee's alias.

It's my understanding that Mr. Sweers' company is Florida Power Boat Brokerage, Inc.

The next report also pertains to the seizure of the vessel, and what's notable about that report is, on September 13 Mr. Omee was arrested in Boca Raton, Florida for his participation in a 5.8 million dollar international fraud.

Prior to Omee's arrest, he attempted to hide two bags containing bank statements and records. And after he was arrested those bags were recovered. And it was in a search of those bags where Agent Puff and the other agents found the documents relating to the 33-foot Advance vessel.

And there's a purchase and sale agreement among those

1    documents dated June 25, 1995, indicating the vessel was purchased by

2    Florida Power Boat Brokerage, Inc.

3            The agreement indicates the vessel was sold by Hide-Away

4    Yacht Sales, Inc., located at 750 South Federal Highway in Pompano.

5            The address displayed on the agreement for Florida Power

6    Boat Brokerage, Inc. was a P.O. Box 1041007 North Federal Highway,

7    Fort Lauderdale, Florida.

8            This address is a post office box at Mail Boxes, Etc.,

9    which was utilized by Tracy Wood, Omee's wife.

10           The agreement indicates the vessel was purchased for

11   $50,000.  The deposit was paid with a check, and then on page 3 of

12   the agreement, a signature appears that resembles T. Wood.

13           So at that time Agent Puff advised he went out to

14   investigate this company, Florida Power Brokerage, Inc., and found

15   that its address was for a Mail Boxes, Etc.

16           The next report is an interview that Agent Puff did with

17   a Mr. Gaudreau, G-A-U-D-R-E-A-U, pertaining to his knowledge of Mr.

18   Omee and the transfer of the vessel.        Mr. Gaudreau stated

19   he met Omee three and a half years ago and, according to Gaudreau,

20   Omee wanted to rent office space at Hide-Away Yacht Sales but he said

21   it was too expensive.

22           Regarding the 33-foot Advance vessel, Gaudreau stated he

23   received the vessel on a trade.

24           Omee first looked at the 33-foot Advance then purchased

25   in June of 1995 for $50,000.

13

1      Gaudreau stated Omee purchased the vessel to sell at a

2  later time, and the vessel was purchased by Florida Power Boat

3  Brokerage, Inc.

4      When questioned regarding Florida Power Boat Brokerage,

5  Inc., Gaudreau stated that it came from Florida Power Boat Club,

6  which sponsors trips to the islands in the Keys.

7      During the interview Gaudreau was referred to Omee

8  utilizing the name Wood.  At this time Gaudreau referred to Omee

9  utilizing the name Omee.

10     When Puff questioned Gaudreau about this Gaudreau stated

11 that he knew Omee by both names.  Gaudreau stated Omee had problems

12 with the police and changed his name and was hiding in North Miami

13 for a while.

14     Gaudreau stated that Omee had a cigarette vessel that was

15 repossessed because of police problems.

16     Gaudreau stated that Omee and an individual identified

17 as Randy Sweers utilized the vessel.  The last time the vessel was

18 used was approximately two months ago.        According to

19 Gaudreau, the vessel was put in the water and Omee cleaned the

20 vessel.

21     The last paragraph says that there was -- in Omee's bag

22 was a checkbook for a First Union cap account in the name of Thomas

23 Wood.  And those checks had the address of Thomas Wood at 1007 North

24 Federal Highway, Suite 104, Fort Lauderdale.

25     The aforementioned address is the post office box at Mail

14

Boxes, Etc. utilized by Tracy Wood, Omee's wife, and that's the
address for Florida Power Boat Brokerage.

So what concerned the government here was that Mr. Sweers
appeared to be involved with this gentleman, Mr. Omee, that he stated
to Agent Puff that he received funds from Mr. Omee for his business,
that this boat that was seized, Mr. Sweers claimed was his, but, yet,
he missed two meetings with the agent, and never appeared to contest
the forfeiture and the boat was ultimately forfeited.

The boat was evaluated at about $100,000, which, to the
government's way of thinking, for a person to call and say, "This is
my boat," and then never appear to challenge the forfeiture of a
$100,000 boat, that's a lot of money to write off.

And, in addition, Mr. Omee using business cards with Mr.
Sweers' business, and having this person, Tracy Wood, who is Mr.
Sweers' ex-wife,  employed there and using mail box drops, we felt
obligated to bring this information to your attention since you have
decided, based on the last hearing, that he could be a surety in the
amount of $500,000.

So I'd like to cross examine Mr. Sweers relating to these
documents.  Unless you decide at this point that he would not be a
proper surety.

THE COURT:  Okay.

Mr. Srebnick, would you like --

MR. SREBNICK:  I'd like to call --

THE COURT:  Would you like to take some testimony from

15

him first, or do you prefer the government cross examine him?

1            MR. SREBNICK:  Sure.  I'll call Mr. Sweers right now.

2

3            THE COURT:  Okay.

4            MS. VORPE-QUINLAN:  Your Honor, I also have some

5    information about Ms. Caravano, but I thought we could deal with this

6    first and then Mr. Sweers (inaudible, no microphone).

7            THE COURT:  Hold on, Mr. Srebnick.

8            Why don't we hear about Ms. Caravano and then we can just

9    move on.

10            I've read the pleading about it, that she -- it is the

11    government's position that she is not residing with the defendant,

12    rather has a relationship with another gentlemen?

13            MS. VORPE-QUINLAN:  Yes, and we filed the affidavit of

14    Mr. Andre Zammerano, and Mr. Zammerano pleaded with us because he had

15    a vacation planned --

16            THE COURT:  I don't have any affidavit.

17            MS. VORPE-QUINLAN:  We filed the original with the court,

18    and here's a copy.

19            THE COURT:  Okay.

20            MS. VORPE-QUINLAN:  May I approach?

21            THE COURT:  Please.

22            MS. VORPE-QUINLAN:  Mr. Zammerano (phonetic) is a duly

23    licensed attorney.  He's a civil trial attorney here in Miami, and he

24    had a long-standing vacation planned to go on a cruise in the

25

Mediterranean, and he had a plane leaving this past Saturday. So I

could have given him a subpoena, but I talked to Mr. Srebnick, gave

Mr. Srebnick Mr. Zammerano's phone number, and I elected to proceed

by affidavit.

THE COURT: Okay.

MS. VORPE-QUINLAN: And in that affidavit he basically

states that he was under the impression that Ms. Caravano was in a

relationship with him, and that when Ms. Caravano began the

relationship with him, she moved out of the defendant's house, or the

defendant's apartment, and moved into another apartment in the same

building.

He said Ms. Caravano's mother came to visit and it was

his understanding when the defendant was arrested that Ms. Caravano's

mother told her not to have anything to do with the defendant, not to

sign anything, and then, of course, at the hearing you had ordered

the defendant to live with her.

THE COURT: Right.

MS. VORPE-QUINLAN: And for her to be a custodian.

What the agents did when they -- after the hearing, they

went and interviewed Mr. Zammerano, and that's how we received this

affidavit. And he clearly said all this was news to him. So we felt

that, again, the conflicting information about this person, who's

been presented as a responsible surety, should be reported to the

court.

THE COURT: Okay.

1    MS. VORPE-QUINLAN:  And we still believe that pretrial

2    detention is the best thing here, Your Honor, with this person's

3    international ties.  And I think this information today further

     supports that position.

4            THE COURT:  Okay.

5            MS. VORPE-QUINLAN:  Thank you.

6            THE COURT:  Mr. Srebnick.

7            MR. SREBNICK:  I note that the so-called boyfriend, Mr.

8    Zammerano, is out vacationing in the Mediterranean without his

9    girlfriend, but we'll get to that when she testifies under oath.

10           I'll be prepared to call both.

11           (Inaudible, off microphone) Caravano (inaudible) she has

12   nothing to do with Mr. Sweers?

13           THE COURT:  I believe so, yeah.  Unless the government

14   doesn't object to her sitting here.

15           MS. VORPE-QUINLAN:  (Inaudible)

16           THE COURT:  Okay.

17           MR. SREBNICK:  Maybe Mr. Sweers should take the witness

18   stand.

19           THE COURT:  Yeah, if you'd come up here, Mr. Sweers,

20   please.  Would you raise your right hand, please.

21          RANDALL SWEERS, DEFENDANT'S WITNESS, SWORN

22           THE CLERK:  Please be seated.  State your name for the

23   record and spell your last name.

24           THE WITNESS:  Randall A. Sweers, S-W-E-E-R-S.

25

18

DIRECT EXAMINATION

1   BY MR. SREBNICK:

2   Q    Mr. Sweers, if you could just, again, introduce yourself to

3   Judge O'Sullivan. From our last week he's had other hearings, so --

4   A    Okay.

5            THE COURT:  I remember him.

6            THE WITNESS:  Okay.

7            THE COURT:  This is the guy with all the boats.

8            MR. SREBNICK:  Right.  And the basketball player, I

9   should add, Judge.  Canadian Junior Basketball team.

10           THE COURT:  That's right. Canadian Junior --

11  BY MR. SREBNICK:

12  Q    Mr. Sweers, today we've been discussing a gentleman by the name

13  of Wolfgang Omee.  You and I had a conversation last week where I

14  brought this matter to your attention?

15  A    Yes.

16  Q    Okay.  Tell Judge O'Sullivan, basically, how you knew Mr. Omee,

17  what your relationship was with him, what was his relationship to

18  your business, and then we'll get into some of the details.

19  A    Okay.  Mr. Omee I met through a girl I know from Toronto,

20  Canada, who he actually ended up marrying her.  Her name is Tracy

21  Woods.

22           I seen Mr. Omee around the marina that I worked at at

23  that time quite often.

24           THE COURT:  What time period was that?

25

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

19

THE WITNESS:  This was about 1993, I guess, 1993, '94.

THE COURT:  Okay.

BY MR. SREBNICK:

Q    Was this before you started your business?

A    Yes.

Q    Florida Power Boat?

A    Yes.  I worked for Sunny Isles Marina & Yacht Sales in North Miami Beach, Florida.

Q    Who did Mr. Omee represent himself to be, what was his background so far as you were aware?

A    I knew that he was from Germany, and he had a consulting business in, I believe it was Bal Harbour, if I'm not mistaken.

Q    Okay.  And he was either dating and later marrying a woman by the name of Tracy Wood?

A    Correct.

Q    And you knew her from when you lived in Canada?

A    Correct.

Q    Okay.  Tell us a little more about how you got into business, if at all, with Mr. Omee.

A    A friend of mine, also from Canada, who lives down here now, started doing what's called poker runs, which is they get a bunch of high-performance boats together and they do trips down to the Keys, trips to the Bahamas, things like that.  It's a group of boats.  And he started a company called Florida Power Boat Club, which my friend Stu Jones still owns today.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida  33130**

1    I was involved selling boats, spec buying boats, just in

2    the -- at a very small level.  I was just, basically, starting in the

3    business, and I would see Mr. Woods quite often, and would see his

4    wife quite often, join them on poker runs, brought other boats of

5    mine and customers and stuff like that on poker runs with them. And

6    we ended up opening up a company called Florida Power Boat Brokerage,

7    which is a company that I currently own today.

8         Tracy Woods was a -- the secretary, I believe, of the
     company at that point in time.

9         THE COURT:  Secretary as on the corporate papers, or a

10   secretary --

11        THE WITNESS:  Secretary on corporate papers.

12        THE COURT:  Okay.

13        THE WITNESS:  The company was going to -- I had a little

14   bit of money at that given time, and there was always boat deals

15   because the marina that I worked at, there was always trade-ins

16   coming in, things of that sort.

17        Mr. Omee said that this would be a way that we could buy

18   and sell some boats, split some profits, and go from there.

19        We did that on a couple of occasions.  I guess this was -

20   - I believe I opened the company in -- I think '94, I think June of

21   '94.  But the company didn't really do much business.  I was still at

22   Sunny Isles Yacht Sales.  And --

23   BY MR. SREBNICK:

24   Q    What was the physical address of the company when you first

25

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida  33130**

started?

1   A    I believe it was 5870 Northeast 22nd Avenue.

2   Q    Did you work out of a --

3   A    No, that was -- sorry.  That was later.

4   Q    Do you recall a mail box drop that was used for the company

5   address?

6   A    I'm trying to remember now where it was.

7   Q    Do you recall using like a Mail Box USA?

8   A    Yeah, early on.  That's correct.

9   Q    Is that before your company was able to afford a physical

10  address?

11  A    Correct.

12       MS. VORPE-QUINLAN:  Objection to leading.

13       THE COURT:  Overruled.

14  BY MR. SREBNICK:

15  Q    Tell the Court about that in terms of when you got started with

16  your business, how it was that you operated.

17  A    Well, when the business was actually opened up, I didn't really

18  do very much with it.  I was working for Sunny Isles Yacht Sales.  It

19  wasn't like, you know, I stopped working for another company.  I had

20  opened the company up with intentions of making the company a full-

21  blown company by the time, within the next couple of years.  But at

22  that given time I wasn't in a financial position to go on my own yet.

23  Q    Sort of like when Microsoft opened up in a garage of somebody's

24  home?  Something like that?

25

22

A        Same thing, I'm sure.

Q        Same idea, maybe not the same level of success.

         Okay. So is that why you ended up -- Well, without being
leading, tell us why you then used a mail box address for your
company that was first getting started with very little capital.

A        Because I didn't have an office or anything like that.

Q        Okay.

A        And I didn't want to -- I was still working another company,
Sunny Isles Yacht Sales, and --

Q        Did you know anything about Mr. Omee being involved
international fraud out of Germany?

A        None whatsoever.

Q        And, to your knowledge, did Mr. Omee appear to you to be
somebody that had the financial ability to go into business with you?

A        Correct. Yes, he did.

Q        So tell us a little bit more about how the company developed,
leading up to what you later learned to be Mr. Omee's arrest and his
legal problems in Germany.

A        Basically, we had bought and sold a couple of boats over a
period of maybe a year and a half or so. I would see Mr. Omee all
the time.

         At the same time Mr. Omee was involved in promoting the
Florida Power Boat Club, which, when I was at the marina, I would --
customers of mine that would buy a cigarette boat from me, a scarab,
whatever -- I would direct them towards Florida Power Boat Club. It

23

1    would do events where we would all go and we'd have helicopters that

2    would come and videotape, and we had people that did professional

3    video that would send the customers videotapes of their boats running

     in the water to music, and aerial photography and stuff like that.

4    

5         The company still does that today. I still work with them

     very closely today. And, basically, Mr. Wolfgang -- Mr. Omee -- had

6    

7    a cigarette top gun that was kind of used as -- we called it the pace

     boat, so he would be like the lead boat. He knew his way down to the

8    

9    Keys and stuff like that.

10        That went on for, you know, a couple of years or

     whatever.

11   

12        After that, I come to find out that there was a boat that

     -- I have dealer numbers. This whole -- I guess the whole thing

13   

14   started over -- I have what's called dealer numbers, which is, when

     you're a boat dealer you apply to the State of Florida and we get an

15   

16   FL number that I can take -- it's on a placard, and when I want to

     sea trial a boat, or use a boat, or anything like that, I put that FL

17   

18   number on the side of the boat.

19        THE COURT: It's like a car dealer's plate?

20        THE WITNESS: Right. Same thing. But it's registered to

     my company. And Mr. Omee had bought a center console boat, asked me

21   

22   -- because he had not registered the boat or anything of the sort --

     and asked me if he could use my dealer numbers to operate the boat.

23   

24   BY MR. SREBNICK:

25   Q    Would that be the 33-foot Advance?

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

24

A    That's correct.

Q    Tell the Judge then what developed with regard to that vessel.

A    I received a phone call from -- I don't know if it was customs, or actually I guess I come to find out it was customs now. I didn't know if it was the police or customs, whoever it was. And they said to me that they had confiscated or seized this vessel, and asked me if knew anything about it, or if I owned it or what the situation was, if I had any claim to it. And at that given time I didn't know what the -- what had happened or what was going on as far as why they had the boat or anything like that.

So they said they -- I don't know if I asked them to make an appointment, or if they wanted to make an appointment with me. Anyway, to make a long story short, nobody, after that given time, ever -- I mean, they knew where I lived, you know, telephone numbers or cell phone numbers, office numbers. I was never contacted by anyone from that office, questioned.

Q    Who had actually paid for the vessel?

A    Mr. Omee had paid for the vessel.

Q    Your -- I think you already told us that your dealer number was affixed to the vessel.

A    That's correct.

Q    When the customs, or whoever it was from law enforcement that contacted you, did you inform them that you had an interest, or some sort of relationship to the vessel in response to their questions? How did you explain your relationship to the vessel?

A    They asked me if I had any interest in the vessel, you know, as far as -- they didn't ask me if I had ownership or anything, if I had any interest in the vessel.  And I said to them at that given time, that, yes, I may have.  Let me check and see what the situation is.

I didn't know, you know -- I didn't step forward and say "I own the vessel.  It's my boat," or anything like that.  I was owed a small amount of money by Mr. Omee at that given time, and obviously I seen the vessel was being seized and stuff like that, that there were some problems going on, so my only concern was if there was any way to protect any of the monies that I was owed.  I didn't know how exactly that would work.

After speaking with -- I don't know if I spoke with -- I don't know if it was Mr. Omee's attorney or a friend, or something like that -- I asked him what was going on.  They basically told me that he was being -- they were trying to -- something to do with the Boca police.  It wasn't so much customs, but it was the Boca police that was after him for something that a partner of his from Germany that came over here.

Later I found out they said it was money laundering or something to this extent.  But at that given time nobody said, oh, Mr. Omee is being charged with this, or being charged with that.  They just said they had wanted him.

At that given time I didn't proceed with claiming anything on the vessel.  I figured that if anybody wanted to contact me, they had my dealer numbers, phone numbers, addresses.

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida  33130

I mean, I advertised in magazines.  Anyone in the boat

business, with high-performance boats, just mention my name, they

know where to find me.

Q    Did you actually have an ownership interest in the vessel that

you would have been able to pursue?

A    No.

Q    So other than the tag pertaining to your company, of which Mr.

Omee was originally an investor, was there any claim that you could

have made, so far as you learned from whatever resources you were

able to learn from, that you could have filed a lawsuit or somehow

attached a lien to the vessel, was there anything that you thought

you could do to keep a vessel which you didn't buy?

A    No.

Q    Did you know that Mr. Omee was using an alias named Thomas

Wood, that he was using a fake name?

A    Well, I know that he had got -- he had been married.

Q    Right.

A    And that he had taken her last  name because of the fact that

he said that everybody -- nobody ever got his name right, or anything

like that.  I didn't really --

Q    Did you go down to the courthouse to check if he filed a legal

name change or anything?

A    No.  I mean her name was Wood, you know.  So I didn't think it

was -- I mean, I thought it was a little bit different, but,  you

know, the Germans are also -- you know, they have different ways of

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida  33130**

27

1   doing things and stuff like that.

2   Q    Was there anything at all that, up until the time that you

3   learned that the vessel was seized, and then you learned more about

4   this case, was there anything at all that you had reason to believe

5   that Mr. Omee was anything other than just a legitimate business man?

6   A    Not really.  I mean there was nothing that, you know.  No one

7   ever came to me and said, you know, he's believed to be this or that

8   or otherwise.  You know.

9   Q    Okay.  And my client, Mr. Matetich, did he have anything to do

10  with any of these events?

11  A    No.

12           MR. SREBNICK:  Tender the witness, Your Honor.

13           THE COURT:  Thank you.

14                        CROSS-EXAMINATION

15  BY MS. VORPE-QUINLAN:

16  Q    Mr. Sweers, what's your date of birth?

17  A    9/18/65.

18  Q    Have you ever used a date of birth, 9/18/61?

19  A    No.

20  Q    Okay.  Now, with respect to your corporation, Florida Power

21  Boat Brokerage, Inc. --

22  A    Umm-hmm.

23  Q    -- you are the president?

24  A    That's correct.

25  Q    And Maureen Navano, vice president and secretary?

28

A    No, not anymore.

Q    Okay, who is?

A    I am.  I'm sole -- I'm president, vice president.  I have no
secretary.

Q    So you're a one-man corporation?

A    That's correct.

Q    And Tracy Woods was the vice president and secretary, is that
correct--

A    She was --

Q    --at the time you incorporated?

A    Yes.

         MS. VORPE-QUINLAN:  Your Honor, I'm going to mark this as
Government's Exhibit No. 2.

         THE COURT:  Okay.

         MS. VORPE-QUINLAN:  May I approach the witness?

         THE COURT:  Yes.

BY MS. VORPE-QUINLAN:

Q    Do you recognize this person?

A    Yes, I do.

Q    Who is that?

A    That's Tracy Wood.

         MS. VORPE-QUINLAN:  Your Honor, I'd like to move in
Government's Exhibit 2 for purposes of this hearing.

         THE COURT:  Have you shown it to defense counsel?

         MS. VORPE-QUINLAN:  Yes, he has seen it.

(Government's Exhibit 2 admitted into evidence.)

BY MS. VORPE-QUINLAN:

Q    Now you say that Mr. Omee married this woman who's depicted there in Government's Exhibit No. 2?

A    That's correct.

Q    And that he took her last name?

A    That's correct.

Q    So he was using two different names, Omee and Thomas Wood, during the time that you knew him?

A    Well, after he got married he just used Wood, to my knowledge.

Q    Was he buying boats in both names?

A    Was he buying boats in both names?  I don't know.  He didn't -- the only boats that we bought -- if we bought a boat it was done in Florida Power Boat Brokerage.

Q    Okay.  So you don't know whether he bought and sold boats between the name Omee and Woods?

A    No, I do not.

Q    Okay.  Now let me ask you, who is Axel Haydash?

A    Axel Haydash is the attorney that originally incorporated the company.

Q    Okay.  And he's also -- he was also affiliated with Florida Power Boat Club, and Wolfgang Omee was a director of that as well, correct?

A    Correct.

Q    Where is he an attorney?

30

A    In Miami.

Q    Now the time that you learned that Mr. Omee was arrested was about September 13th, in September of 1996?

A    I don't remember the exact dates.

Q    Do you remember the date that the vessel was seized?

A    No, I do not.

Q    You called customs on October 10, 1996, did you not, and stated that the boat was your boat.

A    No, I never stated that the boat was my boat.

Q    Did you tell customs agents that Mr. Omee had invested money in your company?

A    Yes, I did.

Q    And at that time how much money had he invested in your company?

A    At that point in time?

Q    Umm-hmm.

A    I don't remember exactly how much at that point in time.

Q    Well approximate.

A    I don't -- changed from if we had boats and what we had in inventory.  But at that given time, I don't think we had very much in inventory.

Q    So about how much would it have been?

A    About how much would it have been?

Q    About how much would Mr. Omee have invested in your company?

A    At that point in time maybe $25,000.

31

Q    Only $25,000?

A    Umm-hmm.

Q    Now you said that you met Mr. Omee during these poker runs, is that correct?

A    No, I met him prior to those.

Q    Prior to that, but that you and Mr. Omee went on poker runs to the Keys.

A    Correct.

Q    Are those excursions in which people go on these boats down to the Keys -- are they called "poker runs" because they play poker and gamble?

A    They're playing cards -- each location you go to you-- might have five stops, and at each stop you get a playing card and we have companies that put up storage for their boats, repairs, propellers, you know.  It's basically for marketing.

Q    And how much money did you have invested in your company at the time that Mr. Omee had only invested $25,000?

A    I probably had 50,000 and a lot of man hours.

Q    Where did the 50,000 come from?

A    The $50,000 I had?

Q    That you had invested in your company in what -- 1996?

A    It came from monies I had made from other boat deals working for Fort Apache Marina, Champion Marine, Sunny Isles Yacht Sales.

Q    Now you said that you sold Scarab vessels, is that correct, and other go-fast type cigarette boats?

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

32

1    A    Correct.

2    Q    Are Scarabs made by Wal-Craft (phonetic)?

     A    Yes, they are.

3    Q    Are you a licensed Wal-Craft franchisee?

4    A    No. I don't have to be a licensed franchisee.

5    Q    So you buy boats on the secondary market then?

6    A    Correct.

7    Q    Now when did you -- you also told customs that Tracy Wood no

8    longer had anything to do with your business, when you talked to

9    customs in October, is that correct?

10   A    In October of --

11   Q    Of 1996.

12   A    Not to my knowledge, no.

13   Q    What did you tell customs about Tracy Wood?

14   A    I don't -- 1996, I don't remember exactly what I had said.

15   Q    Well, didn't the customs agent ask if they could meet with you

16   again to further interview you about your business and Ms. Wood?

17   A    To my knowledge the first that I've heard of this is that there

18   was supposedly two appointments that I made or didn't make.

19        The customs agents knew exactly where I lived, where I

20   worked.  If they needed to speak with me, I was very easily

21   accessible.

22   Q    So that's the position that you're taking today, that even

23   though you made appointments to meet with them and you failed to

24   appear, they knew where you were, so they could come track you down.

25

         MR. SREBNICK:  Objection.  That's assuming her facts that

are not in evidence.  He's not admitted that he made any appointments

that he failed to appear at.

         THE COURT:  Well, let the witness answer the question:

Did you make any appointments that you failed to show up for?

         THE WITNESS:  To my knowledge, no.  I don't remember

making any specific appointments or anything of the sort.

BY MS. VORPE-QUINLAN:

Q    Well, now if you learned that an investor in your company had a

boat seized and was ultimately deported from this country for

international money laundering, did you go to the police and offer to

give them any information that might assist them in that

investigation?

A    No.

Q    Even though you had talked with them you didn't go offer your

assistance?

A    I figured that if they had required my assistance, they would

contact me.

Q    Now did you also try to import boats across the border from

Canada at Buffalo, New York?

         MR. SREBNICK:  Objection, beyond the scope.

         MS. VORPE-QUINLAN:  Well, this is a Nebbia inquiry as to

the source of the collateral.

         THE COURT:  Overruled.  Go ahead.

BY MS. VORPE-QUINLAN:

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida  33130

Q    Have you also imported boats from Canada?

A    Yes, absolutely.

Q    And have you had any problems importing those boats across the border into Buffalo?

A    I always have problems.

Q    Tell the Court about that.

A    Which boat would you like to know about?

Q    You can pick one.

A    I had a 40-foot Skater that came in one time that they checked all the paperwork and stuff like that, and we didn't have the proper bonds.  It was being sold to a Canadian citizen in Canada.  We didn't have the proper bonds and stuff like that for it.  But that has, you know, nothing to do with any wrongdoing that I've done or the owner of the boat, or anything of the sort.  This is Canada customs.

Q    Apart from that, you've had some other problems, is that correct, getting boats over the border with your paperwork?

A    I always have problems getting boats over with the paperwork.  That's just -- I mean, Canadian border is common, ask anybody that ships boats back and forth between Canada.  It's normal.

Q    Have you been to the Bahamas a great deal?

A    The Bahamas?

Q    Umm-hmm.

A    Yes, I have.

Q    Have you gone over there with Mr. Omee?

A    Have I gone over there with Mr. Omee?

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

Q    Umm-hmm.

A    Yes, I have.

Q    And did you bring Mr. Omee back on a boat and then not clear customs on your way back with Mr. Omee?

A    Did I do that?

Q    Umm-hmm.

A    No.

Q    You've never done that?

A    No.

Q    Did you ever attempt to get Mr. Omee in this country without clearing customs?

A    No, I did not.

Q    What is your boat inventory at this moment?

A    I gave a list to the courts earlier.

Q    You gave a list to the courts earlier?

        MR. SREBNICK:  I think he means he gave it to me.

        THE WITNESS:  I'm sorry, I gave it to --

        MR. SREBNICK:  (Inaudible, no microphone) tender it to the court (inaudible) have a list if the Court would like it.

BY MS. VORPE-QUINLAN:

Q    Do you actually have titles to these boats?

A    Yes, I do.

Q    Okay.  Now what other accounts do you have?  Do you have a savings account?

A    I have stock brokerage accounts.

36

Q    And how much money is in that account?

A    Ahh -- in total probably $60,000.

Q    Did Mr. Omee ever loan you any other money for your business besides the $25,000 that you mentioned earlier?

A    No.  And that wasn't a loan, that was just money that was invested for paperwork and brochures and things like that.  He never gave me a loan to my company.

Q    You never received any money from him?

A    No.  Not specifically as a loan or anything like that.

Q    Have you ever received any money from Mr. Matetich?

A    Have I ever received any money?

Q    Yes.

A    No.

Q    Has he ever given you any money?

A    No.

Q    Are you paying his attorney's fees?

A    Am I paying his attorney's fees right now?  Yes, I am.

Q    And then you're also willing to sign on a $500,000 bond and a $100,000 bond.

A    That's correct.

Q    How much is your boat inventory at this moment?

A    Ahh -- over $500,000.

Q    In addition to the savings -- or the money market account that you have $60,000 in, do you have a checking account?

A    Yes, I do.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

37

Q    And how much is in that account?

A    Today?

Q    Yes.

A    Probably about $45,000.

Q    Do you own any stocks or bonds?

A    Yes, I do.

Q    Tell the Court about that.

A    I don't -- I can't give you specifics.  I know I own Sysco, FUTR.  I have a stock broker in New York that trades my account.  I also nave one here in Fort Lauderdale.

Q    And how much money is in the account in New York, in bonds?

A    Bonds?

Q    How much are the bonds worth?

A    Bonds?

Q    Yes -- well, stocks and bonds combined.

A    Are you talking about personal or combined with my corporation?

Q    No, personal.

A    Personal?  I think I have about 25,000 right now.

Q    In stocks and bonds in your account in New York?

A    Correct.

Q    And what about in the account in Fort Lauderdale?

A    I think I have about -- I think about 18, 20.

Q    Where is Mr. Omee right now?

A    Where is Mr. Omee?

Q    Yes.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

A   I don't know where he is now.

Q   When was the last time you saw him?

A   The last time I saw Mr. Omee was, I guess, October or whatever

of '96, whenever it was -- prior to when he was arrested.

Q   Have you had any other contact with him at all?

A   No.

        MS. VORPE-QUINLAN:  May I have just a moment?

        THE COURT:  Yes.

    (Brief pause.)

BY MS. VORPE-QUINLAN:

Q   Let me just clarify one thing with you.  You testified on

direct that this 33-foot Advance vessel, you did not own that vessel?

 Is that your testimony on direct, that you did not have an ownership

--

A   I personally did not own the vessel, that's correct.

Q   Okay.  So you did not tell customs that you owned the vessel?

A   To my knowledge, no.

Q   What does that mean, to your knowledge?

A   To my knowledge, no.

Q   Did you ever tell them that?

A   I don't -- to my knowledge, no.  I don't remember the exact

situation.  With that particular boat, I don't remember if Mr. Omee

had bought it through -- used a check from Florida Power Boat, or how

he'd have done it.  You know, whether it was money that he put in the

account and then wrote a check for it, or how exactly it was.

Q    Did you ever go back and look at the documents relating to that vessel to see?

A    Did I ever go back?

Q    Yes.  After you talked to customs.

A    I don't remember if I ever did.  I'm sure I must have looked at the documents to figure out exactly how this had transpired or whatever.

All I knew was that the boat was seized, okay, and that if there was any wrongdoings, or anything of the sort, they would, by all means, come and contact me.  I knew I had done nothing wrong.  I would assume that they had arrested Mr. Omee, you know, and deported him, or whatever it was that they were doing with him, and that was really not anything that I had done or been involved with.  And at that point in time -- like anybody else, I mean, if you're -- somebody who you've known for a while and has been an investor in your company, gets arrested or gets deported, or whatever the situation is, I mean, I just figured if they wanted any information from me, or if they needed to talk to me about anything, they knew exactly where I was.  I wasn't hiding or anything of the sort.  I was available for questioning.

They never contacted me, never came to see me.  And, quite honestly actually I was quite surprised about that.

Q    Now -- you were surprised about it, but you never called them and asked them if you --

THE COURT:  Now let's move along.  We've already--

40

MS. VORPE-QUINLAN:  Let me --

THE COURT:  That answer's been given already.  He never called them.  He testified to that already.

Anything further?

MS. VORPE-QUINLAN:  Just one other question.

BY MS. VORPE-QUINLAN:

Q    If you looked at the boat documents for that Advance vessel, and you saw that there were documents in the name of Omee, transferring it back to a person by the name of Thomas Wood and Thomas Wood, and Thomas Wood transferring it back to Omee, wouldn't that have caused you to have some concern about the vessel?

A    Well, I can tell you -- if that's what you're saying has happened, I never seen those documents.

My main concern was whether the boat was in Florida Power Boat Brokerage's name.  That was my only concern.

Q    Okay.

MS. VORPE-QUINLAN:  Thank you, Judge.

THE COURT:  All right.

MR. SREBNICK:  Nothing further, Judge.  We're prepared to call the next witness.

THE COURT:  Thank you.  Step down, sir.

MR. SREBNICK:  May he remain in the courtroom now that he's done?

THE COURT:  Yeah.  You're not calling him -- I assume no one is calling him as a witness again.

1          MR. SREBNICK:  (Inaudible) Ms. Caravano.

2      (Brief pause.)

3          MR. SREBNICK:  Would the Court like her to sit up front

4  or --

5          THE COURT:  Yeah, come on up here if you would.

6          MR. SREBNICK:  Go right up and sit next to the Judge.

7          THE COURT:  You need to raise your right hand, please.

8          MARIE ANGE CARAVANA, DEFENDANT'S WITNESS, SWORN

9          THE CLERK:  Please be seated.  State your name for the

10  record, spelling your last name.

11          THE WITNESS:  My name is Marie Ange Caravano.  My last

12  name is spelled C-A-R-A-V-A-N-O.

13          MR. SREBNICK:  May I proceed, Your Honor?

14          THE COURT:  Yes.

15                      DIRECT EXAMINATION

16  BY MR. SREBNICK:

17  Q    Ms. Caravano, you were in court last time in front of Judge

18  O'Sullivan.  Do you remember being there?

19  A    Yes.

20  Q    Have you been -- you know the defendant, Mr. Matetich, Charlie

21  Matetich?

22  A    Yes.

23  Q    How long have you known him?

24  A    Four years and two months.

25

42

Q    Okay.  Did you have a romantic/fiancee, girlfriend type relationship with him?

A    Yes, we were engaged.

Q    Okay.  When you were in court last time, do you recall that you were asked whether you'd be willing to live with Charlie Matetich during the period of his -- while this case is pending?

A    Yes.

Q    And you told the Judge you would be willing to, right?

A    Yes.

Q    Okay.  At present, do you live in the same building as Charlie Matetich's residence?

A    Yes.  Same address.

Q    Different apartment?

A    Different apartment.

Q    And what is the status of your relationship today, are you still friends?

A    Yeah, we're very good friends.  We just -- we had an argument about two weeks before his arrest and I wanted to break up with him.  And now we're trying to reconcile our differences.

Q    Have you had a relationship with a gentleman by the name of Andre Zammerano -- and I'm sorry to get into your personal life, but the government's making an issue of it.

A    Andre is a really good friend of mine and I started seeing him, dating him, about a couple of days before Charlie got arrested.

Q    Umm-hmm.

43

A     And last  week we just -- we had an argument and we broke up,

and now -- but he remains my really good friend.

Q     I see you're not vacationing with him in the Mediterranean.

A     No, no.

Q     He didn't invite you?

A     No.

            MS. VORPE-QUINLAN:  Objection, Your Honor.

            THE COURT:  Overruled.

BY MR. SREBNICK:

Q     You were in court the very first appearance in front of Judge

Dubé, do you recall being in court?

A     Yes.

Q     Do you recall your mother was in court?

A     No, she -- she stayed outside.

Q     Okay.  What I mean in court, she was at the courthouse?

A     Yes.  She took the bus with me. She don't want me to come

alone.

Q     You introduced her to me?

A     Yes.

Q     At that time did I explain to both you and your mom what was

involved in the bail process?

A     Yes.

Q     Did I explain to you that by signing on a bail you'd be

guarantying Charlie -- we call him Charlie -- Mr. Matetich's

appearance in court?

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida  33130**

44

A     Yes.

Q     Did I explain to you and your mom that by signing on a bail, should Charlie not come to court that you could lose whatever the bail would be set by the Judge?

A     Yes.

Q     Do you remember at that time there was no bail set yet.

A     Yes.

Q     We didn't know how much it would be, correct?

A     Umm-hmm.

Q     Correct.

A     I remember.

Q     Speak right into the microphone.

A     Yes, it's correct. I remember.

Q     But did I explain to your mom, long before you came to see Judge O'Sullivan, both to you and your mother, exactly what was involved in the process?

A     Yes, you did.

Q     Did your mom tell anybody that you should -- did she tell me that you should not participate in the bail process?

A     No, she didn't tell you, but she give me advices.

Q     Okay.  And whatever advice she gave you, did you decide on your own that you wanted to sign the bail?

A     Yes.

Q     The date we came to court --

        MS. VORPE-QUINLAN:  Your Honor, I'm going to object to

45

the leading questions.

        THE COURT:  Yeah, I agree.  Sustained.

        MR. SREBNICK:  I can rephrase.

BY MR. SREBNICK:

Q    We came to court last  time before Judge O'Sullivan.  Did we

have a conversation outside the courtroom?

A    Yes.

Q    Who was present -- you don't have to give all the names, but

were -- without trying to lead -- were all the other people who came

to court --

A    Yes.

Q    -- sitting?

A    All Charlie's friends and Randy and me.

Q    And did I go through the exact same discussion with all of them

that I had gone through with you and your mom?

A    Yes, you did.

Q    And did -- What did I explain generally about the bail process?

A    Yes.

Q    And explained that the Judge might set a bail?

A    Umm-hmm.

        MS. VORPE-QUINLAN:  Objection, leading.

        MR. SREBNICK:  Judge, I don't have to lead if -- this is

--

        THE COURT:  Well, you are leading.

        MR. SREBNICK:  There's no question.  I'm just trying to

46

get to the meat and potatoes.

1            THE COURT:  What are you trying to get to?

2            MR. SREBNICK:  The government's alleging she didn't

3    understand what was involved in the process.

4            THE COURT:  Okay, well, I think it's clear that you

5    described the process to her --

6            MR. SREBNICK:  Okay.

7            THE COURT:  --and she --

8            THE WITNESS:  I --

9            THE COURT:  --had a discussion with her mother and

10   decided on her own what she wanted to do.

11           THE WITNESS:  The thing I didn't understand was, because

12   I don't own anything, I didn't really understand how -- but now I do.

13    Now I do.  If one day I own something, then the government could go

14   after whatever I own.

15   BY MR. SREBNICK:

16   Q    And that was actually explained to you by Judge O'Sullivan

17   himself in court that day, right?

18   A    Yes.

19   Q    Did you have any questions about what was involved in the bail

20   process when you told Judge O'Sullivan, here in court, that you were

21   willing to sign?  You understood?

22   A    Yes.  I understood.  It was clear.

23   Q    Let's talk about today.  Today are you willing to sign the bail

24   for Charlie Matetich?

25

47

A     Yes.  Yes.

Q     And if the Judge requires that you live together so that you can, essentially, monitor his compliance with the bail, are you still willing to do that?

A     Well, if it's a condition of him getting out on bail I will just move to his apartment, which is next door.

Q     Okay.  And, again, I hate to get into your personal life, how are you going to deal with this Andre Zammerano who's vacationing in the Mediterranean when he comes back?

A     We decided to stay good friends, so hopefully, you know, we'll work it out.

          MR. SREBNICK:  Your witness.

                    CROSS-EXAMINATION

BY MS. VORPE-QUINLAN:

Q     Ms. Zammerano, how old are you?

A     Caravano.

Q     Caravano.  I'm sorry.

A     I'm 23.

Q     When did you turn 23?

A     August 6th.

Q     So you just turned 23.  And you grew up mostly in France?

A     Yes.  All my life.

Q     All your life.

          Now what assets do you own personally?

A     Ahh -- I own a car in Paris, and that's it.  And my furnitures.

48

Q      Where is your furnitures?

A      In Paris, in my apartment.

Q      Now is it that you're in this country?

A      I came here to do an internship with CNN.  I'm currently a
student at the Sorbonne University.  I'm doing a post-graduate
degree.  And it's a bi-lingual program so I had to do one internship
in France, which I did before I came, and I had to do one in an
English-speaking country, and I found that one. I came for an
interview around New Year's Eve, and they said, yeah, it's okay, so I
came here.  And I did my internship.

Q      When did you come here?

A      I arrived on May 25th, and I started the internship, I think
two days later.

Q      What kind of travel documents do you have?

A      I have a 10-year B-1 visa.

Q      Explain.  What does that mean?

A      That means that I can stay in the United States for ten years,
and I have to leave the country every six months and, basically, I
can leave for one day and come back.  It's a B-1 visa.

Q      Okay.  Where is it your intention to live, here or back in your
apartment in Paris?

A      I'm sorry?

Q      Where are you going to live, here or in your apartment in
Paris?

A      Right now I don't know. If Charlie gets out on bail I will stay

49

1    here for a while.  If he doesn't get out on bail, I guess I'll

2    probably go back.

     Q    Okay.  When is your internship up with CNN?

3
     A    It's supposed to end at the end of September, but I'm going to
4
     end it before because it's unpaid.  And I have to write a report for
5
     the Sorbonne University which I don't have time to do yet, so I have
6
     to do that.
7
     Q    So you need to get back to the Sorbonne at some point?
8
     A    No, because we can do it through the internet.  We -- I can
9
     send my report and then we do a videoconference through -- in front
10
     of all my teachers, and they ask me questions about the report.
11
     Q    Okay.  Now you said that you had conversations with your mother
12
     in which she gave you advice.  What did she say?
13
     A    Ahh--She said you really have to think about that.  It's a big
14
     responsibility.  You know, if I were you I'd think about it twice.
15
          She wants me to go back to France.  She's afraid.  I'm
16
     here alone, I don't know anybody.  So she's really scared.
17
     Q    Do you understand that if Mr. Matetich is not here in court
18
     when he is supposed to be in court, that the United States of America
19
     will get a judgment against you for $600,000, if you sign on the
20
     bond?
21
     A    Yes, I understand.
22
     Q    Now you don't have the money to pay that judgment, do you?
23
     A    No.
24
     Q    And you're only 23 years old.
25

50

A     Yes.

Q     What language does your mother speak?

A     She speaks French, German, Spanish and English.

Q     How long has she spoken English?

A     How long has she spoken English?

Q     Umm-hmm.

A     Um -- she learn English when she was in public school, for twenty years.

Q     Okay.  So when Mr. Srebnick explained to her the implications of the bond, she understood what that meant, that they could get a judgment against you, or the United States could get a judgment against you, is that right?

A     I'm not sure she really understood when Howard explained to her, but then I explained to her again in French, and she understood it, yeah.  She knows.

Q     Now also the Court ordered that you be a sort of a custodian of Mr. Matetich, is that correct?

A     Yes.  Call a phone number if he's not home after 9:00 p.m.

Q     Right.  And you had this other relationship with Mr. Zammerano up until the time of the hearing, basically, correct?

A     Yes.

Q     Okay.  So if Mr. Matetich was very angry with you, and you didn't reconcile with him, an easy thing for him to do would be leave and then you're holding the bag for $600,000.  Do you understand that?

51

A     If --

Q     If he gets angry with you, that would be one way for him to show his anger, is to leave and then you have a judgment against you for $600,000.

A     I guess that could happen if one day he loses his mind.   Yes.

Q     If he loses his mind?

       Well, now, also, if he commits a crime while he's out on bond --

A     Umm-hmm.

Q     --it's possible that the Court would then seek the bond because you're a custodian of him.  Do you understand that?

A     Yes.

Q     Okay.  Is it your intention to still sign on a $600,000 bond for him?

A     Yes, because I trust him.

Q     You trust him.  Okay.

       MR. SREBNICK:  I just have one question.

                      REDIRECT EXAMINATION

BY MR. SREBNICK

Q     Do you recall that I actually offered to speak to your mom in Spanish, because I told her I spoke Spanish?

A     Yes.

Q     And she chose English for whatever reason, right?

A     Yes.

       MR. SREBNICK:  Those are all the questions I have.

52

1          THE COURT:  Okay.  Thank you, ma'am.

2          THE WITNESS:  You're welcome.

3          THE COURT:  You may step down.

4          MR. SREBNICK:  Thank you.

5          THE COURT:  All right.

6          MR. SREBNICK:  Judge, I can't speak French, so I was

7  limited to Spanish and English that day.

8          THE COURT:  I'm sure you did your best. Better than I

9  could have done.  I don't speak Spanish.

10         All right, where are we now?  Does the defense have any

11  witnesses to call?

12         MR. SREBNICK:  One moment.

13         No, Judge.

14         THE COURT:  Okay.  How about the government?

15         MS. VORPE-QUINLAN:  (Inaudible, no microphone.)

16         THE COURT:  Okay.

17         MS. VORPE-QUINLAN:  (Inaudible.)

18         THE COURT:  With who?

19         MS. VORPE-QUINLAN:  With Ms. Caravano.

20         THE COURT:  What's he going to testify to?

21         MS. VORPE-QUINLAN:  Your Honor, he would testify--

22         THE COURT:  Come up to the microphone, if you would.

23         MS. VORPE-QUINLAN:  He wrote about a three-page report

24  which I could give to the Court, if you'd like, in lieu of his

25  testimony, but he interviewed her in the company of Mr. Zammerano in

53

which she identified him as her boyfriend, and stated that she was

not living with Mr. Matetich and hadn't been living there for a long

time, and that it wasn't her intention to live with him, and she was

currently in a relationship with this gentleman, Mr. Zammerano. And

that was right after the arrest of Mr. Matetich.

THE COURT:  Is that subsequent to her coming her to the

prior bond hearing?

MS. VORPE-QUINLAN:  No, that was prior, just prior to the

bond hearing.

THE COURT:  Well, I mean, even if -- if I accept all that

testimony, she's now indicated, as she did at the bond hearing, that

she would reside with Mr. Matetich pending the outcome of the case.

MS. VORPE-QUINLAN:  Well, Judge --

THE COURT:  I don't see any reason to call the agent.

MR. SREBNICK:  She could ask Ms. Caravano about it if

she'd like, but I don't have any dispute that in the presence of this

guy who's sailing the Mediterranean now that she may have said

something about him being her date or her boyfriend, whatever it is,

but we know that since then she's been before Your Honor twice now,

and that's the issue, and if Ms. Quinlan would like to further

inquire of Ms. Caravano, she's here.

There's no sense in bringing Roberto Bryan.  But if she

wants to, that's her business.

MS. VORPE-QUINLAN:  Well, Judge, I don't intend to, you

know, pursue the matter more than it really needs to be pursued.

54

THE COURT:  Okay.  Well, I mean, I'll accept the proffer of the agent's testimony.  It's not necessary to put him on the stand.

MS. VORPE-QUINLAN:  It really appears that she says certain things at certain times and then certain things at other times, and it appears to us that she's under some pressure, either emotional or whatever, in this situation.  I think it was apparent on the stand today.  So I won't call him.

MR. SREBNICK:  The only other thing I would add is that Ms. Caravano consulted with a lawyer, as I understand it, that was obtained for her, through, I think, the French consulate, who called me yesterday, a Mr. Tobin, who I don't know him personally.  So she's had the advice of counsel as well, not just what I said, because, obviously, I have an interest in seeing Mr. Matetich make bail.

But I encouraged everybody -- Mr. Sweers, Ms. Caravano, that if they have any questions, they should talk to any lawyer that they feel comfortable with because, obviously, I have an interest on behalf of the defendant.

THE COURT:  All right.  Anything further in this matter?

MR. SREBNICK:  Not from us, Your Honor.

MS. VORPE-QUINLAN:  The agent reminds me that the we also have (inaudible), Your Honor, if you want to take the matter under advisement -- we have the tape recording of the defendant himself in which he talks about Ms. Caravano and the problems that they're having, and that she's with this attorney, and that their

55

relationship is over, and that she doesn't approve of the way he's making his living.

I'll mark that if I may --

THE COURT: Well, I'm not going to listen to the tape. I mean, I'll accept your proffer, because I'm prepared to rule now. I accept you proffer of what's on the tape.

I'm going to persist in my prior ruling, in the prior bond that was set by the Court. I find that Mr. Sweers has met the Nebbia requirements of the bond.

The government has presented evidence that reflects some activities of a person who was involved in business with Mr. Sweers in, I believe, 1995 and 1996. There's no link of any of Mr. Omee's or Mr. Wood's money to the money that Mr. Sweers has today and which he'll use to support this bond.

I also find his connection with Mr. Omee, who may have been a nefarious character, a criminal, was somewhat attenuated, and his response to customs when called in reference to the seizure and forfeiture of a vessel, I believe he explained sufficiently on the stand.

As to Ms. Caravano, is it -- Ms. Caravano has twice been before the Court, and has made clear to this Court that she understands the consequences of signing on this bond.

I will say that the first time she was here I was under the impression that these folks were living together, the defendant and her. It's now become clear that they actually were not residing

56

together, but, rather, in different apartments.

1

        MR. SREBNICK:  That is correct.  They had been living

2

together previously, Your Honor.

3

        THE COURT:  Well, I think that's something that should

4

have been -- the Court should have been advised of.  The Pretrial

5

Services report indicated that they were residing at the address

6

above -- that the defendant was residing at the address above with

7

his fiancée, which is 929 Collins, Apartment 11.  Is that the

8

defendant's apartment or is that Ms. Caravano's apartment?

9

        MR. SREBNICK:  That was Mr. Matetich's apartment that she

10

had moved out some period beforehand.

11

        THE COURT:  Okay.  Well, I mean, that wasn't clear to the

12

Court at the time because the Pretrial Services report indicated that

13

he told Pretrial Services that he was living there with his fiancée

14

at that time.

15

        However, I find that, based on her testimony today she

16

may have had conversations with her mother where her mother

17

discouraged her from posting a bond, which I think is very -- is

18

quite reasonable.  I probably would discourage a child of mind from

19

posting a bond where she's going to put herself at risk for $600,000

20

for the rest of her life, or for 20 years, however long the judgment

21

lasts.  But I find that she's persisted in her agreement to reside

22

with the defendant in his apartment, in Apartment 11 -- just so it's

23

clear for the record -- and that she will advise the Court if he

24

should violate any conditions of bond.

25

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida  33130

57

So I'm going to persist in my prior ruling, and I find
that the Nebbia has been met.

Anything further for the Court?

MS. VORPE-QUINLAN:  Yes, Your Honor.  I'd ask you again
to enter a stay and (inaudible).

THE COURT:  What's the defendant's position on that?

MR. SREBNICK:  Normally I wouldn't, but today I will
object, given the delay.  We're now ten days since our original bail
hearing.  They've --

THE COURT:  Is the defendant prepared to post bond now?
I thought last time he wasn't anyway.

MR. SREBNICK:  Well, Mr. Sweers has now satisfied Nebbia,
so he is prepared to pos the bail.

THE COURT:  Okay.  Well, I'm going to stay the bond --
how much time do you need?

MS. VORPE-QUINLAN:  Can I have until tomorrow at noon?

THE COURT:  Okay.  I'm going to stay the bond until
tomorrow at noon, so that the government can decide if they want to
appeal, and then -- had you filed a motion with Judge Hurley for a
stay?

MS. VORPE-QUINLAN:  I did, Your Honor, (inaudible).

THE COURT:  Oh, I see. okay.

MS. VORPE-QUINLAN:  (Inaudible.)

THE COURT:  Okay.  So the bond is stayed until noon
tomorrow.  All right?

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

58

THE CLERK:  This is on tomorrow for re counsel and

arraignment.

MS. VORPE-QUINLAN:  (inaudible) hearing tomorrow at noon.

THE COURT:  There is no hearing tomorrow at noon.

Pretrial Services -- there's not going to be a hearing as far as I

know, unless something else comes up.  But after 12 o'clock tomorrow

you can present the bond papers to Pilar, and the defendant will be

released, unless the government has obtained a stay order from Judge

Hurley.  Is that right?  Everybody understand that?

MS. VORPE-QUINLAN:  Yes.

THE COURT:  Okay, good.

MR. SREBNICK:  Sorry for being late, Judge.

THE COURT:  All right.  No problem.

Oh, I'm sorry, before we go you need to --  We're here on

report re counsel and arraignment as well.

MR. SREBNICK:  I'm prepared to proceed with permanent

appearance and arraignment.

THE COURT:  Okay.  Would you arraignment your client.

MR. SREBNICK:  Your Honor, we have received a copy of the

indictment.  We would waive its formal reading, stand mute to the

charges, request that discovery be tendered, and demand a speedy

trial by jury.

THE COURT:  Okay.  And you filed a written Notice of

Permanent Appearance?

MR. SREBNICK:  I will file one today.

1    THE COURT: Okay. Thank you.

     I'm signing the Standing Discovery Order. I accept your
2
plea of not guilty, and the matter will be referred to Judge Hurley
3
for jury trial. All right?
4
     Anything else for this defendant?
5
     MR. SREBNICK: No, Your Honor.
6
     THE COURT: Okay. Thanks a lot, folks.
7
     (Whereupon the hearing was concluded.)
8

9                          - - - - -

10    I HEREBY CERTIFY that, the foregoing is a correct

11 transcript from the electronic sound recording of the proceedings in

12 the above-entitled matter.

13

14

15

16    August 31, 2000

17

18  Transcriber                              Date
19  Florence E Levy                          8/31/2000
20

21

22

23

24

25

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**