# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 00-6198-CR-HURLEY/GOLD

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**MAXIMILLIAN C. MATETICH,**

      **Defendant.**

_____/



FILED by _____ D.C.

SEP 2 2 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

## GOVERNMENT'S MOTION FOR REVOCATION OF MAGISTRATE'S ORDER RELEASING DEFENDANT ON BOND

COMES NOW, United States of America, by and through the undersigned Assistant United States Attorney, and files this, its Motion For Revocation of Magistrate's Order Releasing Defendant on Bond and in support thereof states:

### Statement of the Case

1.   **Course of Proceedings**

On July 25, 2000, the defendant was arrested by DEA agents in Miami after arriving by airplane from Canada and charged with knowingly and intentionally conspiring to commit an offense against the United States. The object of the conspiracy was to knowingly and intentionally import



into the United States from a place outside thereof   3,4-Methylenedioxymethamphetamine

(commonly known as MDMA or "Ecstasy).  (See Criminal Complaint filed in this matter DE:2)[1]

The government filed, along with the Complaint, a request for Pretrial Detention.  At the request of

the defendant, the pretrial detention hearing occurred on August 18, 2000.  Prior to the pretrial

detention hearing, the defendant was indicted in a superseding indictment in Case No. 00-6198-CR-

HURLEY.  Count One charged that the three defendants conspired to import ecstasy into the United

States from a place outside thereof.  Count Two charged that the three defendants possessed with

intent to distribute ecstasy.  Following the hearing on August 18, 2000, the Magistrate Judge denied

the government's request for pretrial detention and admitted the defendant to bond on conditions.

The conditions of the bond were: $500,000 personal surety bond  unsecured "cosigned by girlfriend

and Mr. Swears;" Corporate surety bond in the amount of $100,000 with Nebbia; surrender all travel

documents to Pretrial Services Office; Report to Pretrial Services 1 time a week in person and 2

times a week by telephone; curfew imposed 7 days a week, from 9PM to 7AM; stay away from

commercial transportation facilities or marinas; electronic monitoring; travel restricted to the

Southern District of Florida; drug testing as required; defendant to sign waiver of extradition from

Canada; property owned by Mr. Swears cannot be sold.  The government requested that the

Magistrate stay the bond order which was granted.  The government filed a motion for stay before

the District Court.  Prior to the District Court ruling on that motion, On August 23, 2000, the

government filed a Motion to Reopen the Pretrial Detention hearing.  That Motion included copies

of  U.S. Customs Reports concerning the defense witness Randy Swears.   (That Motion and

---

[1] The pleadings referenced herein are contained in the Appendix to this motion.

attachments are Exhibit B to the "Government's Motion to Stay the Magistrate's Order Releasing the Defendant on Bond"). The Government also filed the Affidavit of Andre J. Zamarano.

The Magistrate Judge set the Government's Motion to Reopen for a hearing on August 29, 2000. At that hearing, the Magistrate Judge affirmed his bond order, but gave the government until Noon on August 30, 2000 to obtain a stay of the bond order from the District Court. The government timely filed its Motion for Stay along with: the transcript of the August 30, 2000 pretrial detention hearing, the U.S. Customs reports relating to Mr. Swears and the Affidavit of Andre Zamarano.

On August 30, 2000, Judge Hurley granted the stay after "consideration of the motion and a review of the transcript of the bond hearing." On August 31, 2000, the defense filed a Motion to Dissolve the Stay. On September 1, 2000, as soon as it was received, the government filed the transcript of the August 29, 2000 pretrial detention hearing. On Friday, September 1, 2000, Judge Hurley denied the Motion to Dissolve the Stay including the defense request that the bond motions be transferred to another judge.

On Tuesday, September 6, 2000, the defense filed "Matetich's Emergency Motion for Review of His Pretrial Detention Status." On September 11, 2000, the defense filed "Matetich's Emergency Motion for Pretrial Release or for a Writ of Mandamus before the Eleventh Circuit Court of Appeals. On September 19, 2000, the Eleventh Circuit Court of Appeals granted the "petition for writ of mandamus, seeking to compel the District Court to transfer review of Petitioner's continued pretrial detention to another judge." On September 19, 2000, the Clerk of the Court entered an Order transferring this matter to the docket of the Honorable Alan S. Gold pursuant to the Order of Chief Judge William J. Zloch directing the clerk to transfer the above-styled cause to

another Judge for "the limited purpose of reviewing Defendant Matetich's continued pretrial detention.[2]

The government respectfully requests that the Magistrate Judge's Order be revoked as provided in Title 18, United States Code, Section 3145(a)(1).

2.    **Statement of the Facts**

At the pretrial detention hearing on August 18, 2000, the government adopted the facts included in the Criminal Complaint and Affidavit.(Aug. 18, 2000, TR: at 6). The Complaint Affidavit states that DEA seized approximately 30,000 ecstasy pills in July of this year. The different seizures of pills had various distinctive markings stamped on them including "A1," "007," a star and a triangle. Two defendants were arrested,[3] and identified their source for the shipments of ecstasy as "Charlie Matetich." After the arrest of these individuals, the DEA recorded telephone calls between one of the arrested individuals and Matetich. During the time of the recorded telephone calls, Matetich was in different places in Europe and in Canada. During the telephone calls,

_____

[2] Undersigned counsel was advised by the Appellate Division, that the United States Attorney's Office responds to Petitions for Writ of Mandamus upon request of the Court of Appeals. No request was received. In preparing this memorandum, it was noted that the defendant was arrested on July 25, 2000. The defendant's initial appearance as required under the Rules was within 24 hours, on July 26, 2000. The Bond Reform Act provides that the government may have only 3 days to prepare for the pretrial detention hearing. However, the bond hearing was repeatedly delayed at the request of the defendant without objection from the government for 23 days until August 18, 2000. The government observed the signed written waiver of the statutory time limits upon a review of the Court file on September 21, 2000. The waiver is attached hereto along with the other orders of continuance. This matter is set for hearing Tuesday, September 26, 2000 in Miami. Judge Hurley returns to the District on September 29, 2000. The government recommends that this Court review the continued pretrial detention of the defendant and transfer the matter back to Judge Hurley for a de novo hearing.

[3] These people are the defendant's two codefendants in Case No. 00-6198-CR-HURLEY.

Matetich discussed the symbols on the ecstasy tablets, specifically, the "007," the stars, the triangles and the "A1" symbols and the fact that these shipments were not of good quality. They also discussed another deal for 10,000 pills, for a price of $24,000.00. They also discussed that Matetich wanted payment of $4200.00 to pay off a previous debt for ecstasy pills. The DEA sent a series of Western Union money transfers to Amsterdam in the Netherlands representing the $4200.00. In a subsequent recorded telephone conversation between a cooperating defendant and Matetich, they discussed the Western Union tracking numbers for the $4200.00. The DEA confirmed that the $4200.00 was retrieved in the Netherlands the next day.

On July 24, 2000, Matetich arrived by airplane at the Ft. Lauderdale airport from Canada. The cooperating defendant met Matetich at the airport. The CI was equipped with transmitting equipment. The DEA agents listened to the transmission of the conversation and heard Matetich confirm that he had received the $4200.00. Matetich was taken into custody that day. In a post arrest statement, Matetich admitted that he was in the ecstasy business. He disclosed the name of a person he said was his source for ecstasy and that he owed that source $100,000.00. DEA Agents also seized a ledger book from him which Matetich stated memorialized the debt of $100,000.00 to his source. (A report of the post arrest statement will be provided at the hearing) At the time of arrest, the agents seized numerous telephone credit cards.

The government proceeded by proffer with the case agent available for cross-examination.[4] The government noted that the defendant was in charge of the importation and distribution of ecstasy tablets. At the time of his arrest, he made admissions to the agents regarding his involvement. In

_____

[4] United States v. Gaviria, 828 F.2d 667 (11th Cir. 1987) holds that both the government and the defense may proceed by proffer, subject to the discretion of the presiding judge.

conversations with the cooperating witness, the defendant stated that he ran a "turnkey operation" that allowed him to have easy access to additional funds that are available. (Aug. 18, 2000 TR: 9).

The government proffered the facts concerning risk of flight (Aug. 18, 2000 TR:7). The defendant is a Canadian citizen. The defendant possessed a Canadian passport. The defendant claims an apartment residence on South Beach, however there is no evidence that the defendant is in this country legally. The government noted that there is no verification by INS showing that he has the lawful right to be in the United States. The apartment on South Beach is a temporary residency at best. The passport reflects an address in London, Ontario, Canada. The government disclosed that the defendant was stopped on February 12, 1996 attempting to make entry into the United States at the Canadian border near Detroit, Michigan. At that time, he possessed two Florida ID's with different dates of birth. The U.S. Customs report of this incident shows that the defendant also possessed two vehicle license plates for which he had no explanation. The defendant was refused entry into the United States at that time. (A report concerning this U.S. Customs incident will be provided to the Court at the hearing).

The Pretrial Services Report states that the defendant told Pretrial Services that he has been living with his "fiancee" Marie Ange Caravan[a] off and on for 3 years. He stated that he lived off and on for 6 years at the address, 929 Collins Avenue, Apartment 11, Miami, Florida. He stated that he lived off and on for three months in Barcelona, Spain. He stated that he has resided most of his life in Canada, but he did not provide a Canadian address. He claimed to be in the United States on a tourist visa, but Pretrial Services was unable to verify that information with INS.

The defendant told Pretrial Services that he was self-employed selling leather handbags from an apartment in Barcelona, Spain. The defendant has provided no evidence documenting any employment history anywhere.

## MEMORANDUM OF LAW AND ARGUMENT

Section 3142(e) of the Bail Reform Act of 1984 provides that a judicial officer shall order detention if the judicial officer:

> finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.

18 USC 3142(e).

The Bail Reform Act articulates certain offenses for which a person may be detained pending trial. Rebuttable presumptions are created by the Bail Reform Act. Congress determined that where a defendant is charged with a drug offense for which the maximum sentence is ten years or more, there is a rebuttable presumption that there are no conditions that will reasonable assure the appearance of the person, or the safety of the community. 18 U.S.C. 3142(e). A grand jury indictment provides the probable cause required by the statute to trigger the presumption. United States v. Hurtado, 779 F.2d 1467 (11th Cir. 1985); United States v. Quartermaine, 913 F.2d 910 (11th Cir. 1990); United States v. King, 849 F.2d 485 (11th Cir. 1988). In this case, the defendant has been charged in two counts with drug offenses for which the maximum penalty is 20 years.

Once the government establishes probable cause, it becomes the burden of the defendant to come forward with some evidence to rebut the presumption of danger to the community. Once the defendant produces that evidence, the burden of persuading the judge to detain, based upon danger to the community, still rests with the government. To detain the defendant, the government's

7

showing must be clear cut. <u>United States v. Hurtado</u>, 779 F.2d 1467, 1470 (11th Cir. 1985).
However, even if the defendant comes forward with evidence to suggest that he is not a danger, the
presumption of dangerousness remains in the case as an evidentiary finding, militating against
release, to be weighed along with other evidence. <u>United States v. Quartermaine</u>, 913 F.2d 910, 916
(11th Cir. 1990). The magistrate erred in finding that the defendant had overcome the presumption
of dangerousness and flight.

A defendant should be detained if the government establishes by a preponderance of the
evidence that the defendant poses a risk of flight. <u>United States v. Medina</u>, 775 F.2d 1398 (11th Cir.
1985). The district court may rely on the presumption created by 18 U.S.C. 3142(e) to deny bond
to a defendant charged with a narcotics offense n the basis that he poses a risk of flight. <u>United
States v. King</u>, 849 f.2d 485 (11th Cir. 1988).

Section 3142(g) of the Bail Reform Act the enumerates a list of considerations to be taken
into account in determining whether detention is appropriate, including the nature and circumstances
of the offense, the weight of the evidence against the person to be detained, and the history and
characteristics of the person. "[s]ection 3142(e) accords the judicial officer substantial latitude in
determining whether pretrial detention is appropriate." <u>United States v. King</u>, 849 F.2d 485, 487
(11th Cir. 1988). To the extent that the government proceeds under "danger to the community" as
a basis for pretrial detention, courts have broadly interpreted the concept of "dangerousness." While
on the one hand, the safety of a person may refer to an identifiable individual, the safety of the
community refers to a likelihood of the defendant continuing to commit crimes if released on bond
into the community. <i>Id.</i> at 487 n. 2.

In reviewing a magistrate's release or detention order, a district judge should enter written findings of fact. United States v. King, 849 F.2d 485 (11th Cir. 1988).

In reviewing the magistrate's decision, the district court must review the case de novo, although it need not conduct a de novo hearing. United States v. Gaviria, 828 F.2d 667 (11th Cir. 1987).

## I.    Nature and Circumstances of the Offense Charged

As previously noted, the crime with which Matetich is charged is a drug trafficking crime. The guideline range is estimated by the government to be 78-97 months. Enhancements may apply for role in the offense. The government views Matetich as the source for the ecstasy seized in this case and a person with connections to the clandestine laboratories in Europe. As such, he is viewed as a significant risk of flight and a danger to the South Florida community through continued trafficking in ecstasy.

## II.    Weight of the Evidence Against Matetich

The government's evidence is overwhelming. The government has seized a large number of ecstasy pills, over 30,000. There are two cooperating witnesses who dealt personally with the defendant. There are numerous recorded controlled telephone conversations by the defendant discussing the specific shipments of ecstasy. The defendant claims to be involved in a large organization. The defendant was traveling around Europe during the course of the investigation. The defendant admitted receiving the $4200 that was sent by the DEA to Amsterdam. The defendant admitted his involvement in the ecstasy trafficking business. He admitted owing $100,000.00 for ecstasy which is a fairly extensive line of credit, probably only allowed to persons who have a good record of past payment. Even though the defendant stated in his briefs filed in this matter that he was

9

presumptively innocent, he did not contest the facts at the pretrial detention hearing on August 18, 2000. He stood mute at arraignment.

### III.    Defendant Matetich's History and Characteristics

The charged offenses and the evidence in the case suggests ongoing criminal activity involving a network of people. The evidence of Matetich's travels and the Pretrial Services Report supports the conclusion that Matetich has the ability to be involved in such a network. The defendant has no record of employment. The defendant has no record of any permanent residence anywhere. The defendant provided no address in Canada or Spain. He only has a rental apartment in Miami. He has no ties to the United States. The girlfriend is a resident of France.

### IV.    Nature and Seriousness of Danger to Community

By narrowly focusing on certain serious criminal activity, "Congress specifically found that those individuals [arrested in connection with those serious crimes] are far more likely to be responsible for dangerous acts in the community after arrest." United States v. Salerno, 481 U.S. 739, 750 (1987), citing S.Rep. No. 98-225, at 6-7. Here the defendant is charged with importing and trafficking in illegal drugs. Although Congress has not chosen to penalize drugs such as ecstasy as severely as crack or heroin, there is no question that trafficking in ecstasy is a serious crime. There is no FDA oversight for the laboratories in Europe. Ecstasy is marketed mainly to the kids in the nightclubs and concert venues. Because of the vulnerability of this population, ecstasy poses a special danger to the community. The symbols on the ecstasy pills are appealing to these buyers.

While the government cannot show that the defendant poses a danger to any specific person, this should not vitiate a district court's finding that Matetich poses a danger to the community if released. Even the condition of electronic monitoring or house arrest can do nothing to prevent telephone calls

10

to others who can relay messages to persons overseas in the ecstasy business. The defendant needs money at this time. He has great incentive to continue his business whether in Miami or abroad. The government is concerned about the defendant's ability to continue to have ecstasy sent to the United States, Canada or elsewhere.

Taken together, the factors set forth in Section 3142(g) of the Bail Reform Act, and applied to the facts developed at the hearings before the magistrate judge and to be developed before the district court, demonstrate by clear and convincing evidence that, as Congress has presumed, Matetich poses a danger to the community. As amply demonstrated by the facts, he is a risk of flight and he should be detained.

The conditions imposed by the Magistrate are not sufficient to assure his presence before the Court or protect the safety of the community. House arrest and electronic monitoring only give notice to the Court after the defendant has fled. Waivers of extradition are not honored by Canadian authorities according to the Office of International Affairs in Washington, D.C.

For all the reasons stated by the government in its Motion to Reopen and at the hearing on the Motion to reopen, the government objects to Mr. Swears and Ms. Caravano as sureties. The defendant can simply pay back Mr. Swears over time. The court did not restrain Mr. Swears' used boat inventory and there is not much equity in Mr. Swears' residence. The 23 year old girlfriend has no assets and is judgment proof. The defendant and Ms. Caravano have a broken and troubled relationship. The purpose of having a family member or spouse act as custodian is that the defendant has an interest in being in the United States to preserve the relationship. Mr. Matetich can preserve this relationship in France.

11

The transcript shows that, respectfully, the Magistrate Judge erred in the conclusion that the Nebbia condition had been met as to the bond. There was no appearance by a bondsman to testify as to the source of the $15,000.00 that would have to be posted on a $100,000.00 corporate surety bond. There was no information submitted to the court as to the collateral to secure the $100,000.00 corporate surety bond. Presumably, the Magistrate did not conclude that the boat inventory of Mr. Swears that was to secure the $500,000.00 personal surety bond was also to secure the corporate surety bond. The defense presented no testimony which would meet the Nebbia condition on the corporate surety bond. The court also did not restrain the boat inventory.

No amount of bond money however, can prevent him from dealing in ecstasy.

For all the foregoing reasons, the government respectfully requests that this court revoke the order of the Magistrate Judge denying the government's request for pretrial detention.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____

NANCY VORPE QUINLAN
ASSISTANT UNITED STATES ATTORNEY
FL Bar No. 0593532
500 Australian Avenue, Suite 400
West Palm Beach, Fl 33401
(561)820-8711
(561)820-8777

12

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was delivered by fax without

attachments to:

Howard Screbnick, Esquire
Heidi A. Schulz, Esquire
201 South Biscayne Boulevard
Miami, FL 33131

Nancy Vorpe Quinlan
Assistant United States Attorney

13

# APPENDIX

AO 91 (Rev. 5/85) Criminal Complaint                    AUSA VORPE QUINLAN

# United States District Court

SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

V.

MAXIMILLIAN CHARLES MATETICH

*(Name and Address of Defendant)*

FILED by _____ D.C.
MAG. SEC.
JUL 2 6 2000
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

**CRIMINAL COMPLAINT**

CASE NUMBER: $00 - 3131 - Turnof$

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about July 5, 2000 through July 24, 2000 in Broward and Miami-Dade Counties, in the Southern District of Florida, the defendant, did knowingly and intentionally combine, conspire, confederate and agree to commit an offense against the United States, that is, to violate Title 21, United States Code, Section 952. It was the purpose and object of this conspiracy to knowingly and intentionally import into the United States from outside the United States a mixture and substance containing a detectable amount of 3,4-Methylenedioxymethamphetamine (commonly known as MDMA or "Ecstasy"), a Schedule I controlled substance.

in violation of Title ___21___ United States Code, Section(s) ___952 and 963___

I further state that I am a(n) ___Special Agent of the Drug Enforcement Administration___ and that this complaint is based on the following facts:
                                                    Official Title

Please **see** attached affidavit.

Continued on the attached and made a part hereto:    [x]Yes [ ]No

_____
Signature of Complainant
Special Agent Chris W. Mathes
U.S. Drug Enforcement Administration

Sworn to before me, and subscribed in my presence,

THE COURT FINDS PROBABLE CAUSE.

___July 25, 2000___                    at    ___Miami, Florida___
Date                                             City and State

WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE                    _____
Name and Title of Judicial Officer                    Signature of Judicial Officer

## BOND RECOMMENDATION

## MAXIMILLIAN CHARLES MATETICH,

Defendant.

Pre-trial Detention is recommended.

_for_ _David J. Weinstein_

Nancy Vorpe Quinlan
Assistant U. S. Attorney

# AFFIDAVIT

I, Christopher W. Mathes, being duly sworn, depose and say:

1). I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been so employed since March 1998. Prior to that employment, I was a Police Officer assigned to the Criminal Investigations Division, with the Johnson City Police Department, Johnson City, Tennessee, for five and one half years. I have completed in excess of 1,200 hours of basic and advanced law enforcement instruction within the states of Tennessee and Florida as well as the DEA Academy. During my employment with DEA, I have received specialized training regarding the investigation and enforcement of drug violations and have actively participated in numerous investigations related to persons involved in the trafficking and importation of drugs, including MDMA, also known as Methylnedioxymethamphatamine (Ecstasy).

2). This affidavit is based upon an ongoing drug investigation, conversations with other law enforcement officers, information obtained through training and experience, enforcement activity previously conducted, and a series of taped meetings and telephone conversations. I have personally participated in this investigation and am familiar with the facts and circumstances of this investigation. I have not included in this Affidavit each and every fact and circumstance known to me, but only those facts and circumstances that I believe are sufficient to establish probable cause.

3). Beginning on July 5, 2000, pursuant to an on going DEA investigation, approximately 30,000 dosage units of MDMA were seized by the DEA. More particularly, on July 5, 2000 a sample of eight (8) MDMA dosage units, bearing the emblems of "A1" or a star symbol were seized. On July 7, 2000, approximately 10,000 dosage units of MDMA were seized bearing the emblems of "A1" or a star symbol. On July 12, 2000, approximately 10,000 dosage units were seized, bearing the emblems of "007" or a triangle symbol. On July 14, 2000, approximately 10,000 dosage units were seized, also bearing the emblem of "007." The dosage units of the seized MDMA have been subsequently tested by the Southeast Regional DEA Laboratory and confirmed positive for the presence of MDMA (ecstasy).

4). Subsequent to the seizures of the MDMA, two defendants were arrested and cooperated with law enforcement in the investigation. These defendants identified their source for the ecstasy as a person named "Charlie" Matetich. Based upon his/her cooperation one of these two individuals has now been documented as a Confidential Source (CS).

5). Beginning on or about July 20, 2000, the aforementioned CS had a series of recorded telephone conversations with an individual now identified as Maximillian Charles MATETICH who at the time of the phone calls was in Europe and then in Canada. During these telephone conversations, MATETICH and the CS discussed the July 5th, July 7th, July 12th, and July 14, 2000 shipments of MDMA as set forth above. They discussed the symbols on the tablets, specifically the "007," the stars, the triangles, and the "A1" symbols, and the fact that the shipments were not of a good quality. They also discussed conducting another deal for 10,000 pills, for a price of $24,000.00. Also, an amount of $4200.00 had to be sent to pay off a previous debt for ecstasy pills.

6). On Friday, July 21, 2000, DEA sent a series of Western Union money transfers to Amsterdam in the Netherlands representing the $4200.00. In a subsequent telephone conversation between the CS and Matetich, they discuss the Western Union tracking numbers for the $4200.00. DEA confirmed that the $4200.00 was retrieved in the Netherlands the next day.

5). On July 24, 2000, Matetich arrived by airplane at the Fort Lauderdale, Florida airport from Canada. The CI met Matetich at the airport. The CI was wired for transmission of the conversations between the CI and Matetich. The DEA agents listening to the transmission of the conversation heard Matetich state that "he had received the $4200.00." Later on that same day, Matetich was taken into custody in Miami, Florida. After being advised of his Miranda rights, Matetich admitted that he was in the ecstasy business. He disclosed the name of his source for ecstasy and stated that he owed this source $100,000.00. Agents also seized a ledger book from him which Matetich stated memorialized the debt of $100,000.00 to this source.

6). Based upon the foregoing events, your affiant requests the issuance of a complaint charging Maximillian Charles MATETICH with conspiracy to import a controlled substance, namely MDMA, in violation of Title 21, United States Code, Sections 952 and 963, on the basis of the probable cause set forth in this affidavit.

FURTHER AFFIANT SAYETH NAUGHT


CHRIS MATHES
DEA SPECIAL AGENT



Sworn to and subscribed before me
this _____ day of July 2000 in
Miami, Florida.

WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____

UNITED STATES OF AMERICA

vs.

MAXIMILLIAN CHARLES MATETICH,

Defendant.
_____/

## CRIMINAL COVER SHEET

1.  Did this case originate from a matter pending in the United States Attorney's Office prior to April 1, 1999? _____ Yes  __X__ No

2.  Did this case originate from a matter pending in the Central Region of the United States Attorney's Office prior to April 1, 1999? _____Yes  __X__ No

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

BY: _____  749214
Nancy Vorpe Quinlan
ASSISTANT UNITED STATES ATTORNEY
Florida Bar Number 0593832
500 Australian Avenue, Suite 400
West Palm Beach, Florida 33401
TEL (561) 820-8711
FAX (561) 659-4526
Nancy.Vorpe-Quinlan@usdoj.gov

koia.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _00-3131-Turnoff_

UNITED STATES OF AMERICA

       Plaintiff,

v.

MAXIMILLIAN MATETICH
      Defendant.

_____/

**ORDER ON INITIAL APPEARANCE**
Language ENGLISH
Tape No. 00G-_C08-216F_
AUSA _David Weinstein_
Agent DEA/CHRIS MATHES

DOB:   07-20-65
Reg #   66109-004

> FILED JUL 26 2000 D.C.
> MAG. SEC.
> JUL 2 6 2000
> CLARENCE MADDOX
> CLERK U.S. DIST. CT.
> S.D. OF FLA.  MIAMI

    The above-named defendant having been arrested on _07-24-2000_ having appeared
before the court for initial appearance on _07-25-2000_
_and proceedings having been held in accordance with **F.R.C.P. 5 or 40(a)**, it is thereupon
**ORDERED** as follows:

1. _Ralph Behr_ appeared as permanent/temporary counsel of record.
   Address: _101 SE 10 St. Ft. Lauderdale Fl_
   Zip Code: _33316_ Telephone: _954 761-3444_
2. _____ appointed as permanent counsel of record.
   Address: _____
   Zip Code: _____ Telephone: _____
3. The defendant shall attempt to retain counsel and shall appear before the court at 10:00 A.M. on
   _____, 2000.
4. Arraignment/Preliminary/Removal/Identity hearing is set for _10am August 4_, 2000.
5. The defendant is held in temporary pretrial detention pursuant to 18 U.S.C. Section 3142 (d) or (f)
   because _____
   A detention hearing, pursuant to 18 U.S.C. Section 3142(f), is set for _10am July 31_, 2000.
6. The defendant shall be release from custody upon the posting of the following type of appearance
   bond, pursuant to 18 U.S.C. Section 3142:

_____
_____

    This bond shall contain the standard conditions of bond printed in the bond form of this Court
and, in addition, the defendant must comply with the special conditions checked below:
___a. Surrender all passports and travel document to the Pretrial Services Office.
___b. Report to Pretrial Services as follows:___times a week by phone, ___time a week in person;
    other: _____
___c. Submit to random urine testing by Pretrial Services for the use of non-physician-prescribed
    substances prohibited by law.
___d. Maintain or actively seek full time gainful employment.

<u>MAXIMILLIAN MATETICH</u>

___e. Maintain or begin an educational program.
___f. Avoid all contact with victims of or witnesses to the crimes charged.
___g. Refrain from possessing a firearm, destructive device or other dangerous weapon.
___h. Comply with the following curfew: _____
___i. Avoid all commercial transportation facilities; no airports, no marinas, no bus terminals.
___j. Comply with the following additional special conditions of this bond:

_____

_____

This bond was set: At Arrest _____
                   On Warrant _____
                   After Hearing _____

If bond is changed from that set in another District, the reason pursuant to Rule 40(f) is ___

_____

_____

_____

_____ If this space is checked, an evidentiary hearing pursuant to United States v. Nebbia, 357, F.2d 303 (2 Cir. 1966) shall be held prior to the posting of the bond. Such hearing shall be scheduled promptly upon notification to the court that the defendant is ready to post bond.

7. The defendant has been advised by the court that if he or she is released on bond pursuant to the conditions set forth herein or those later ordered by the court, the defendant is subject to arrest and revocation of release and to various civil and criminal sanctions for any violation of those conditions. These various sanctions and penalties are set forth more fully in the Appearance Bond itself.

8. The defendant is committed to the custody of the United States Marshal until an appearance bond has been executed in accordance with this or subsequent court order.

**DONE AND ORDERED** at <u>Miami, Florida</u>, this 25 day of <u>July</u>, 2000.

_____
**UNITED STATES MAGISTRATE JUDGE**
**WILLIAM C. TURNOFF**

c: Assistant U.S. Attorney
   Defendant
   Counsel
   U.S. Marshal
   Pretrial Services/Probation

UNITED STATES OF AMERICA
SOUTHERN DISTRICT COURT

CASE NO. _00-3131 - Turnoff_

UNITED STATES OF AMERICA,

v.

**NOTICE OF TEMPORARY
APPEARANCE AS COUNSEL**

_maxim Matetich_

COMES NOW _Ralph S. Behr_ and

files this temporary appearance as counsel for the above named
defendant(s) at initial appearance.  This appearance is made with
the understanding that the undersigned counsel will fulfill any
obligations imposed by the Court such as preparing and filing
documents necessary to collateralize any personal surety bond which
may be set.

Counsel's Name (Printed) _Ralph S. Behr_

Counsel's Signature _Ralph S Behr_

Address _101 S.E. 10 ST_
_Fort Lauderdale, Fl_     ZIP CODE: _33316_

Telephone _( 954) 761-3444_

FILED by _____ D.C.
MAG. SEC

JUL 26 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:00-3131-TURNOFF

FILED by MAG. SEC _____ D.C.
JUL 28 2000
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

UNITED STATES OF AMERICA,

vs.

**ORDER ON HEARING TO**
**REPORT RE COUNSEL**

MAXIMILLIAN MATETICH

The above named defendant having appeared before the Court as
ordered and reported efforts to retain counsel, it is thereupon

ORDERED as follows:

_____ Private counsel_____
appeared in open court and is noted as permanent
counsel of record.

_____ The defendant requested Court appointed counsel, was
found eligible, and counsel will be appointed by
separate order.

_____ The defendant requested Court appointed counsel but
was found ineligible, and shall appear before the
Court on _____
at 10:00 a.m. to report regarding his/her further
efforts to retain counsel, unless counsel notices a
permanent appearance before that date.

____✓____ The defendant requested further time to retain
counsel and shall appear before the Court on
_July 31, 2001_____ at 10:00 a.m. to report
regarding his/her further efforts to retain counsel,
unless counsel notices a permanent appearance before
that date.

**DONE AND ORDERED** at Miami, Florida this _____28_____ day
of _JULY_____, 2000

TAPE NO.2000G-_70-807_

_____
UNITED STATES MAGISTRATE JUDGE
WILLIAM C. TURNOFF

c: AUSA
   Defense Counsel
   Pretrial Services or Probation
   U.S. Marshal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:00-3131-TURNOFF

UNITED STATES OF AMERICA,

vs.

**ORDER ON HEARING TO
REPORT RE COUNSEL**

MAXIMILLIAN MATETICH

The above named defendant having appeared before the Court as
ordered and reported efforts to retain counsel, it is thereupon

ORDERED as follows:

_____ Private counsel_____
appeared in open court and is noted as permanent
counsel of record.

_____ The defendant requested Court appointed counsel, was
found eligible, and counsel will be appointed by
separate order.

_____ The defendant requested Court appointed counsel but
was found ineligible, and shall appear before the
Court on _____
at 10:00 a.m. to report regarding his/her further
efforts to retain counsel, unless counsel notices a
permanent appearance before that date.

_____ The defendant requested further time to retain
counsel and shall appear before the Court on
_____8/3/00_____ at 10:00 a.m. to report
regarding his/her further efforts to retain counsel,
unless counsel notices a permanent appearance before
that date.

**DONE AND ORDERED** at Miami, Florida this ___31st___ day
of JULY_____, 2000.

TAPE NO.2000H- 29-1024

_____
UNITED STATES MAGISTRATE JUDGE
ROBERT L. DUBE'

c: AUSA
   Defense Counsel
   Pretrial Services or Probation
   U.S. Marshal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-3131- Turnoff

UNITED STATES OF AMERICA,

v.

MAXIMILLIAN   MATETICH

NOTICE OF TEMPORARY
APPEARANCE AS COUNSEL

FILED by ___ D.C.
MAG. SEC.
Jule 31 2000
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.    MIAMI

COMES NOW ___HOWARD M. SREBNICK___ and

files this temporary appearance as counsel for the above named

defendant(s) at initial appearance.  This appearance is made with

the understanding that the undersigned counsel will fulfill any

obligations imposed by the Court such as preparing and filing

documents necessary to collateralize any personal surety bond which

may be set.

Counsel's Name (Printed)  HOWARD  M.  SREBNICK

Counsel's Signature  _____

Address  BLACK, SREBNICK & KORNSPAN, P.A.

201 S. Biscayne Blvd #1300  ZIP CODE: MIAMI  33131

Telephone (305) 371 6421

FAX   305   358-2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. OO-3131- Turnoff

UNITED STATES OF AMERICA,

vs.

Maximillian Matelich



FILED by ___ D.C.
MAG. SEC.

Jul 31 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.  MIAMI

     This cause came before the Court and pursuant to proceedings held, it is thereupon

     ORDERED AND ADJUDGED as follows:

     Upon request of the parties, and good cause being shown, the

Pretrial Detention       is hereby reset to

8|3|00       at 10:00 Am

before the Duty Magistrate Judge.

     DONE AND ORDERED at Miami, Florida this 31st    day of

July     , 2000.

TAPE NO: 00b-29-1024

UNITED STATES MAGISTRATE JUDGE
ROBERT L. DUBE

c: AUSA
   Defense Counsel
   Pretrial Services
   U.S. Marshal



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:   *00 - 3131 - Turnoff*

UNITED STATES OF AMERICA,

vs.

*MAXIMILLIAN MATETICH*

FILED by _____ D.C.
MAG. SEC.

AUG 3 - 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.   MIAMI

**WAIVER**

I, *MAXIMILLIAN MATETICH* the above-named defendant,
being advised of the nature of the charge(s) pending against me in
the U.S. District Court, Southern District of Florida, hereby
acknowledge the following facts to be true:

1) I have been fully advised of my rights, specifically my
right to *an immediate PTD hearing / arraignment*

2) I possess full knowledge and understanding of the charges
pending against me in this case.

3) Of my own free will, I do hereby refuse and waive in open
court on *8/3/00*, my right to
*immediate ptd hearing / arraignment*

DATED: *8/3/00*

_____
Defendant

_____
Counsel for Defendant

**MAGISTRATE JUDGE'S CERTIFICATE**

The undersigned United States Magistrate Judge certifies that the
defendant, having been advised of his Constitutional rights, has
refused and waived his/her right to *PTD - Detention Hearing*

DATED this *3rd* day of *August*, 2000 at MIAMI
Southern District of Florida.

TAPE NO.2000-H *32-437*

_____
UNITED STATES MAGISTRATE JUDGE
ROBERT L. DUBE'

c: AUSA
   Defense Counsel
   Pretrial Services/Probation
   U.S. Marshal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-3131-TURNOFF

UNITED STATES OF AMERICA,

vs.                                         ORDER ON HEARING TO
MAXIMILLIAN MATETICH                        REPORT RE COUNSEL

FILED by _____ D.C.
MAG. SEC.

AUG 3 - 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.  MIAMI

        The above named defendant having appeared before the Court as
ordered and reported efforts to retain counsel, it is thereupon

ORDERED as follows:

_____ Private counsel_____
         appeared in open court and is noted as permanent
         counsel of record.

_____ The defendant requested Court appointed counsel, was
         found eligible, and counsel will be appointed by
         separate order.

_____ The defendant requested Court appointed counsel but
         was found ineligible, and shall appear before the
         Court on _____
         at 10:00 a.m. to report regarding his/her further
         efforts to retain counsel, unless counsel notices a
         permanent appearance before that date.

___✓____ The defendant requested further time to retain
         counsel and shall appear before the Court on
         8|18|00 _____ at 10:00 a.m. to report
         regarding his/her further efforts to retain counsel,
         unless counsel notices a permanent appearance before
         that date.

DONE AND ORDERED at Miami, Florida this ____3rd_____ day of

AUGUST_____, 2000.

TAPE NO. 00H-32-437

                                        _____
                                        UNITED STATES MAGISTRATE JUDGE
                                        ROBERT L. DUBE

c. Defense Counsel
   Pretrial Services or Probation
   U.S. Marshal
   AUSA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-3131- Turnoff

UNITED STATES OF AMERICA,

vs.



FILED by _____ D.C.
MAG. SEC.

AUG 3 - 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.    MIAMI

Maximillian matetich

This cause came before the Court and pursuant to proceedings
held, it is thereupon

ORDERED AND ADJUDGED as follows:

Upon request of the parties, and good cause being shown, the
_____ amaignment /detention _____ is hereby reset to
8/18/00 _____ at 10:00 Am
before the Duty Magistrate Judge.

DONE AND ORDERED at Miami, Florida this _____ day of
August _____, 2000.

TAPE NO: 00H-32-437

_____
UNITED STATES MAGISTRATE JUDGE
ROBERT L. DUBE'

c: AUSA
   Defense Counsel
   Pretrial Services
   U.S. Marshal





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6198-CR-HURLEY


UNITED STATES OF AMERICA,

        Plaintiff,

-vs-


MAXIMILLIAN C. MATETICH,

        Defendant.
_____/

## GOVERNMENT'S MOTION TO STAY
## MAGISTRATE'S ORDER RELEASING DEFENDANT ON BOND

        The United States, by and through the undersigned Assistant United States Attorney, files this Motion to Stay Magistrate's Order Releasing Defendant on Bond and in support thereof states as follows:

        1.   Magistrate Judge John J. O'Sullivan has entered an order releasing the defendant MAXIMILLIAN C. MATETICH on bond.  Magistrate Judge O'Sullivan stayed his order until NOON on August 30, 2000 to allow the government the opportunity to apply for a stay to the District Court.  The government requested pretrial detention on the basis of danger to the community and risk of flight.  In sum, the government believes that the defendant is a danger to the community because of his admitted importation of ecstasy into the United States from Europe.  At

1

the pretrial detention hearing, the defendant did not contest the facts stated in the Complaint (Attached hereto as Exhibit A). On the consensual tapes, the defendant states that he has network in place in Europe and Canada for the purpose of distributing ecstasy and he discusses the movement of money from Canada to the United States. The defendant admitted that a he owes a debt of $100,000 for ecstasy. The arresting agents seized the defendant's ledger book. Very large amounts of money are involved in the ecstasy business. There are no conditions of bond that can prevent the defendant from making telephone calls to persons in Europe and Canada in furtherance of the distribution of drugs and the collection of drug proceeds. The defendant has every incentive to try to collect the money that is owed to him. The defendant has no means of employment if released on bond, because he is in the this country illegally. The government believes that the defendant is a risk of flight. The defendant has homes in Canada and in Spain. He has no incentive to stay in this country and face a federal prison sentence.

2. After the initial pretrial detention hearing on August 18, 2000, the government moved to re-open the hearing based on new evidence (Government's Motion to Reopen is attached as Exhibit B, along with a Transcript of the initial hearing) The Magistrate Judge granted that motion and heard the new evidence on August 28, 2000 at approximately noon. The government has attached hereto the reports and affidavit submitted to the Magistrate Judge at that hearing (Exhibit C). Following that hearing at which Mr. Swears and Ms. Caravano testified, the Court ruled that it would continue to accept Randy Swears and Marie Ange Caravano as sureties on a $500,000 bond and a $100,000 corporate surety bond, requiring Ms. Caravano to live with and act as custodian for the defendant. The government respectfully objects to Mr. Swears as a surety on several grounds. His boat inventory which would collateralize the bond was not restrained by the court. The

2

government is concerned about Mr. Swear's prior business associations as set forth in the reports

and the fact that the defendant could simply reimburse Mr. Swears for the bond amount. The

government objects to Ms. Caravano as a surety. Ms. Caravano is a young 23 year old, a foreign

national with no assets whatsoever. The government would refer this court to the Affidavit of Mr.

Zamarano concerning the ability of Ms. Caravano to control the whereabouts and activities of the

defendant. The transcript of the testimony of Mr. Swears and Ms. Caravano and the subsequent

rulings of the Magistrate on August 29, 2000 at the hearing on the Motion to Reopen in Miami has

been ordered expedited and should be available to this Court by Tuesday, September 5, 2000 at the

latest. (Monday is Labor Day).

WHEREFORE, the government moves the District Court to stay the order of the Magistrate

Judge releasing the defendant on bond until the government has obtained the transcript of the

hearing held yesterday in Miami and further files its Motion for Revocation of Order Releasing the

Defendant on Bond. The Magistrate Judge has stayed his order only until NOON on August 30,

2000.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _Nancy Vorpe Quinlan_

NANCY VORPE QUINLAN
Assistant United States Attorney
Florida Bar No. 0593532
500 Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 820-8711 ext 3054
Fax: (561) 820-8777

3

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the Government's Motion for Stay has been delivered by fax Howard Srebnick, Esquire this 30th day of August, 2000.

NANCY VORPE QUINLAN
Assistant United States Attorney

4

# United States District Court

| SOUTHERN | DISTRICT OF | FLORIDA |
|---|---|---|

UNITED STATES OF AMERICA

V.

MAXIMILLIAN CHARLES MATETICH

**CRIMINAL COMPLAINT**

**CASE NUMBER:**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about July 5, 2000 through July 24, 2000  in  Broward and Dade   county, in the

___ Southern ___  District of  Florida, the defendant, did knowingly and intentionally combine, conspire, confederate and agree to commit an offense against the United States, that is, to violate Title 21, United States Code, Section 952.  It was the purpose and object of this conspiracy to knowingly and intentionally import into the United States from outside the United States a mixture and substance containing a detectable amount of 3,4-Methylenedioxymethamphetamine (commonly known as MDMA or "Ecstasy"), a Schedule I controlled substance.

in violation of Title ___21__ United States Code, Section(s) ___963_____

I further state that I am a(n) U.S. Drug Enforcement Administration, S/A ___  and that this complaint is based on the following facts:
<br>Official Title

Please see attached affidavit.

Exhibit "A"

Continued on the attached and made a part hereto:  [x] Yes  [ ] No

_____
Signature of Complainant
**Special Agent Chris W. Mathes**
**U.S. Drug Enforcement Administration**

Sworn to before me, and subscribed in my presence,

THE COURT FINDS PROBABLE CAUSE.

| July  25, 2000 | at | Miami, Florida |
|---|---|---|
| Date | | City and State |

WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

**BOND RECOMMENDATION**

## MAXIMILLIAN CHARLES MATETICH,

Defendant.

Pre-trial Detention is recommended.

_____
Nancy Vorpe Quinlan
Assistant U. S. Attorney

# AFFIDAVIT

I, Christopher W. Mathes, being duly sworn, depose and say:
I am a Special Agent with the United States Drug Enforcement
Administration ("DEA"), and have been so employed since March
1998.   Prior to that employment, I was a Police Officer
assigned to the Criminal Investigations Division, with the
Johnson City Police Department, Johnson City, Tennessee, for
five and one half years.   I have completed in excess of 1,200
hours of basic and advanced law enforcement instruction
within the states of Tennessee and Florida as well as the DEA
Academy.   During my employment with DEA, I have received
specialized training regarding the investigation and
enforcement of drug violations and have actively participated
in numerous investigations related to persons involved in the
trafficking and importation of drugs, including MDMA, also
known as Methylnedioxymethamphatamine (Ecstasy).

1.  This affidavit is based upon an ongoing drug
    investigation, conversations with other law enforcement
    officers, information obtained through training and
    experience, enforcement activity previously conducted,
    and a series of taped meetings and telephone
    conversations.

2.  Beginning on July 5, 2000, approximately 30,000 dosage
    units of MDMA were seized in an on going DEA
    investigation. More particularly, on July 5, 2000 a
    sample of eight MDMA dosage units, bearing the emblems of

"A1" or a star symbol were seized. On July 7, 2000,
approximately 10,000 dosage units of MDMA were seized
bearing the emblems of "A1" or a star symbol. On July
12, 2000, approximately 10,000 dosage units were seized,
further bearing the emblems of "007" or a triangle
symbol. On July 14, 2000, approximately 10,000 dosage
units were seized, further bearing the emblem of "007".
Subsequent to the seizures of the MDMA, two defendants
were arrested and further cooperated in the
investigation. These defendants named their source for
the ecstasy, a person named "Charlie" Matetich. The
dosage units of the seized MDMA have further been tested
by the Southeast Regional DEA Laboratory and confirmed
positive for the presence of MDMA (ecstasy).

3. Beginning on or about July 20, 2000, a DEA Confidential
Source (CS) had a series of recorded telephone
conversations with an individual now identified as
Maximillian Charles MATETICH in Europe and in Canada.
During these telephone conversations, MATETICH and the CS
discussed the previous shipments of MDMA as described
above, that is, the shipments of MDMA on July 5, July 7,
July 12, and July 14, 2000. They discuss the symbols on
the tablets, namely the the "007", the stars, the
triangles, and the A1 symbols. They further discuss that
the shipments were not good quality, and they discuss
doing another deal for 10,000 pills, for a price of
$24,000.00. Also, an amount of $4200.00 had to be sent

to pay off a previous debt for ecstasy pills.  On Friday, July 21, 2000, DEA sent a series of Western Union money transfers to Amsterdam in the Netherlands representing the $4200.00.  In a subsequent telephone conversation between the CS and Matetich, they discuss the Western Union tracking numbers for the $4200.00.  DEA confirmed that the $4200.00 was retrieved in the Netherlands the next day.

4. On July 24, 2000, Matetich arrived by airplane at the Fort Lauderdale, Florida airport from Canada.  The CI met Matetich at the airport.  The CI was wired for transmission of the conversations between the CI and Matetich .  The DEA agents heard Matetich state that he had received the $4200.00.  On that same day, Matetich was taken into custody in Miami, Florida.  After being advised of his Miranda rights, Matetich admitted that he was in the ecstasy business.  He disclosed the name of his source for ecstasy and stated that he owed this source $100,000.00.  Agents also seized a ledger book which Matetich stated memorialized the debt of $100,000.00 to this source.

5. Based upon the foregoing events, I have probable cause to believe that Maximillian Charles MATETICH imported a controlled substance, namely MDMA, in violation of

Title 21, United States Code, Sections 952 and 963.


FURTHER AFFIANT SAYETH NAUGHT


_____
CHRIS MATHES
DEA SPECIAL AGENT



Sworn to and subscribed before me
this _____ day of July 2000 in
Miami, Florida.



_____
WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6198-CR-HURLEY


UNITED STATES OF AMERICA,

        Plaintiff,

-vs-



MAXIMILLIAN C. MATETICH,

        Defendant.

_____/

## GOVERNMENT'S MOTION TO REOPEN PRETRIAL DETENTION and MOTION FOR NEBBIA INQUIRY

The United States, by and through the undersigned Assistant United States Attorney, files

this Motion to Reopen the Pretrial Detention Hearing pursuant to Title 18, U.S.C. 3142(f) and

Motion for Nebbia Inquiry pursuant to Title 18, U.S.C. 3142(g)(4) and in support thereof states as

follows:

    1. A pretrial detention hearing was held before Magistrate Judge John O'Sullivan on Friday,

August 18, 2000.   At the conclusion of the hearing, Magistrate Judge O'Sullivan denied the

government's request for pretrial detention and ordered the defendant to be released on conditions

of bond.  The United States Attorney's Office has received the transcript of the hearing (attached

hereto).  Based on the oral pronouncements in court, the conditions include inter alia: $100,000.00

1

corporate surety bond, cosigned by the defendant's fiancee[1] and Mr. Randy Swears; and a

$500,000.00 personal surety bond co-signed by the defendant's fiancee and Mr. Randy Swears;

along with a <u>Nebbia</u> condition.

2. While the pretrial detention hearing was ongoing in Miami,[2] undersigned counsel, who

is assigned to this case, contacted U.S. Customs concerning the defense witnesses that were set forth

in the pleading styled "Motion in Support of Bond" that the government received the afternoon

before the hearing. At approximately 11:30 am on Friday, August 18, 2000, undersigned counsel

learned that there is a file at U.S. Customs which reflects that in 1996, a vessel was seized in an

international money laundering prosecution. Mr. Swears told Customs agents over the telephone

the seized vessel was his vessel. Mr. Swears agreed to be interviewed. Although the vessel was

worth $100,000, Mr. Swears failed to appear at 2 interviews scheduled by U.S. Customs agents.

The vessel was ultimately forfeited. The government has contacted the case agent, now stationed

in Berlin, Germany. Matters contained in the Customs file may have some bearing on the Court's

decision concerning the sureties and may be relevant as to the <u>Nebbia</u> condition.

3. Secondly, the transcript of the hearing reflects that the Court agreed to accept Ms. Marie

Ange Caravano, age 23, a French citizen in this country on a temporary visa which expires in

September, as a co-signor on a $100,000 corporate surety bond and as a co-signor on a $500,000

personal surety bond. The Court referred to Ms. Caravano as the defendant's fiancee. The Court

inquired of Ms. Caravano whether she would be residing with the defendant and she indicated that

---

[1] The Pretrial Services Report refers to Ms. Caravano as the defendant's fiancee.

[2] Undersigned counsel's mother was scheduled for surgery at 1:00 pm on Friday, August 18, 2000.

she would. The Court then ordered that Ms. Caravano act as a custodian of the defendant, promising to alert a Pretrial Services Officer if the defendant was not at home with her in compliance with the Court imposed curfew. The case agents, mindful that the defendant, Mr. Matetich was heard on the consentual recordings to be lamenting that Ms. Caravano was now dating a lawyer, contacted that lawyer to confirm Ms. Caravano's current residence. Yesterday afternoon, the government interviewed the lawyer who advised that Ms. Caravano has been in a relationship with him. He stated that Ms. Caravano does not reside in the defendant's apartment, rather she lives in her own apartment and has been living there for some period of time. The lawyer advised that Ms. Caravano consulted with her mother concerning the arrest of the defendant and her mother advised her not to say anything or sign anything. Ms. Caravano told the lawyer after the Pretrial Detention hearing on Friday that she did not understand the implications of a bond or that she would be liable to the United States government. This lawyer, who is a trial lawyer in Miami, told the government that he would be willing to testify before this Court has to his knowledge of the facts.

3. The government's suggestion is that, in light of the conflicting information concerning Ms. Caravano's residence and engagement, it would be unfair to the United States and to Ms. Caravano for Ms. Caravano who is only 23, a citizen of France and has no assets, to be liable for $600,000 to the United States government should the defendant flee. It would also put Ms. Caravano at risk should the defendant violate his curfew or violate the law by continuing to engage in his international ecstasy business.

4. The government asks the court to review the information from U.S. Customs and revisit

3

the issues concerning Ms. Caravano at a further hearing to be set by the Court.

Respectfully submitted,

GUY S. LEWIS
UNITED STATES ATTORNEY

By: *Nancy Vorpe Quinlan*

NANCY VORPE QUINLAN
Assistant United States Attorney
Florida Bar No. 0593532
500 Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 820-8711 ext 3054
Fax: (561) 820-8777

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the Government's Motion to Reopen the Pretrial Detention hearing by fax to Howard Srebnick, Esquire this 23rd day of August, 2000.

*Nancy Vorpe Quinlan*

NANCY VORPE QUINLAN
Assistant United States Attorney

4

1                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2                      MIAMI DIVISION

3

4

5  UNITED STATES OF AMERICA,        No: 00-3131-TURNOFF

6              Plaintiff,      Miami, Florida
                                 August 18, 2000
7      v.

8  MAXIMILLIAN MATETICH,

9              Defendant (s).

10  _____  _____  _____/

11

12          TRANSCRIPT PRETRIAL DETENTION HEARING
        BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
13            UNITED STATES MAGISTRATE JUDGE.

14

15  APPEARANCES:

16  For the Plaintiff:       DAVID WEINSTEIN,
                         Asst. U. S. Attorney
17                        99 N.E. 4th Street
                         Miami, Florida  33132-2111
18
  For the Defendant:       HOWARD SREBNICK, ESQ.
19

20

21  Transcriber:            F. Levy

22

23

24

25

2

1

2     RANDALL SWEERS

3     CROSS EXAMINATION
      BY MR. WEINSTEIN . . . . . . . . . . . . . . . . . . . . 19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1            THE COURT:  United States vs. Maximillian
 2  Matetich.
 3            MR. SREBNICK:  Good morning again, Your Honor.
 4            THE COURT:  Good morning.
 5            MR. SREBNICK:  Howard Srebnick on behalf of Mr.
 6  Matetich, is the way it's pronounced.
 7            THE COURT:  Matiche (phonetic).
 8            MR. SREBNICK:  Yes, Your Honor.  But it's
 9  spelled correctly M-A-T-E-T-I-C-H.
10            THE COURT:  Okay.
11            MR. SREBNICK:  I'm here as temporary counsel for
12  the pretrial detention hearing.  I was going to ask that
13  the arraignment and the report re counsel be deferred
14  until ten days from now, August 29th or 30th, somewhere in
15  there, whatever is convenient for the Court.
16            THE COURT:  Okay.
17            MR. SREBNICK:  So that I can conclude my
18  arrangements with Mr. Matetich for permanent
19  representation.
20            MR. WEINSTEIN:  Good morning, Your Honor.  David
21  Weinstein on behalf of the United States.  I'm standing in
22  for Nancy Vorpe-Quinlan.
23            Your Honor, this case has been indicted.  It's a
24  Judge Hurley case out of Fort Lauderdale, so any reports
25  with regard to report re counsel and/or arraignment, if we
```

4

1  could set those in the division where this case is

2  assigned.

3          THE COURT:  In West Palm.

4          That would be appropriate, wouldn't it, Pilar?

5  Okay.

6          MR. SREBNICK:  Judge, we're prepared to go

7  forward with the PTD hearing today.

8          THE COURT:  Okay.  The case number is --

9          MR. WEINSTEIN:  I have it here, Your Honor:

10  6198-Hurley, 00-6198-Hurley.

11          MR. SREBNICK:  Judge, since it's just a

12  formality, since I'm in Miami and Mr. Matetich is in Miami

13  and we don't need the actual prosecutor in the case, if

14  possible could we just keep the arraignment for the duty

15  so that I can not have to travel for the five minute

16  formality; is that possible?

17          THE COURT:  Where will this defendant be housed,

18  Marshal?

19  He's on a Hurley case, will he stay here at the Federal

20  Detention Center?

21          THE MARSHAL: More than likely.  Once he goes up

22  for the case, then he'll be housed in one of the local

23  jails.

24          THE COURT:  Okay.  Yeah, I'll set it here, then.

25          August 29th at 10 a.m. for arraignment and

5

1    report re counsel.

2            No further continuances on the arraignment or

3    the report re counsel.

4            MR. SREBNICK:  Understood.

5            We're also on for bond.

6            THE COURT:  Today, yeah.

7            Could I see a copy of the indictment?

8            MR. SREBNICK:  Does Your Honor have a copy of

9    the motion that I submitted yesterday?

10            THE COURT:  Yeah, I got that motion.

11        (Brief pause.)

12            MR. WEINSTEIN:  Does Your Honor have a copy of

13    the complaint that was filed?

14            THE COURT:  I do have a copy of the complaint,

15    yeah.

16            Can I keep this, or do you need it?

17            MR. WEINSTEIN:  I need it back.  If somebody can

18    make a copy of it.

19            THE COURT:  Okay.  You can have it back, just --

20    I don't need it.  We need one for the court file,

21    somewhere along the way because there's none in the file

22    down here, but we can get it from you at the end.

23            Or maybe after this hearing, you can go to my

24    chambers and copy it, and deliver a copy to Pilar.

25            MR. SREBNICK:  Your Honor, may we approach in

6

1    camera on one matter, both parties?

2            THE COURT:  Okay.

3        (In camera discussion.)

4            THE COURT:  Okay, is the government prepared to

5    go forward on the detention hearing?

6            MR. WEINSTEIN:  We are, Your Honor.

7            THE COURT:  And is the defense prepared?

8            MR. SREBNICK:  We are, Your Honor.

9            THE COURT:  Okay.

10           All right, let me hear from the government

11   first.

12           MR. WEINSTEIN:  Your Honor, we would adopt the

13   factual allegations that are contained within the

14   complaint that was filed before Judge Turnoff.

15           In addition to that, this case has been indicted

16   so there are presumptions that attach.

17           At this point we're proceeding on risk of flight

18   and danger to the community.

19           This is a crime that's punishable by more -- a

20   maximum penalty of more than ten years.  We're talking

21   about 50,000 pills of Ecstasy here, at the bare minimum,

22   which, by conversion and computation, is approximately a

23   Level 28.

24           There is no minimum mandatory, but he's looking

25   at about 78 to 97 months.

7

1           This defendant, as laid out in the factual
2   allegations was in charge of the importation and
3   distribution of the Ecstasy tablets.
4           In addition, at the time of his arrest he made
5   an admission to the agents regarding his involvement.
6           The agents also seized records from the
7   defendant that mirrored the allegations contained in the
8   complaint with regard to the distribution of the Ecstasy.
9           As to risk of flight, while the defendant has
10  presented a motion for bond to this Court, the defendant
11  is a Canadian citizen.  The defendant possesses a Canadian
12  passport, and while he has a residence in South Florida on
13  South Beach, there is no indication whatsoever that the
14  defendant has entered the United States legally to obtain
15  that residence.
16          There is no verification of any INS records
17  showing that he made a lawful permanent residency here.
18  If at best it's a temporary residency.  That's certainly
19  not his permanent address.
20          In addition, the passport that was seized from
21  the defendant at the time of his arrest lists an address
22  on Coburn (phonetic) Street in London, Ontario, Canada as
23  the address for his passport.
24          It does not list the South Beach address.
25          While he claims to have ties to South Florida,

8

1    his ties are entirely to the country of Canada.

2            With regard to his residency here, while he

3    claims he has been residing here since 1995, in 1996 the

4    defendant was stopped attempting to make an entry into the

5    United States in the Detroit, Michigan area.

6            At that time he had in his possession two

7    Florida ID's with different dates of birth.

8            He also indicated to the inspectors there that

9    he was here on -- going at that time on a shopping spree.

10   However, the possessions that he had with him were

11   inconsistent with that.

12           He was denied entry into the United States at

13   that time and turned around and sent back to London,

14   Ontario.

15           THE COURT:   When was that?

16           MR. WEINSTEIN:   In 1996, on February the 12th of

17   1996.

18           And at that time the address that he provided

19   was the Coburn Street address.

20           In his motion the defendant claims that he's

21   been residing in South Beach since 1995, at the South

22   Beach address.

23           He lists no permanent source of employment and

24   income other than an inheritance that he obtained from his

25   parents at the time of their death.

9

```
1          He also claims to be in the clothing business.
2          While he may have witnesses to present alleging
3   ties to South Florida, none of those witnesses are
4   American citizens.  Only one of the witnesses has a
5   residence within the Southern District of Florida.
6          In addition, during the conversations that the
7   defendant had with the cooperating witness, he indicated
8   that he ran a turnkey operation that allowed him to have
9   easy access to additional funds that are available.
10          It's the position of the United States, based on
11   the presumption that attaches to this indicted case, the
12   fact that he's looking at a fairly substantial amount of
13   time in jail, the fact that he has no ties to the Southern
14   District of Florida, and that he is a Canadian citizen,
15   there are no conditions that this Court could set that
16   could guaranty and assure his appearance here, nor that
17   would guaranty the fact that the defendant could still
18   continue to run his importation and distribution of
19   Ecstasy with regard to the tablets that he has already
20   imported up to this date.
21          THE COURT:  Okay.
22          All right, let me hear from the defense.
23          MR. SREBNICK:  Good morning, Your Honor.
24          Mr. Matctich is a Canadian citizen.  He does
25   have a Canadian address; that's where he grew up.
```

1          However, he has had a residence here in Miami

2   Beach for the last five years.  It's set forth in our

3   pleading, together with the proof of his residency.

4          He's paid rent, has a phone bill.  He has an

5   electric bill.  He's had a residence here in South

6   Florida.

7          While it's not a permanent address, and he's not

8   a permanent resident of the United States, he does have a

9   place that he lives here in Miami when he's living in

10  Miami.

11         THE COURT:  Does he maintain a residence in

12  Ontario as well?

13         MR. SREBNICK:  That's where he's from.  Yes, so

14  -- he has an aunt who lives in Ontario, an 80-year-old

15  aunt.

16         He's an orphan.  Both of his parents are

17  deceased.  But his aunt, who I've spoken to, who's 80

18  years old, lives in Ontario and that's who he visits, and

19  that's his only real family member at this point in his

20  life, given the death of his parents and he has no living

21  siblings.

22         THE COURT:  Is that where he lives when he's in

23  Ontario?

24         MR. SREBNICK:  Yeah.  He lives in -- when he

25  lives in Ontario, that's who he lives with his, aunt.

12

1    He is a graduate of the University of Western

2    Ontario from Canada.  He's attended the London School of

3    Economics.

4         And let me just start by saying we are not here

5    to debate the strength of the government's case, other

6    than to say that the one person with whom the government

7    alleges he was involved with the importation of these

8    pills, Greg Collins, his codefendant -- and it's the only

9    episode that Mr. Matetich has been involved in according

10   to the government's own evidence with regard to

11   importation into the United States -- that person, who

12   became a cooperating witness -- was released on a

13   stipulated bond of $100,000 personal surety, together with

14   that person's sister, another defendant in this case.

15        So the two other defendants in this case have

16   been released on a personal surety bond of $100,000.

17        So let's start there.

18        THE COURT:  Are they U.S. citizens?

19        MR. SREBNICK:  They are.  There's no question

20   that as a result of that they have a stronger case for

21   bond, but just in terms of the strength of the evidence,

22   the case -- they caught those two cold and agreed on a

23   bond for them.

24        What I'd like to point out, however, is although

25   Mr. Matetich is an orphan, doesn't have direct family

12

```
1    members, he does have very close friends who have come to
2    court today -- three from Canada have flown in and that's
3    why we had postponed this.
4              And I'd like to introduce those people to Your
5    Honor right now.
6              Let me start with Randy Sweers (phonetic).  And
7    I'm going to tell you a little bit more about him in a
8    second.  He lives in South Florida.  He has a business
9    here in South Florida.  He's the first person that I
10   listed in our motion for bond, Judge.
11             THE COURT:  Umm-hmm.
12             MR. SREBNICK:  He is going to be the person with
13   the financial means to collateralize a bond that Your
14   Honor might set in this case.
15             I'd like to introduce Marie Ange Caravano
16   (phonetic).
17             I'd like to introduce Demetra Capples
18   (phonetic).
19             I'd like to introduce John Wood.
20             And I'd like to introduce Martine Lanu.
21             We have four -- I said three.  Four people from
22   -- three Canada.  Marie Ange is a French national who
23   works for CNN here in South Florida.
24             All of those persons have known Charlie for
25   years.  Some of them went to school with Charlie.
```

1      And I call him Charlie, Your Honor, that's his

2  middle name.

3      Mr. Matetich is Maximillian Charles Matetich.

4  He's known as Charlie.

5      They've known him for years.

6      And I don't need to waste the Court's time; the

7  Court has had an opportunity to look at our motion.

8      Each of these persons is a substantial

9  individual.  College graduates.

10      Marie Ange has a graduate degree in journalism.

11      Ms. Capples is an investment banker with Bay

12  Street Direct, Inc.

13      John Wood works for an internet company called

14  UU Net (phonetic), a division of Worldcom.

15      These are real people who went to universities,

16  they are people of substance, all of whom have come to

17  Miami, at great expense to themselves, to tell Your Honor

18  that they trust Charlie, they know that even if Charlie

19  made a mistake and did something wrong, he will honor his

20  promise to Your Honor to be in court whenever he needs to

21  be in court.

22      I'd like to speak about Randy Sweers for a

23  moment, and I don't know if Your Honor wants to have me

24  present him as a witness, or if you'd like me to proffer,

25  and then he'd be available for cross-examination in the

14

1 event that Mr. Weinstein would like to cross examine.

2 THE COURT: Yeah, why don't you proffer, if you

3 would.

4 MR. SREBNICK: Randy Sweers is also from Canada,

5 although he has relocated to South Florida. He graduated

6 high school here in South Florida, Pompano Beach High

7 School. He has a bachelors from Wilfred Lar University, a

8 graduate business school attendee.

9 He was a member of the Canadian Junior Olympic

10 basketball team in Canada. Relocated to South Florida,

11 was working as a salesman, started as a salesman for

12 Champion Marine up in North Miami, and started his own

13 business in 1994, where he is the president, 100 percent

14 owner of a company in Fort Lauderdale called Florida Power

15 Boat Brokerage, Inc. You can find it on the internet if

16 you're interested, Your Honor.

17 And he does a very good business here in South

18 Florida. He has sales of three million dollars a year.

19 He has inventory -- over half a million dollars equity in

20 his inventory, and he is telling Your Honor he's known

21 Charlie for 25 years, and while he has nothing to do with

22 the allegations in this indictment, he knows that Charlie

23 will keep his promise to come to court if Your Honor sets

24 a bond.

25 He's so confident of it, Your Honor, he's

15

 1    willing to sign his name on the bond, both in his personal

 2    and in his corporate capacity.

 3             He would lose his home which he owns at 5870

 4    Northeast 22nd Avenue.  He would lose his home, and he

 5    would risk his entire business, his entire future, because

 6    he knows that his friend of 25 years would not turn his

 7    back on the court, and certainly would not turn his back

 8    on him.

 9             I've also discussed with Mr. Sweers the general

10    allegation people make, well, maybe the defendant will pay

11    him under the table and all of this business.

12             Randy Sweers says point blank, it's not going to

13    happen.  Number one, he would never do that, but, number

14    two, he knows the personal finances of Mr. Matetich.  Mr.

15    Matetich simply doesn't have the ability to make those

16    payments.

17             While the government is going to allege he's

18    been in the Ecstasy business and blah, blah, the fact is,

19    even the government's own evidence establishes a very

20    small amount of income that Mr. Matetich was making off of

21    this.  He lives a very modest -- Mr. Matetich lives a very

22    modest lifestyle.  His apartment in South Beach, I think

23    the rent is $800 a month.  He is not a man of great means.

24             He did inherit quite a bit of money, twenty or

25    fifteen years ago when his parents died.  Unfortunately,

16

1    he was not a good investor of that money and the money is

2    gone.

3              What I tell Your Honor, based on the contacts

4    that Mr. Matetich has, the Court can set a bond, let him

5    go to his home on South Beach.  He can remain at his home

6    until the case is over.  We've got people willing to

7    guaranty his appearance in court, Judge.

8              THE COURT:  Let me ask you about Mr. Sweers,

9    does he have a business in Canada and a home in Canada as

10   well?

11             MR. SREBNICK:  Let me call Mr. Sweers up and

12   introduce him to the Court.

13             THE COURT:  Sure.

14             MR. SREBNICK:  Randy.

15             THE COURT:  Let me have him raise his right

16   hand, please.

17             RANDY SWEERS, DEFENDANT'S WITNESS, SWORN

18             THE COURT:  Did you want to ask him anything

19   first?  You don't need to go over the proffer again.

20             MR. SREBNICK:  Just if you'd introduce yourself

21   to the Court and tell him a little about your business and

22   your contacts to Canada, and your parents and all of that.

23             THE WITNESS:  My name is Randall Sweers.  I was

24   originally born in Barry, Ontario, Canada, the same city

25   where I met Charlie when I was ten years old.

17

```
 1              I've known Charlie since he was ten.  I've been
 2    in contact with on a weekly basis, a monthly basis, since
 3    then.
 4              I consider him a very close friend of mine.
 5              THE COURT:  Do you actually live in Miami or do
 6    you live in Canada?
 7              THE WITNESS:  I live in Fort Lauderdale.
 8              THE COURT:  In Fort Lauderdale?
 9              THE WITNESS:  Yes.
10              THE COURT:  Full time?
11              THE WITNESS:  Full time.
12              THE COURT:  Do you have a residence in Canada?
13              THE WITNESS:  No.  I'm a permanent United States
14    resident.  I do travel back to Canada quite often, but I
15    do not have a residence in Canada.
16              THE COURT:  And where is your brokerage business
17    work out of?
18              THE WITNESS:  It's in Dania, Florida, which is
19    basically just outside of Fort Lauderdale.
20              THE COURT:  What is the address of that
21    business?
22              THE WITNESS:  3402 Southwest 26th Terrace, Suite
23    B-3, Dania, Florida 33312.
24              THE COURT:  What are your yearly sales?
25              THE WITNESS:  About three million dollars a
```

1    year.

2            THE COURT:  And what type of inventory -- I'm

3    sorry, it says "inventory/accounts receivable, 500,000."

4    What is that made up of?

5            THE WITNESS:  I own -- I spec buy a lot of --

6    it's high performance boats, and I do cigarette-type

7    boats, scarabs, things like that.  And I own a lot of

8    inventory that I purchased for resale, as well as doing

9    out and out brokerage.

10           I also own a house in Fort Lauderdale, vehicles.

11           THE COURT:  What's the value of your home?

12           THE WITNESS:  Probably between 200 and 250,000.

13           THE COURT:  And how much is the mortgage on it?

14           THE WITNESS:  About 145.

15           THE COURT:  And what type of cars do you have?

16           THE WITNESS:  I own a '97 Porsche twin turbo.  I

17    own a Harley-Davidson.  I own a Dodge truck.

18           THE COURT:  Are there notes on those?

19           THE WITNESS:  Yes, but they all have a lot of

20    equity in them.

21           THE COURT:  Does the government have any

22    questions for Mr. Sweers?

23           MR. WEINSTEIN:  Yes.

24                      CROSS-EXAMINATION

25    BY MR. WEINSTEIN:

1    Q    Yes, of that inventory, how many of those boats are
2    actually owned by you and the company, versus how many are
3    just inventory and are floating through, so to speak, as a
4    brokerage?
5    A    Any of the boats that I have described as being the
6    500,000, I own those free and clear.  There's no notes
7    against them.
8                I have far more inventory than the 500,000, but
9    a lot of that is on brokerage.  I probably have about
10   three or four million dollars on brokerage, but actual
11   stuff that I own, is probably about 500,000.
12   Q    You're the sole owner of that home on Northwest 22nd
13   Avenue?  Anybody else on the deed or the mortgage?
14   A    No.
15   Q    You said you were a permanent U.S. resident, when did
16   that happen?
17   A    1990, I believe.  I've lived here since 1976.  I was
18   a resident underneath my parents.  My mother is originally
19   from Canada and my father from Europe.
20   Q    You retain Canadian citizenship as well, dual
21   residency?
22   A    I do -- no, not dual residency, but I am still a
23   Canadian citizen, but a legal U.S. resident.
24   Q    And your taxes, you pay Canadian taxes or United
25   States taxes?

1    A    United States taxes.

2            MR. WEINSTEIN:  Nothing else, Your Honor.

3            THE COURT:  Thank you.

4            All right, thank you, Mr. Sweers.

5            Mr. Srebnick, how come Mr. Maletich has no

6    witnesses here who live in the United States -- I mean,

7    who are United States citizens, or live in the United

8    States, other than Mr. Sweers?  He's been here for six

9    years?

10            MR. SREBNICK:  Well, the answer to that is,

11   people that are -- his girlfriend, who is here in court

12   today, she's not a U.S. citizen, but she is his

13   girlfriend.

14            THE COURT:  Who is that, which woman is that?

15            MR. SREBNICK:  Marie Ange Caravanc.  She's

16   worked as an intern for CNN.  They've been friends for

17   four years.

18            She just stood.

19            I have spoken, for example, with his landlord.

20   I spoke with the people at his building, but these are

21   just people who know him in that context, and I didn't

22   think they would be helpful in terms of a bail issue.  I

23   thought what would be most helpful are the people that

24   have known him for a long period of time.  And I called

25   the people that know him, rather than the people that see

21

1    him.

2            THE COURT:  Right.

3            MR. SREBNICK:  There's no debate, based on the

4    documents that I've tendered to the Court, that he's had

5    the residence.  His landlord confirmed that he's been

6    paying rent for five years.  Southern Bell confirms it.

7    Florida Power & Light confirms it.  His girlfriend

8    confirms it.  Randy Sweers confirms it.

9            The other folks from Canada who come down here

10   and visit with him, who have lived in his apartment, and

11   who are staying there right now while Mr. Maletich is in

12   custody, waiting to find out if he has bail, they've all

13   confirmed this is where his residence is in South Florida.

14           I don't dispute that he has family in Canada,

15   and I don't even dispute that he has a business that sells

16   handbags and leather goods in Europe.  But the issue is

17   can the Court fashion a bond and say to Mr. Maletich, Mr.

18   Maletich, you stay at your home on South Beach pending the

19   resolution of this case.  Mr. Sweers, you can lose a half

20   a million dollars in inventory by signing on the bond, not

21   to mention your personal home.  Will that keep Charlie

22   here in Miami or West Palm, wherever the court is, pending

23   the resolution of this case.

24           I submit to the Court, given the other bonds set

25   in this case by stipulation, given other bonds that I've

22

1    seen in this courthouse, where Ecstasy cases by Canadian

2    nationals have gotten bond, I think this is a case, given

3    the quality of Mr. Sweers' guaranty, where the Court can

4    set a bond, put Mr. Sweers on the hook -- and anybody else

5    the Court feels would be appropriate.  And what more can

6    someone do who's not a U.S. citizen to get a bond in a

7    case?

8         There's no mandatory minimum in this case.  And

9    while there certainly a presumption based on the statutory

10   maximum, we don't even know what the weight of the

11   substances are yet.  And whatever the predictions are of

12   the government, there is no mandatory minimum.

13        I think that given all of those factors the

14   Court can fashion a bond.  If it requires a curfew, if

15   worst case scenario the Court says put an electronic

16   bracelet, stay in your home on South Beach, we can do

17   that, too.

18        Whatever the Court says.

19        That's all I have to say, Your Honor.

20        THE COURT:  Mr. Weinstein.

21        MR. WEINSTEIN:  Your Honor, a couple of things.

22        In addition to the Miami address, at the time of

23   his arrest he also gave an address in Barcelona, Spain.

24   So the defendant has multiple residences in multiple

25   countries throughout, not just North America, but we're

23

1   talking about throughout the entire world with the Spanish

2   address.

3         In addition to that, the defendant claims that

4   he doesn't have a significant income from the Ecstasy

5   business. Just based on a review of the documents at the

6   time of his arrest, he had accounts receivable due to him

7   in the Ecstasy business for approximately $160,000, and

8   that was just concerning two of the deals that were

9   pending, one of which did not involve the cooperating

10   witness.

11         In addition, the passport that was seized from

12   the defendant at the time of his arrest was a passport

13   that replaced one that was reported lost in Copenhagen.

14   And it also shows extensive travel throughout Europe as

15   well as in and out of the United States from 1997, '98,

16   '99 and 2000.

17         For an individual that claims to have a

18   residence in South Beach that he's had for the last five

19   years, he doesn't spend a lot of time there. The passport

20   reflects travel in and out of the United States,

21   extensively, without residing in the South Florida

22   address.

23         The defendant also, by his own admission, and by

24   his own submission, he shows no lawful entry into the

25   United States on either a tourist visa on a permanent

24

1  resident application, on a work visa, yet he claims to own
2  a residence down here and is now claiming to be in that
3  residence.  And at the time that he claimed to have that
4  residence was when he made that entry, or attempted to
5  make the entry, into Detroit, Michigan from London,
6  Ontario where he was turned around and sent back into
7  London, Ontario because he possessed two Florida ID cards
8  with different dates of birth on them.
9       Your Honor, this defendant presents a
10  substantial risk of flight.  He has worldwide ties.  He
11  has accounts receivable to him in his Ecstasy business
12  that are not money that's on the books.
13       As for the individuals that are willing to put
14  up their property and willing to vouch for him, he
15  presents no one who is a United States citizen.
16       Mr. Sweers is a permanent resident of the United
17  States, and he's willing to sign some property up there,
18  but I would suggest that's not going to be enough at this
19  point to guaranty the defendant's appearance and also his
20  inability to continue to conduct his Ecstasy business.
21       I think that based on the presumptions and based
22  upon the evidence that's been presented to Your Honor at
23  this point that the government has met their burden, and
24  there are sufficient facts that you can find that would
25  substantiate an order of pretrial detention as to the

1    defendant, both on risk of flight and danger.

2           As to the quantity of the drug, we're dealing

3    with a minimum of 50,000 pills, and these are pills that

4    there are -- at this point the legislature has not

5    established a minimum mandatory, however, by conversion,

6    again, he's looking at 78 to 97 months; that's at a base

7    level, without enhancement for organizer.  And that's

8    where he begins.

9           As to the fact that a bond has been set as to

10   two other codefendants, both of those codefendants are

11   United States citizens, and there were additional facts

12   considered by the Assistant United States Attorney at the

13   time they stipulated to a bond with regard to those

14   defendants.

15          That should not be an overriding factor showing

16   that this defendant is not a risk of flight or a danger to

17   the community.

18          THE COURT:  As far as danger to the community,

19   are you basing that on his distribution of drugs, or is

20   there any evidence that he is of a violent nature?

21          MR. WEINSTEIN:  Based upon the statutory

22   presumption and his distribution of drugs.

23          This is a controlled substance that's relatively

24   new.  There are studies on both sides that deal with the

25   fact that this is a dangerous substance, and that when it

1    is abused it can result, and has resulted, in death and

2    serious bodily harm.

3         There is no mandatory minimum that's been

4    established by Congress, or the Senate, with regard to

5    this particular controlled substance as they've done with

6    cocaine and also with marijuana.

7         However, it is scheduled as a dangerous

8    controlled substance and the presumption applies since the

9    maximum penalty is greater than ten years.

10        THE COURT:  How would this gentleman support

11   himself, Mr. Srebnick, if he was released on a bond?

12        MR. SREBNICK:  I know that his -- I spoke to his

13   friends about that because, as a Canadian citizen, just to

14   make sure we're clear -- Canadians don't need to go to INS

15   and get visas and all of this.  A Canadian can just come

16   into the United States.  He does not have work papers here

17   in the United States to work.  He was working in the

18   handbag business in Barcelona, and we don't deny it.  His

19   passport shows it.  He disclosed that to the government

20   and to the Pretrial Services office.

21        The answer to your question is, I've spoken to

22   his friends.  His rent is going to be paid for either by

23   Mr. Sweers or one of his other colleagues. I spoke to his

24   aunt in Canada.  These people have the ability to make

25   sure he has all of his bills paid for during the pendency

27

1    of this case.

2            MR. WEINSTEIN:  Your Honor, just one -- with

3    regard to that comment -- Canadian citizens are entitled

4    to enter the United States to visit and to vacation.

5    However, if they intend to make permanent residence in the

6    United States, they're obligated, as any other foreign

7    national, to notify INS and make an application.  He can't

8    just come here and live here and say he's a Canadian

9    citizen.  They ask when they cross the border what the

10   purpose of their visit here is.

11           INS has no record of this defendant making a

12   lawful entry one way or the other with regard to his entry

13   into the U.S. to permanently -- what appears to be a

14   permanent residence in South Beach according to his own

15   testimony.

16           MR. SREBNICK:  May I clarify?  He doesn't own

17   the residence, he rents it.

18           THE COURT:  I realize that.  Okay.

19           MR. SREBNICK:  So we're clear.

20           THE COURT:  And I think the defendant could

21   enter the county without it necessarily being recorded,

22   coming in from Canada, but, yeah, I think the government's

23   point is well taken, that he's--if he was going to

24   establish a permanent residence here, then I think there

25   would be certain notifications that would need to be made

28

1     to the immigration service.

2           MR. SREBNICK:  I agree.  We're not claiming he's

3     a de facto permanent resident of the United States, or

4     that he's filing for those papers.  All I'm saying is he

5     has a residence that has been consistent, and while he

6     doesn't stay here for the statutory period of six months

7     to establish residency, he does have a place to live which

8     has been available for five years.

9           THE COURT:  Okay.

10          I find that this offense carries a penalty in

11    excess of ten years and the presumption arises as to risk

12    of flight and danger to the community.

13          I find that the defendant has overcome that

14    presumption, and I'm going to set a bond in this matter.

15          I'm going to set a 100,000 corporate surety

16    bond, to be signed by the defendant, the defendant's -- is

17    it girlfriend or fiancé?

18          MR. SREBNICK:  Yes.  Marie Ange Caravano.

19          THE COURT:  Okay.

20          And by Mr. Sweers.

21          In addition, I'm going to -- I said 100,000

22    corporate surety bond, correct?

23          In addition, I'm going to impose a 500,000

24    personal surety bond to be signed by the defendant, the

25    defendant's fiancé, and Mr. Sweers.

29

1    I'm going to impose a Nebbia condition on the

2    bond.

3    I'm going to require the defendant to surrender

4    all passport and travel documents to the Pretrial Services

5    office, that the defendant sign a waiver of extradition

6    from Canada to the United States, that the defendant

7    report to Pretrial Services two times a week by phone and

8    one time a week in person, that the defendant remain --

9    As far as travel restrictions, Mr. Weinstein,

10   what would you request, make it Dade County or the entire

11   Southern District?

12   MR. WEINSTEIN:  In light of the fact he's going

13   to have to make an appearance in Fort Lauderdale --

14   THE COURT:  That's right, he's going to be in

15   Palm Beach.

16   MR. WEINSTEIN:  -- and/or Palm Beach, it should

17   be the Southern District of Florida.

18   THE COURT:  Okay.

19   His travel is restricted to the Southern

20   District of Florida.

21   I'm going to order that Mr. Sweers, or any of

22   the signatories to the bond, with the exception of Mr.

23   Sweers' inventory -- since he's in the business of selling

24   boats, I don't want to prevent him from selling boats that

25   he owns -- but as far as any other assets he has, such as

30

1   his automobiles and his residence, or anything else that,

2   any other asset that he owns, he's not to sell, pledge,

3   mortgage, hypothecate or in any other way encumber any

4   property that he owns, real or personal, until such time

5   as the bond is discharged or otherwise modified by order

6   of the Court.

7           Mr. Sweers, do you understand that?

8           THE WITNESS:  Yes, sir, I do.

9           THE COURT:  Okay.  Could you come up for a

10  moment?

11          You understand that in posting this bond, if the

12  defendant does not abide by all of the conditions of the

13  bond, which include him appearing in court and other

14  things, that the bond could be forfeited and that the

15  government could come to you to collect $500,000 on the

16  personal surety bond, and a bondsman $100,000 on the

17  corporate surety bond?

18          THE WITNESS:  Yes, I do.

19          THE COURT:  So you would be out $600,000 if Mr.

20  Matetich does not show up at court.

21          THE WITNESS:  That's correct.

22          THE COURT:  You're willing to take that risk?

23          THE WITNESS:  Yes, I am.

24          THE COURT:  Okay.  You also understand that I've

25  ordered that you not be permitted to encumber in any way

31

1    any property that you own, other than the inventory of

2    boats that you own, since you're in the business of buying

3    and selling boats?

4            THE WITNESS:  Correct.

5            THE COURT:  You understand that?

6            THE WITNESS:  Yes.

7            THE COURT:  And if you were to violate any of

8    those conditions of the bond, you as well could be held in

9    contempt of court and perhaps charged with a felony.

10           THE WITNESS:  I understand.

11           THE COURT:  Okay.  All right, thank you, Mr.

12   Sweers.

13           MR. SREBNICK:  Judge, may I make one request:

14   Rather than paying the bondsman fee, can we deposit that

15   money, or even a little more money, into the registry of

16   the Court, so as not to put Mr. Sweers out financially?

17           THE COURT:  Yeah, I understand that, but I

18   prefer to have a bondsman involved in this matter if Mr.

19   Sweers should become a fugitive.

20           MR. SREBNICK:  Mr. Matetich.

21           THE COURT:  Mr. Matetich.

22           Mr. Sweers, you can go anywhere you want.

23           If Mr. Matetich should become a fugitive.  I

24   just would not be comfortable with a percentage bond.  I

25   understand -- generally I don't like imposing corporate

32

```
1    surety bonds because it takes money that might be needed
2    for other things away from the defendant, but in this
3    instance, I'm going to require it.
4            I'm also going to impose a curfew on the
5    defendant from 9:00 p.m. in the evening until 7:00 a.m. in
6    the morning.
7            Mr. Maletich, you understand that means you have
8    to be in your residence in Miami Beach during that time
9    period?
10           THE DEFENDANT:  I do, Your Honor.
11           THE COURT:  From 9:00 p.m. until 7:00 a.m.  And
12   if you're not there -- Pretrial Services will be checking
13   on it -- if you're not there -- you'll immediately be
14   remanded to jail.
15           You understand that?  Okay.
16           Could I speak to his girlfriend as well.
17           MR. SREBNICK:  Marie Ange.
18           THE COURT:  Tell me your name, please.
19           MS. CARAVANO:  Marie Ange Caravano.
20           THE COURT:  Ma'am, I've ordered that you sign a
21   bond that would guaranty the appearance of your boyfriend
22   here in court for all future proceedings.  The total
23   amount of the bond is $600,000.
24           Although you may not have that kind of money,
25   the government could come against you and take away any
```

1  assets that you do own in order to meet that bond should

2  your fiancé not show up at court.

3          Do you understand that?

4          MS. CARAVANO: Yes, I do.

5          THE COURT: I've also required that Mr. Matetich

6  have a curfew from 9:00 p.m. in the evening to 7:00 a.m.

7  Are you going to be residing with Mr. Matetich?

8          MS. CARAVANO: Yes, I will.

9          THE COURT: Okay. I'm going to require that if

10  Mr. Matetich is not in your residence from 9:00 p.m. to

11  7:00 a.m. and you're aware of that, that you're to report

12  that to Pretrial Services immediately.

13          MS. CARAVANO: Okay.

14          THE COURT: You understand that?

15          MS. CARAVANO: Yes, I do.

16          THE COURT: Okay. This is the Court that's

17  ordering you to do that so if you fail to do that you

18  could be held responsible, either by contempt of court or

19  the United States government could charge you with a

20  contempt indictment.  So do you understand that?

21          MS. CARAVANO: Yes, I do.

22          THE COURT: So it's important that you let the

23  Court know, through Pretrial Services, if Mr. Matetich is

24  not complying with any condition of the bond.

25          MS. CARAVANO: I understand.

34

1              THE COURT: Okay.

2              Will Pretrial Services make sure this young lady

3      has the phone number to call?

4              MR. SREBNICK: I'll take care of it, Your Honor.

5              THE COURT: All right, thank you.

6              MS. CARAVANO: Thank you.

7              THE COURT: All right, thank you very much.

8              MR. WEINSTEIN: Your Honor, a couple of other

9      additional matters.

10             THE COURT: I wanted to ask the government if

11     they would like Mr. Matetich to wear an ankle bracelet?

12             MR. WEINSTEIN: Yes, Your Honor.

13             THE COURT: Okay. I'm also going to require,

14     then, that he submit to electronic monitoring, at his own

15     expense.

16             Let me ask Pretrial Services, if he's being

17     electronically monitored, does it still make sense for him

18     to call you all, or no?

19             PTS OFFICER: Yes.

20             THE COURT: He should still -- but not report,

21     is that correct?

22             PTS OFFICER: He could report in person. It will

23     be a set date that the officer will have him come in.

24             THE COURT: Okay. Do you prefer that, or  when

25     you have an electronic bracelet, do you prefer that he

1   report as well, or not?

2          PTS OFFICER:  We prefer that he does report,

3   yes, as well.

4          THE COURT:  Okay.  All right, so I'm going to

5   keep that.

6          I'm also going to require that he submit to

7   random drug testing as prescribed by the Pretrial Services

8   Office.

9          Anything else?  I'm sorry, Mr. Weinstein.

10          MR. WEINSTEIN:  He should stay away from

11   airports, seaports --

12          THE COURT:  Okay.

13          MR. WEINSTEIN:  -- bus stations, any modes of

14   public transportation, other than transportation on and

15   off Miami Beach, obviously, but --

16          THE COURT:  Right.

17          You're to avoid all commercial transportation

18   facilities, which means no airports, no marinas and no bus

19   terminals.

20          Do you understand, sir?  Okay.

21          If you need to take a local bus, you can do

22   that, but no -- I mean, I don't know how you -- I assume

23   you have a car.  If you need to take a bus to go to

24   Pretrial Services, a local bus would be okay, anything

25   that travels interstate would not.

36

 1              Yes, sir.

 2              MR. WEINSTEIN:  Do you require him to seek

 3      employment, or attempt to seek employment during the --

 4              THE COURT:  I don't know how he's going to do

 5      that if he's not -- I don't know if he'd be permitted to

 6      do that, so I'm not going to require that.

 7              I mean, the government believes he's here

 8      illegally.  You could move immigration to have him

 9      detained, but that's up to you.

10              MR. WEINSTEIN:  The other matter, I believe, is

11      that immigration is going to be lodging a -- at least a

12      48-hour detainer against the defendant to determine

13      whether or not they're going to institute any other

14      proceedings.

15              THE COURT:  They're going to -- well, that's  up

16      to you.  If INS is going to issue a detainer, then

17      obviously he's not going anywhere on the bond.

18              MR. WEINSTEIN:  And then that brings up the

19      other point: We have no other conditions that we're asking

20      you to impose at this time, however, we would request a

21      stay in order to seek a review of the Court's ruling in

22      front of Judge Hurley.

23              THE COURT:  Okay.  I'll give you until -- how

24      much time do you need for that?

25              MR. WEINSTEIN:  Till 5:00 p.m. today.

37

```
1        THE COURT:  Okay.  Well, when are you going to
2   make this Nebbia?  When are you going to get the bond
3   together, Mr. Srebnick?
4        MR. SREBNICK:  It will probably be till Monday
5   before we could get all the property, and I have to have
6   Mr. Sweers' home probably encumbered by the corporate
7   surety bond.
8        THE COURT:  Okay.  Well, I'm going to stay the
9   bond until Monday at noon.  That way, if Immigration is
10  going to impose a detainer, that could be done by then as
11  well.  If not, Mr. Matelich will be free to go at that
12  time.
13       MR. SREBNICK:  Thank you, Judge.
14       THE COURT:  Okay.  Anything further on this
15  case, Mr. Weinstein?
16       MR. SREBNICK:  That's all we have.
17       MR. WEINSTEIN:  No, Your Honor, other than that
18  if Mr. Srebnick has the paperwork together he can submit
19  that to --
20       THE COURT:  The paperwork on?
21       MR. WEINSTEIN:  The Nebbia requirement.  If he
22  wants to --
23       THE COURT:  Okay, yeah.  If you all will meet on
24  the Nebbia and then let me know if you -- I want to see
25  the paperwork as well.  If you all agree to the Nebbia
```

Accurate Reporting Services, Inc.
Third Floor
172 West Flagler Street
Miami, Florida 33130

38

1    then let me know.

2           I understand that, Mr. Weinstein, the government

3    -- you may agree to the Nebbia without imposing any kind

4    of--

5           MR. WEINSTEIN:  No, my point was that we would

6    have reviewed it before we came to present it to Your

7    Honor.

8           MR. SREBNICK:  Sure.

9           THE COURT:  Right.  Okay.

10          You don't waive your right of appeal by agreeing

11   to the Nebbia is what I want to make clear.

12          MR. WEINSTEIN:  Thank you, Your Honor.

13          THE COURT:  All right, thanks a lot everybody.

14      (Whereupon the hearing was concluded.)

15                - - - - -

16          I HEREBY CERTIFY that, the foregoing is a

17   correct transcript from the electronic sound recording of

18   the proceedings in the above-entitled matter.

19

20

21

22                                        August 22, 2000

23                                        8 - 22 - 00

24   Transcriber                          Date

25

*United States Attorney*
*Southern District of Florida*

---

*500 Australian Ave., Ste. 400*
*West Palm Beach, Florida 33401*
*(561)820-8711*

DATE    8-24-00

**FACSIMILE TRANSMISSION**

UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA
500 AUSTRALIAN AVE., STE. 400
WEST PALM BEACH, FLORIDA 33401
FAX #: (561) 659-4526

TO:        Andre Jordan Zemorano, Esq.

FAX#  (305) 371-6545                    PHONE

FROM:      Nancy Vorpe Quinlan
        ASSISTANT UNITED STATES ATTORNEY
        UNITED STATES ATTORNEY'S OFFICE
        500 AUSTRALIAN AVE., STE. 400
        WEST PALM BEACH, FLORIDA 33401

*IF YOU DO NOT RECEIVE ALL THE PAGES INDICATED OR HAVE ANY PROBLEM WITH RECEIVING, PLEASE CALL (561) 820-8711 AND ASK FOR Marlene.*

*NO. OF PAGES (INCLUDING THIS PAGE):* 43

*COMMENT:*
        *Re: Maximillian C. Matetich*

THIS FACSIMILE CONTAINS *PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE ADDRESSEE(S) NAMED ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\* TX REPORT \*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSMISSION OK

TX/RX NO                          3513
CONNECTION TEL                          13053716545
SUBADDRESS
CONNECTION ID
ST. TIME              08/24 11:55
USAGE T               09'39
PGS. SENT                43
RESULT                  OK

---

**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

500 Australian Ave., Ste. 400
West Palm Beach, Florida 33401
(561)820-8711

DATE    8-24-00

### FACSIMILE TRANSMISSION

UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA
500 AUSTRALIAN AVE., STE. 400
WEST PALM BEACH, FLORIDA 33401
FAX #: (561) 659-4526

TO:    Andre Jordan Zemorano, Esq.

FAX# (305) 371-6545          PHONE

FROM:    Nancy Vorpe Quinlan
ASSISTANT UNITED STATES ATTORNEY
UNITED STATES ATTORNEY'S OFFICE
500 AUSTRALIAN AVE., STE. 400
WEST PALM BEACH, FLORIDA 33401

*IF YOU DO NOT RECEIVE ALL THE PAGES INDICATED OR HAVE ANY PROBLEM WITH RECEIVING, PLEASE CALL (561) 820-8711 AND ASK FOR Marlene.*

*NO. OF PAGES (INCLUDING THIS PAGE):* 43

*COMMENT:*
        Re: Maximillian C. Matetich

*THIS FACSIMILE CONTAINS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE ADDRESSEE(S) NAMED ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY ... OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS ...*

*United States Attorney*
*Southern District of Florida*

---

*500 Australian Ave., Ste. 400*
*West Palm Beach, Florida 33401*
*(561)820-8711*

DATE   8-23-00

## FACSIMILE TRANSMISSION

UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA
500 AUSTRALIAN AVE., STE. 400
WEST PALM BEACH, FLORIDA 33401
FAX #: (561) 659-4526

TO:     Howard Srebnick,Esq.

FAX#  (305)358-2006           PHONE

FROM:     Nancy Vorpe Quinlan
          ASSISTANT UNITED STATES ATTORNEY
          UNITED STATES ATTORNEY'S OFFICE
          500 AUSTRALIAN AVE., STE. 400
          WEST PALM BEACH, FLORIDA 33401

*IF YOU DO NOT RECEIVE ALL THE PAGES INDICATED OR HAVE ANY PROBLEM WITH RECEIVING, PLEASE CALL (561) 820-8711 AND ASK FOR Marlene.*

*NO. OF PAGES (INCLUDING THIS PAGE):* 15

*COMMENT:*
       *Government's Motion to Reopen Pretrial Detention*

          *and Motion for Nebbia Inquiry*

*THIS FACSIMILE CONTAINS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE ADDRESSEE(S) NAMED ABOVE. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

```
        ***********************
           TX REPORT
        ***********************

TRANSMISSION OK

TX/RX NO            3507
CONNECTION TEL              13053582006
SUBADDRESS
CONNECTION ID
ST. TIME            08/23 17:36
USAGE T             09'50
PGS. SENT              43
RESULT               OK
```

500 AUSTRALIAN AVE., STE. 400
WEST PALM BEACH, FLORIDA 33401
FAX #: (561) 659-4526


TO:    _____Howard Srebnick,Esq._____

       _____

       FAX#_(305)358-2006_____          PHONE_____

FROM:     Nancy Vorpe Quinlan
       ASSISTANT UNITED STATES ATTORNEY
       UNITED STATES ATTORNEY'S OFFICE
       500 AUSTRALIAN AVE., STE. 400
       WEST PALM BEACH, FLORIDA 33401

*IF YOU DO NOT RECEIVE ALL THE PAGES INDICATED OR HAVE ANY PROBLEM WITH
RECEIVING, PLEASE CALL (561) 820-8711 AND ASK FOR Marlene.*

*NO. OF PAGES (INCLUDING THIS PAGE):*_____

*COMMENT:*
_____*Government's Motion to Reopen Pretrial Detention*_____

_____*and Motion for Nebbia Inquiry*_____

_____

_____*THIS FACSIMILE CONTAINS PRIVILEGED AND
CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE ADDRESSEE(S) NAMED ABOVE. IF YOU ARE NOT THE
INTENDED RECIPIENT OF THIS FACSIMILE, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED
RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED.
IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL
FACSIMILE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

Exhibit "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA **96-7009**

IN THE MATTER OF THE EXTRADITION )
                 OF )
WOLFGANG OEHME )

MISC NO._____
              **MAGISTRATE JUDGE**
              **SNOW**

**COMPLAINT**

TO: THE HONORABLE LURANA S. SNOW, UNITED STATES MAGISTRATE JUDGE

    I, Jeffrey H. Sloman, being duly sworn, depose and state that I am an Assistant United States Attorney for the Southern District of Florida and act for and on behalf of the Government of the Federal Republic of Germany ("the Requesting State") pursuant to Article 2(1) of the 1978 Extradition Treaty between the United States and Germany (TIAS 9785) as amended by the Supplementary Extradition Treaty of October 21, 1986 entered into force on March 11, 1993 ("the Treaty") with respect to WOLFGANG OEHME.

    In accordance with Title 18, United States Code, Section 3184, I charge, on information and belief, as follows:

    1.    WOLFGANG OEHME is duly and legally charged with having committed, in the jurisdiction of the Requesting State, the crime of fraud pursuant to §§ 263 Section 1, 25 Section 2, an 53 Section 1 of the German Penal Code. Under Article 2 and item 13 of the list of offenses which comprise the Appendix of the Treaty, this crime is an extraditable offense.

    2.    WOLFGANG OEHME is the subject of an arrest warrant (file number ER IV 4826/95) issued on July 3, 1995, by judicial authorities in Munich, Germany.

3.   According to an investigation by authorities of the Requesting State, on November 4, 1991, **WOLFGANG OEHME** established a company known as Pegasus Investment Consulting Corporation ("Pegasus") on behalf of Alexander Herrmann.  In the period between June 1992 and March 1993, Pegasus used various agents in Germany to offer loans.   The amount of the loan was entirely within the client's discretion.   The term was to be 10 years and 1 day, with an interest rate of 4.5% p.a.  The loans were granted on condition that a deposit of 1.5% of the loan amount was paid in advance.   A portion of the loan amount was to be reinvested through ICI Holding, Miami, Florida, another company established by **WOLFGANG OEHME**.  This investment was supposed to generate enough profit by the end of the loan period to cover all interest and redemption payments, so that an interest-free and redemption-free loan was promised.

As premeditated by WOLFGANG OEHME, Alexander Herrmann, Klaus Lauterbach and Markus Effland, no loans were paid out, no loan money was invested by ICI Holding and only a small amount of the deposits were repaid.   Deposit monies were shared out among WOLFGANG OEHME, Alexander Herrmann, Klaus Lauterbach and Markus Effland, in unknown proportions. Between June 1992 and March 1993, a minimum of 129 clients paid to Pegasus total deposits of 7,959,120 Deutschmarks, 2,456,325 US-Dollars, 2,100,000 Belgian Francs and 56,000 Swiss Francs. Payments were made partly in cash, handed to agents who then transmitted the money into accounts with the right of disposal vested in Herrmann, some of the monies were

given to Herrmann in cash, while other monies were remitted directly to other accounts.

4.    WOLFGANG OEHME is currently believed to be working at 1700 E. Las Olas Boulevard, Suite 205, Fort Lauderdale, Florida.

5.    That said WOLFGANG OEHME is a citizen of Germany, was born in Neuss, Germany, on April 6, 1956, and is a white male.

6.    The likelihood of flight is substantial if the fugitive learns of the request prior to arrest.

WHEREUPON, your complainant requests:

a.    that a warrant be issued pursuant to Title 18, United States Code, Section 3184, for the arrest of WOLFGANG OEHME;

b.    that WOLFGANG OEHME be brought before this Court and the evidence of criminality be heard;

c.    that if, on such hearing, this Court deems the evidence sufficient under the provisions of the Treaty to sustain the charges, the Court certify the same to the Secretary of State in order that a warrant may be issued for the surrender of said WOLFGANG OEHME to the appropriate authorities of the Federal Republic of Germany, according to the Treaty; and

d.    that this Court take such other actions as may be required under the provisions of the Treaty and the laws of the United States to meet the obligations of the United States under the Treaty, including the seizure of any items or materials in the possession of WOLFGANG OEHME at the time of the apprehension which are related to the crimes charged or which may be used as evidence,

<u>3</u>

pursuant to Article 25(1).

DATED at Fort Lauderdale, Florida, this 29th day of August, 1996.

Respectfully submitted,

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

JEFFREY H. SLOMAN
ASSISTANT UNITED STATES ATTORNEY

Sworn to before me this 29th day of August, 1996

AND A WARRANT SHALL SO ISSUE.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of the original.
Carlos Juenke, Clerk
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date  8/29/9_

4

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE    1 |
| | 3. CASE NUMBER WP02PT93WF0005 |

4. TITLE: ALEXANDER HERRMANN ET AL.

5. CASE STATUS:    INTERIM RPT

| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|---|---|---|---|---|
| 111296 | 060293 | 1 | 200 | 054 |

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
    OTHER

TOPIC: WOLFGANG OEHME WAIVED EXTRADITION TO GERMANY.

14. SYNOPSIS:
The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME, Marcus EFFLAND, Klaus LAUTERBACH and others for
their participation in an international money laundering and fraud
scheme.  The aforementioned individuals received funds from one
hundred and twenty five "customers" through misconception and false
pretenses.  The funds were then transferred to the United States
contrary to law.

The following report pertains to OEHME waiving extradition to the
Federal Republic of Germany in United States District Court,
Southern District of Florida.  The details of OEHME's extradition
hearing are contained herein.

| 15. DISTRIBUTION:<br>RACWP SACMI | 16. SIGNATURE:<br>PUFF            WILIAM    J    SPECIAL AGENT |
|---|---|
| | 17. APPROVED:<br>ODEN            MARK    F    OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: WP      19. TELEPHONE: 561 659 4606<br>    W PALM BEACH - RAC |
| | 20. TYPIST: PUFF |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

DETAILS OF INVESTIGATION

The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME (aka Thomas WOOD) and others, for their
participation in an international money laundering and fraud
scheme.

On September 13, 1996, OEHME was arrested in Boca Raton, Florida,
on a warrant of arrest issued in the Southern District of Florida.
The warrant of arrest was issued pursuant to a request from the
Federal Republic of Germany for OEHME's participation in a 5.8
million dollar international fraud perpetrated in Germany.

On November 7, 1996, OEHME waived extradition to Germany in United
States District Court, Southern District of Florida, in Fort
Lauderdale, Florida.  OEHME waived extradition before Magistrate
Judge Lurana Snow.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

THESE RECORDS ARE RELATED TO BASE RECORD

P9321499500CWP          OEHME          WOLFGANG     W M 040656
          SV   SERIOUS VIOLATOR FROM S/A/S (CF-151)          SUB-SOURCE

WP02PT93WP0005          CASE CWP PUFF          W 060293
          ALEXANDER HERRMANN ET AL.

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | 2. PAGE   1 |
| | 3. CASE NUMBER WP02PT93WP0005 |

4. TITLE: ALEXANDER HERRMANN ET AL.

5. CASE STATUS:   INTERIM RPT

| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|---|---|---|---|---|
| 102496 | 060293 | 1 | 200 | 053 |

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   INVESTIGATIVE FINDINGS /  OTHER

TOPIC: TWO SCHEDULED MEETINGS WITH RANDALL SWEERS.

14. SYNOPSIS:
The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME, Marcus EFFLAND, Klaus LAUTERBACH and others for
their participation in an international money laundering and fraud
scheme.  The aforementioned individuals received funds from one
hundred and twenty five "customers" through misconception and false
pretenses.  The funds were then transferred to the United States
contrary to law.

The following report pertains to two scheduled meetings with
Randall (Randy) SWEERS regarding the 33 foot Avance vessel seized
from OEHME.  The details regarding these meetings are contained
herein.

| 15. DISTRIBUTION: RACWP SACMI | 16. SIGNATURE: PUFF          WILLIAM    J   SPECIAL AGENT |
|---|---|
| | 17. APPROVED: ODEN          MARK     F  OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: WP   W PALM BEACH - RAC |
| | 19. TELEPHONE: 561 659 4606 |
| | 20. TYPIST: PUFF |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

```
 ------------------------------------------------------------
!        DEPARTMENT OF THE TREASURY        |1. PAGE   2
!        UNITED STATES CUSTOMS SERVICE     |
!                                          |2. CASE NUMBER WP02PT93WP0005
!  R E P O R T   O F   I N V E S T I G A T I O N |
!           C O N T I N U A T I O N        |3. REPORT NUMBER: 053
!                                          |
 ------------------------------------------------------------
```

DETAILS OF INVESTIGATION

The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME (aka Thomas WOOD) and others, for their
participation in an international money laundering and fraud
scheme.

On September 17, 1996, OEHME's 33 foot Avance vessel was seized at
Hideaway Yacht Sales, Inc. located at 599 South Federal Highway,
Pompano Beach, Florida.

On October 10, 1996, at approximately 10:00 a.m., Special Agent
William Puff received a telephone call from an individual
identifying himself as Randall (Randy) SWEERS and inquiring about
the seized vessel.  During the interview, SWEERS claimed that the
vessel was his.  (For details regarding this interview, refer to
Report of Investigation number 52.)  At the conclusion of the
interview, SWEERS and S/A Puff scheduled to meet to discuss this
matter further on October 17, 1996, at 10:30 a.m., at the U.S.
Customs Service office in West Palm Beach, Florida.

On October 17, 1996, S/A Puff received a telephone call from an
individual identifying himself as SWEERS.  SWEERS stated that he
was unable to meet that day.  The meeting was re-scheduled for
October 22, 1993, at 10:30 a.m.

On October 22, 1996, SWEERS failed to appear for the scheduled
interview.

                O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

102496                          TECS II - LIST OF RELATED RECORDS                    PAGE
                                                                                    TN007051
                          4 RECORDS ARE RELATED TO BASE RECORD
WP02PT93WP0005053      ROI  CWP PUFF                W 102496


P9321499500CWP          OEHME              WOLFGANG      W M 040656
         SV  SERIOUS VIOLATOR FROM S/A/S (CF-151)              SUB-SOURCE

P9630236300CWP          SWEERS             RANDALL    A W M 091861
         SC  SUBJECT OF CURRENT INVESTIGATION                  SUB-SOURCE

X9602290900CWP      FLORIDA POWERBOAT BROKERAGE, INC.
         SC  SUBJECT OF CURRENT INVESTIGATION                  SUB-SOURCE

WP02PT93WP0005      CASE CWP PUFF              W 060293
         ALEXANDER HERRMANN ET AL.

```
--------------------------------------------------------------------
|        DEPARTMENT OF THE TREASURY        | 1. TECS ACCESS CODE 3   |
|        UNITED STATES CUSTOMS SERVICE      |-------------------------|
|                                           | 2. PAGE    1            |
|  R E P O R T   O F   I N V E S T I G A T I O N |--------------------|
|                                           | 3. CASE NUMBER WP02PT93WP0005 |
--------------------------------------------------------------------
| 4. TITLE: ALEXANDER HERRMANN ET AL.                                |
--------------------------------------------------------------------
| 5. CASE STATUS:    INTERIM RPT                                     |
--------------------------------------------------------------------
| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|    101696      |    060293        |    1     |     200         |     052        |
--------------------------------------------------------------------
| 11. RELATED CASE NUMBERS:                                          |
--------------------------------------------------------------------
| 12. COLLATERAL REQ:                                                |
--------------------------------------------------------------------
| 13. TYPE OF REPORT:                                                |
|    MEMO OF INTERVIEW    /   INVESTIGATIVE FINDINGS                 |
--------------------------------------------------------------------
| TOPIC: INTERVIEW OF RANDY SWEERS ON OCTOBER 10, 1996.             |
--------------------------------------------------------------------
```

14. SYNOPSIS:
The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME, Marcus EFFLAND, Klaus LAUTERBACH and others for
their participation in an international money laundering and fraud
scheme.  The aforementioned individuals received funds from one
hundred and twenty five "customers" through misconception and false
pretenses.  The funds were then transferred to the United States
contrary to law.

The following report pertains to the telephonic interview of Randy
SWEERS regarding a 33 foot Avance vessel seized from OEHME.  The
details of the interview of contained herein.

```
--------------------------------------------------------------------
| 15. DISTRIBUTION: |                                                |
| RACWP SACMI       | 16. SIGNATURE:                                 |
|                   |    PUFF            WILLIAM   J  SPECIAL AGENT   |
|                   |-----------------------------------------------|
|                   | 17. APPROVED:                                  |
|                   |    ODEN          MARK     F  OI GRP SUPERVISOR |
|                   |                                                |
|                   |                                                |
|                   |                                                |
|                   |-----------------------------------------------|
|                   | 18. ORIGIN OFFICE: WP | 19. TELEPHONE: 561 659 4606 |
|                   |    W PALM BEACH - RAC |                        |
|                   |-----------------------| 20. TYPIST: PUFF       |
--------------------------------------------------------------------
            O F F I C I A L   U S E   O N L Y
```

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

```
|------------------------------------------------------------------------
|        DEPARTMENT OF THE TREASURY       |1. PAGE   2
|        UNITED STATES CUSTOMS SERVICE     |_____
|                                          |2. CASE NUMBER WP02PT93WP0005
| R E P O R T  O F  I N V E S T I G A T I O N |_____
|            C O N T I N U A T I O N       |3. REPORT NUMBER: 052
|                                          |
|------------------------------------------------------------------------
```

DETAILS OF INVESTIGATION

The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME (aka Thomas WOOD) and others, for their
participation in an international money laundering and fraud
scheme.

On September 17, 1996, OEHME's 33 foot Avance vessel was seized at
Hideaway Yacht Sales, Inc. located at 599 South Federal Highway,
Pompano Beach, Florida.

On October 10, 1996, at approximately 10:00 a.m., Special Agent
William Puff received a telephone call from an individual
identifying himself as Randy SWEERS and inquiring about the seized
vessel.  The following is a summary and not a verbatim transcript
of statements made by the interested parties.  SWEERS stated that
the vessel was his and that OEHME was an investor in FLORIDA
POWERBOAT BROKERAGE, INC.  SWEERS stated that OEHME loaned him
(SWEERS) money to purchase boats and he (SWEERS) has documents to
prove that he received funds from OEHME and dispensed the funds to
purchase boats.

Regarding the 33' Avance vessel, SWEERS stated that OEHME paid
lease for storing the vessel.  When S/A Puff questioned SWEERS
regarding FLORIDA POWERBOAT BROKERAGE, INC., SWEERS stated that
Tracey WOOD was the "secretary for a short time" and as of April 4,
1996, she had no interest in the company.

SWEERS stated that he met OEHME four to five years ago when he
(SWEERS) was employed at Sunny Isles Marina.  According to SWEERS,
he worked for Sunny Isles Marina for approximately two years.
SWEERS stated that he knew OEHME from FLORIDA POWERBOAT CLUB, INC.

At the conclusion of the interview, S/A Puff and SWEERS made
arrangements to meet a later date to discuss this matter further.

                    O F F I C I A L  U S E  O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

```
101696                    TECS II - LIST OF RELATED RECORDS                PAGE   1
                                                                          TN007051
                     5 RECORDS ARE RELATED TO BASE RECORD
  WP02PT93WP0005052   ROI  CWP PUFF              W 101696


  P9321499500CWP       OEHME           WOLFGANG      W M 040656
             SV  SERIOUS VIOLATOR FROM S/A/S (CF-151)          SUB-SOURCE

  P9609361400CWP       WOOD            TRACEY        W F 100767
             SC  SUBJECT OF CURRENT INVESTIGATION              SUB-SOURCE

  P9630236300CWP       SWEERS          RANDY         W M
             SC  SUBJECT OF CURRENT INVESTIGATION              SUB-SOURCE

  X9602290900CWP       FLORIDA POWERBOAT BROKERAGE, INC.
             SC  SUBJECT OF CURRENT INVESTIGATION              SUB-SOURCE

  WP02PT93WP0005       CASE CWP PUFF              W 060293
             ALEXANDER HERRMANN ET AL.
```

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. TECS ACCESS CODE 3 |
|---|---|
| R E P O R T  O F  I N V E S T I G A T I O N | 2. PAGE   1 |
| | 3. CASE NUMBER WP02PT93WP0005 |

**4. TITLE: ALEXANDER HERRMANN ET AL.**

**5. CASE STATUS:   INTERIM RPT**

| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|---|---|---|---|---|
| 101196 | 060293 | 1 | 200 | 051 |

**11. RELATED CASE NUMBERS:**

**12. COLLATERAL REQ:**

**13. TYPE OF REPORT:**
   INVESTIGATIVE FINDINGS

**TOPIC: SEIZURE OF WOLFGANG OEHME'S AVANCE VESSEL.**

**14. SYNOPSIS:**

The following investigation pertains to Alexander HERRMANN, Wolfgang OEHME, Marcus EFFLAND, Klaus LAUTERBACH and others for their participation in an international money laundering and fraud scheme. The aforementioned individuals received funds from one hundred and twenty five "customers" through misconception and false pretenses. The funds were then transferred to the United States contrary to law.

The following report pertains to the seizure of OEHME's 33 foot 1993 Avance vessel. The details regarding the seizure are contained herein.

| 15. DISTRIBUTION: | | |
|---|---|---|
| RACWP SACMI | **16. SIGNATURE:** PUFF          WILLIAM  J  SPECIAL AGENT | |
| | **17. APPROVED:** ODEN          MARK     F  OI GRP SUPERVISOR | |
| | **18. ORIGIN OFFICE:** WP W PALM BEACH - RAC | **19. TELEPHONE:** 561 659 4606 |
| | | **20. TYPIST:** PUFF |

O F F I C I A L  U S E  O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF THE TREASURY | 1. PAGE   2 |
| UNITED STATES CUSTOMS SERVICE | |
| | 2. CASE NUMBER WP02PT93WP0005 |
| R E P O R T   O F   I N V E S T I G A T I O N | |
| C O N T I N U A T I O N | 3. REPORT NUMBER: 051 |

DETAILS OF INVESTIGATION

The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME (aka Thomas WOOD) and others, for their
participation in an international money laundering and fraud
scheme.

On September 17, 1996, OEHME's 33 foot Avance vessel was seized at
Hideaway Yacht Sales, Inc. located at 599 South Federal Highway,
Pompano Beach, Florida.

The vessel was removed from the storage warehouse and subsequently
placed on a trailer.  The vessel displayed two Florida
registrations, FL4155HW and FL7953JK.  According to the National
Law Enforcement Telecommunications System, FL4155HW was inactive
and FL7953JK was registered to:

        Cast A Line Marine Surveyors
        1821 North 45 Avenue
        Hollywood, Florida     33021

During an inventory of the vessel, a document titled "Sales
Contract for New or Used Boat" was found in a cabinet.  The
contract indicates that OEHME purchased the vessel for sixty nine
thousand four hundred seventy five dollars ($69,475.00).  According
to the contract, a fifteen thousand dollar ($15,000.00) deposit was
paid by check number 1021 and the balance was paid by cashiers
check.  At the bottom of the contract, there is a signature above
the "Purchaser's Signature" line which resembles OEHME's signature.
The signature above the "Sales Representative" appears similar to
"T. WOOD", OEHME's alias.  The contact was dated September 28,
1995.

Also found in the vessel was "FLORIDA POWERBOAT BROKERAGE, INC.
business cards displaying the name of "Thomas WOOD", OEHME's alias.

This seizure was recorded as S/A/S 9652030034901.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

Case 6:00-cf-06198-DTKH Document 60 TECS II INFORMATION Filed 09/25/2000 Page 101 of 160

```
                            2 RECORDS ARE RELATED TO BASE RECORD
WP02PT93WP0005051       ROI  CWP PUFF                    W 101196


P9321499500CWP          OEHME            WOLFGANG       W M 040656
        SV   SERIOUS VIOLATOR FROM S/A/S (CF-151)                  SUB-SOURCE

WP02PT93WP0005          CASE CWP PUFF                    W 060293
        ALEXANDER HERRMANN ET AL.
```

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

| DEPARTMENT OF THE TREASURY UNITED STATES CUSTOMS SERVICE | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE   1 |
| R E P O R T   O F   I N V E S T I G A T I O N | 3. CASE NUMBER WP02PT93WP0005 |

4. TITLE: ALEXANDER HERRMANN ET AL.

5. CASE STATUS:    INTERIM RPT

| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|---|---|---|---|---|
| 101196 | 060293 | 1 | 200 | 050 |

11. RELATED CASE NUMBERS:

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   INVESTIGATIVE FINDINGS

TOPIC: INFORMATION REGARDING WOLFGANG OEHME'S 33' AVANCE VESSEL.

14. SYNOPSIS:
The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME, Marcus EFFLAND, Klaus LAUTERBACH and others for
their participation in an international money laundering and fraud
scheme.  The aforementioned individuals received funds from one
hundred and twenty five "customers" through misconception and false
pretenses.  The funds were then transferred to the United States
contrary to law.

The following report pertains to the events leading up the seizure
of OEHME's 33 foot 1993 Avance vessel.  The details of the events
leading to the seizure of the vessel are contained herein.

| 15. DISTRIBUTION: RACWP SACMI | 16. SIGNATURE: PUFF         WILLIAM   J   SPECIAL AGENT |
|---|---|
| | 17. APPROVED: ODEN         MARK      F   OI GRP SUPERVISOR |
| | 18. ORIGIN OFFICE: WP   W PALM BEACH - RAC | 19. TELEPHONE: 561 659 4606 |
| | 20. TYPIST: PUFF |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

```
 -----------------------------------------------------------------------
|            DEPARTMENT OF THE TREASURY      |1. PAGE   2
|             UNITED STATES CUSTOMS SERVICE  |_____
|                                            |2. CASE NUMBER WP02PT93WP0005
| R E P O R T   O F   I N V E S T I G A T I O N |_____
|           C O N T I N U A T I O N          |3. REPORT NUMBER: 050
|_____|_____
```
DETAILS OF INVESTIGATION

The following investigation pertains to Alexander HERRMANN,
Wolfgang OEHME (aka Thomas WOOD) and others, for their
participation in an international money laundering and fraud
scheme.

On September 13, 1996, OEHME was arrested in Boca Raton, Florida,
on a warrant of arrest issued in the Southern District of Florida.
The warrant of arrest was issued pursuant to a request from the
Federal Republic of Germany for OEHME's participation in a 5.8
million dollar international fraud perpetrated in Germany.  Prior
to OEHME's arrest, he attempted to hide two bags containing bank
statements and records.  After OEHME was arrested, the two bags
were recovered.

A search of the bags revealed a file containing documentation
pertaining to the purchase of a 33 foot 1993 Avance vessel, hull
identification OMP331642193.  A document titled "Purchase and Sale
Agreement" dated June 25, 1995, indicates that the aforementioned
vessel was purchased by FLORIDA POWERBOAT BROKERS, INC.

The agreement indicates that the vessel was sold by Hideaway Yacht
Sales, Inc. located at 750 South Federal Highway, Pompano Beach,
Florida, 33060.  The address displayed on the agreement for FLORIDA
POWERBOAT BROKERS, INC. was P.O. Box 104, 1007 North Federal
Highway, Fort Lauderdale, Florida, 33304.  (This address is a post
office box at "Mail Boxes Ect." which was utilized by Tracey WOOD,
OEHME's wife.)  The agreement indicates that the vessel was
purchased for fifty thousand dollars ($50,000.00) and a ten
thousand dollar ($10,000.00) deposit was paid with check number
1001.  On page three of the agreement underneath the "buyer" block,
a signature appears that resembles "T. WOOD."

Attached to the aforementioned agreement was a copy of the same
agreement.  This second agreement displayed the same information
except for the balance due block.  The balance due block displays
the amount of forty thousand dollars ($40,000.00) and was paid in
full with check number 1610.

Contained in the file was a Florida "Vessel Certificate of Title"
for the vessel.  The following information was displayed on the
title:

        Title No.:              1735817

                O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

```
-----------------------------------------------------------------------
|           DEPARTMENT OF THE TREASURY          | 1. PAGE   3          |
|           UNITED STATES CUSTOMS SERVICE       |---------------------|
|                                               | 2. CASE NUMBER WP02PT93WP0005 |
|  R E P O R T  O F  I N V E S T I G A T I O N  |---------------------|
|           C O N T I N U A T I O N             | 3. REPORT NUMBER: 050 |
-----------------------------------------------------------------------
```

|                          |                          |
|--------------------------|--------------------------|
| Manufacturer:            | Offshore Marine          |
| Model year:              | 1993                     |
| Hull Identification No.: | OMP331642I93             |
| Vessel Registration:     | FL4155HW                 |
| Hull Material:           | Fiberglass               |
| Propulsion:              | Outboard                 |
| Fuel:                    | Gas                      |
| Use of Vessel:           | Pleasure                 |
| Hull Length:             | 32 8                     |
| Audit number:            | 2526117                  |
| Registered Owner:        | Faust, Charles T.        |
|                          | 601 SW Bay Point Circle  |
|                          | Palm City, Florida    34990 |
| Date of Issue:           | January 19, 1993         |
| 1st Lien Holder:         | None                     |
| 2nd Lien Holder:         | None                     |

On September 14, 1996, Special Agent William Puff and Boca Raton
Police Department Detective James Burke interviewed Pierre
Gaudreau, the president of Hideaway Yacht Sales located in Pompano
Beach, Florida.  The interview was regarding Gaudreau's knowledge
of OEHME (WOOD) and the transfer of the vessel.  (During this phase
of the interview, Gaudreau referred to OEHME as "WOOD.")

Gaudreau stated that he met OEHME approximately three and a half
years ago.  According to Gaudreau, OEHME wanted to rent office
space in Hideaway Yacht Sales' building to start a boat business.
Gaudreau stated that his rent and telephone fees were too expensive
and OEHME didn't move in.

Regarding the 33 foot Avance vessel, Gaudreau stated that he
received the vessel on a trade.  OEHME first looked at the 33 foot
Avance then purchased it in June of 1995 for fifty thousand
dollars.   Gaudreau stated that OEHME purchased the vessel to sell
at a later time and the vessel was purchased by FLORIDA POWERBOAT
BROKERAGE, INC.  When questioned regarding FLORIDA POWERBOAT
BROKERAGE, INC., Gaudreau stated that it came from FLORIDA
POWERBOAT CLUB, INC. which sponsors trips to the "islands and the
Keys."

During in the interview, Gaudreau was referred to OEHME utilizing
the name "WOOD."  At this time, Gaudreau referred to OEHME
utilizing the name OEHME.  When S/A Puff questioned Gaudreau about
this, Gaudreau stated he knew OEHME by both names.  Gaudreau stated
that OEHME had problems with the police and he changed his name and

                    O F F I C I A L  U S E  O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

| | | |
|---|---|---|
| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4 | |
| | 2. CASE NUMBER WP02PT93WP0005 | |
| | 3. REPORT NUMBER: 050 | |

was hiding in North Miami for a while. Gaudreau stated that OEHME
had a Cigarette vessel that was "repossessed" because of the police
problems.

Gaudreau stated that OEHME and an individual identified as Randy
SWEERS utilized the vessel. The last time the vessel was used was
approximately two months ago. According to Gaudreau, the vessel
was put in the water and OEHME cleaned the vessel.

Subsequent investigation determined that OEHME's vessel was stored
at Hideaway Yacht Sales facility. The vessel displayed Florida
registration "FL4155HW." According to the National Law Enforcement
Telecommunications System, the vessel's registration was an
"inactive record."

In OEHME's smaller bag was a checkbook for a First Union "Cap
Account", account number 9980652582. The checks displays the name
of "Thomas WOOD" and the address of 1007 North Federal Highway,
Suite 104, Fort Lauderdale, Florida, 33304. (The aforementioned
address is a post office box at Mail Box Etc. utilized by Tracey
WOOD, OEHME's wife.) In the "Cap Account Register", number "1001"
displays an entry dated "7-29" followed by the words "Hideaway" and
"Avance" and an entry of "10,000" in the payment and withdrawal
column.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

```
101196                  TECS II - LIST OF RELATED RECORDS                PAGE    1
                                                                         TN007051
                        4 RECORDS ARE RELATED TO BASE RECORD
WP02PT93WP0005050     ROI  CWP PUFF            W 101196


P9321499500CWP        OEHME          WOLFGANG    W M 040656
         SV  SERIOUS VIOLATOR FROM S/A/S (CF-151)           SUB-SOURCE

P9609361400CWP        WOOD           TRACEY      W F 100767
         SC  SUBJECT OF CURRENT INVESTIGATION               SUB-SOURCE

X9602290900CWP        FLORIDA POWERBOAT BROKERAGE, INC.
         SC  SUBJECT OF CURRENT INVESTIGATION               SUB-SOURCE

WP02PT93WP0005        CASE CWP PUFF          W 060293
         ALEXANDER HERRMANN ET AL.
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6198-CR-HURLEY

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-

MAXIMILLIAN C. MATETICH,

      Defendant.

_____/

## GOVERNMENT'S NOTICE OF FILING THE AFFIDAVIT
## OF A BOND HEARING WITNESS

The United States, by and through the undersigned Assistant United States Attorney, files

this Notice of Filing the Affidavit of A Bond Hearing Witness and states:

1. The government previously filed a Motion to Reopen the Pretrial Detention Hearing

pursuant to Title 18, U.S.C. 3142(f) and Motion for Nebbia Inquiry pursuant to Title 18, U.S.C.

3142(g)(4).

2. This affidavit represents the testimony that this witness would offer at the Pretrial

Detention hearing. This witness has a long standing vacation planned on a sailboat in the

Mediterranean Sea during the time that this matter would be set for hearing. Undersigned counsel

has provided a copy of this affidavit to defense counsel, along with the telephone number of the

1

witness. The witness is departing the United States on Saturday, August 26 and is returning to the

United States on September 9, 2000.

WHEREFORE, the government presents the testimony of the witness by affidavit.

Respectfully submitted,

GUY S. LEWIS
UNITED STATES ATTORNEY

By: NANCY VORPE QUINLAN
Assistant United States Attorney
Florida Bar No. 0593532
500 Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 820-8711 ext 3054
Fax: (561) 820-8777

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the Government's Notice of Filing the Affidavit of A Bond Hearing Witness was sent by fax to Howard Srebnick, Esquire this 25th day of August, 2000.

NANCY VORPE QUINLAN
Assistant United States Attorney

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6198 - CR HURLEY

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MAXIMILLIAN C. MATETICH,

      Defendant.

_____/

## AFFIDAVIT OF ANDRE J. ZAMORANO

State of Florida

County of Dade

    ***BEFORE ME*** personally appeared ANDRE J. ZAMORANO, who after being duly sworn

states the following:

    1.    My name is Andre J. Zamorano and I am over eighteen (18) years of age.

    2.    I am an attorney licensed to practice in the State of Florida.

    3.    I have personal knowledge of the matters set forth in this affidavit.

    4.    I have reviewed the Government's Motion to Reopen Pretrial Detention and Motion

For Nebia Inquiry (the "Motion"), particularly the statements contained in paragraph two of the

Motion.

5.    I hereby represent that the following statements attributed to me in the Motion are true and correct:

> That I was involved in a personal relationship with Marie-Ange Caravano
>
> That Marie-Ange Caravano was not residing in the Defendants apartment, rather she had been living in her own apartment and had been living there for some period of time
>
> That Ms. Caravano had consulted with her mother after the hearing and her mother had advised her not to sign any documents or to say anything
>
> That Ms. Caravano did not understand the implications of the bond or that she would be liable to the United States Government

6.    My relationship with Marie-Ange Caravano began after she represented to me that she was no longer involved with the Defendant. At that time she removed all of her personal belongings from the Defendant's apartment and moved into a separate apartment in the same building. Since that time she has lived exclusively in this new apartment and has otherwise been in daily communication with me.

7.    Ms. Caravano has represented to me on several different occasions that she is not the Defendant's girlfriend or fiancee, she does not want to live with the Defendant and does not want to sign any bond on behalf of the Defendant.

8.    While I am prepared to testify before this Court regarding these facts, I will be traveling out of the Country for the next two weeks and will not return to the jurisdiction until

Miami-11374.1                          2

September 9, 2000.

FURTHER AFFIANT SAYETH NAUGHT.

_____
AFFIANT

**WITNESS** my hand and seal in the State and County aforementioned this 24 day of August, 2000.

THELMA GARCIA SAMANIEGO
Notary Public, State of Florida
My comm. expires July 23, 2003
Comm No. CC840703
I.D. #194811
Bonded thru Service Insurance Company, Inc.

_____
NOTARY PUBLIC

Miami-11374.1                                   3



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6198-CR-HURLEY


UNITED STATES OF AMERICA,

       Plaintiff,

-vs-


MAXIMILLIAN C. MATETICH,

       Defendant.

_____/

## GOVERNMENT'S NOTICE OF FILING THE TRANSCRIPT OF THE HEARING ON THE GOVERNMENT'S MOTION TO REOPEN THE PRETRIAL DETENTION HEARING

      The United States, by and through the undersigned Assistant United States Attorney, files

this Notice of Filing the Transcript of the Hearing on the Government's Motion to Reopen the

Pretrial Detention Hearing and in support thereof states as follows:

      1.   Attached is a transcript of the hearing on the Government's Motion to Reopen the

Pretrial Detention held on August 29, 2000 in Miami. The government, having now received the

transcript of the second hearing, will be preparing its Motion for Revocation of the Magistrate's

Order as provided in Title 18, United States Code, Section 3145(a)(1).

is a flight risk because of his ties to other countries, as well as, a danger to the community because of his foreign Ecstasy importation network . The government objects to Mr. Swears as a surety. The government objects to Ms. Caravano, age 23, as a surety. She has no assets in the United States whatsoever.

   3. The government requests that the release order be revoked, or in the alternative, that this Court hold a hearing de novo.

   WHEREFORE, the government moves the District Court to revoke the Magistrate's Order releasing the defendant on bond, or in the alternative to set this matter for a hearing.

<div style="margin-left: 50%;">

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: *Nancy Vorpe Quinlan*
NANCY VORPE QUINLAN
Assistant United States Attorney
Florida Bar No. 0593532
500 Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 820-8711 ext 3054
Fax: (561) 820-8777

</div>

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that a true and correct copy of the Government's Notice of Filing the Transcript has been delivered by fax Howard Srebnick, Esquire this 1st day of September, 2000.

<div style="margin-left: 50%;">

*Nancy Vorpe Quinlan*
NANCY VORPE QUINLAN
Assistant United States Attorney

</div>

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 1                        MIAMI DIVISION

 2

 3

 4   UNITED STATES OF AMERICA,              No: 00-6198-HURLEY

 5                  Plaintiff,              Miami, Florida
                                            August 29, 2000
 6        v.

 7   MAXIMILLIAN MATETICH,

 8                  Defendant (s).

 9   _____/

10

11           TRANSCRIPT OF HEARING ON MOTION TO REVOKE BOND AND
                     REOPEN DETENTION HEARING
12            BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
                    UNITED STATES MAGISTRATE JUDGE.
13

14
     APPEARANCES:
15
     For the Plaintiff:         NANCY VORPE-QUINLAN,
16                              Asst. U. S. Attorney
                                99 N.E. 4th Street
17                              Miami, Florida  33132-2111

18   For the Defendant:         HOWARD SREBNICK, ESQ.

19

20
     Transcriber:               F. Levy
21

22

23

24

25
                    Accurate Reporting Services, Inc.
                              Third Floor
                         172 West Flagler Street
                          Miami, Florida 33130
```

I N D E X

2

| 1 | WITNESS | DIRECT | CROSS | REDIR. | RECR. |
|---|---------|--------|-------|--------|-------|

2  Randall Sweers
      By Mr. Srebnick      20
3      By Ms. Quinlan                     31

4  Marie Caravano
      By Mr. Srebnick      46                        57
5      By Ms. Quinlan                     52

6                              E X H I B I T S

7                                               Page

8  Plaintiff's Exhibit No. 1                   7
   Plaintiff's Exhibit No. 2                  22
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

3

THE COURT: We're here on the case of United States of
America vs. Maximillian Matetich.

Could I have your appearances for the record, please.

MS. VORPE-QUINLAN: Good morning, Your Honor. Nancy
Vorpe-Quinlan on behalf of the United States from the West Palm Beach
office of the U.S. Attorney's Office.

And sitting here at counsel table with me is Special
Agent Chris Mathis (phonetic), and Special Agent Roberto Bryan
(phonetic). They are the case agents assigned to the Ecstasy
investigation.

THE COURT: Okay.

MR. SREBNICK: Good morning, Your Honor. Howard
Srebnick, together with Heidi Shules (phonetic), on behalf of the
defendant, Maximillian Charles Matetich, who is present before the
Court, still in custody.

THE COURT: Okay. Mr. Srebnick, this matter was set for
hearing at 11 o'clock. It's 11:45 now. There was no -- I
understand that you told Pilar that you had a hearing at 10 o'clock
in front of Judge Bandstra, but there was no call to chambers, no
notification that you were going to be late.

The Marshals have been sitting here with this prisoner
for 45 minutes. Why is that?

MR. SREBNICK: I had asked my associate to come up here
at quarter to 11. Let me find out if that happened or not.

THE COURT: Okay.

4

1    MS. VORPE-QUINLAN:  Your Honor -- she came up and told us

2    that you were downstairs -- he was downstairs in mag. court, and I

3    advised the clerk that that's where he was.  We knew that's where he

4    was.  He was downstairs.

5    MR. SREBNICK:  In other words, when I realized that we

6    weren't going to be done at a quarter to 11, I asked my associate to

7    notify your chambers.  She must have bumped into Ms. Quinlan and then

8    assumed that the word would be passed on to Your Honor.

9    I apologize for any inconvenience.

10   THE COURT:  All right.  Good enough.

11   MR. SREBNICK:  And, also, when this matter was originally

12   set, I had advised Ms. Quinlan I was going to be in mag. court at 10

13   a.m.  I assumed it would be done by 11:00, but apparently there was a

14   very long calendar.  We were the last on the calendar.  I simply had

15   no control over that.

16   THE COURT:  Okay.  Our understanding was you were going

17   to be in mag. court at 10 o'clock for this defendant, that's why we

18   had him brought here instead, so we'd do the arraignment here.

19   MR. SREBNICK:  Okay.  Well, that's why I mentioned to

20   Pilar this morning that I did have other matters, in the event there

21   was some confusion about that.

22   THE COURT:  Okay.  All right, good enough.

23   We're here on the government's motion to reopen pretrial

24   detention and a motion for a Nebbia inquiry.

25   Let me hear from the government first.

5

MS. VORPE-QUINLAN:  First, could I ask that the witnesses in this matter be excused.  I think that the defense has the two witnesses, Mr. Sweers and Ms. Caravano.

THE COURT:  Okay.

Do you have any objection to that?

MR. SREBNICK:  I don't join in the request, but if the Court thinks it's appropriate, I -- whatever the Court says.

THE COURT:  Okay.  I'd ask the two witnesses to please step outside.

(The clerk advises the Court that some microphones are not working.)

THE COURT:  Okay.  We need to make sure we use the podium microphone because none of the other microphones are working in the courtroom.

Okay, go ahead, Ms. Quinlan.

MR. SREBNICK:  Judge, to the extent that the government --

THE COURT:  Come up here.

MR. SREBNICK:  To the extent that the government is going to call any witnesses, then I think it would be a reciprocal rule. We would invoke the same rule.

MS. VORPE-QUINLAN:  We have an exception for case agents, I believe.

THE COURT:  For one case agent.

MS. VORPE-QUINLAN:  I don't anticipate -- all right, I'll

excuse Agent Bryan.

THE COURT:  Well, he can sit here if he's not going to be a witness, but you only get on sitting at the table who's going to be a witness.

MS. VORPE-QUINLAN:  It's hard to say what Mr. Srebnick, so I'll let Agent Bryan be excused at this time-                THE COURT:  Okay.

MS. VORPE-QUINLAN:  In the event that--he might be called as a witness.

THE COURT:  Okay, good.

Mr. Bryan, if you would wait out in the hallway, please.

THE COURT:  All right.

MS. VORPE-QUINLAN:  After this Court began the detention hearing on Friday, August 18th, I received a telephone call from U.S. Customs.  And I received that call from Customs because I had sent Mr. Srebnick's pleading, in which he had listed all the witnesses and their biographical information over to Customs because my DEA agents were down here, this was a joint investigation with Customs.  And so I sent that pleading over.

In that pleading, Mr. Srebnick had listed Mr. Sweers as a witness, and Customs ran those witnesses in law enforcement databases as best it could.  And they came up with some information about Mr. Sweers and a case number, and they pulled those reports.

And I'd like to give the Court some of that information at this time, and I also have copies for the defense.

1       THE COURT:  Okay.

2       MS. VORPE-QUINLAN:  And, Your Honor, at this time I'll

just mark these reports as Government's Exhibit 1--

3       THE COURT:  All right.

4       MS. VORPE-QUINLAN:  -- for purposes of this hearing.

5        (Government's Exhibit 1 marked in evidence.)

6       MS. VORPE-QUINLAN:  It's a collection of reports -- for

7 the record, it's a complaint on a gentleman named Wolfgang Omee

8 (phonetic).  It's a complaint for extradition.  And then there are

9 customs reports attached all stapled together.

10      May I approach, Your Honor?

11      THE COURT:  Sure.

12      MS. VORPE-QUINLAN:  In the first document, Your Honor,

13 which is the matter of the extradition of Wolfgang Omee, if I could

14 just be brief by proceeding through the document.

15      At the bottom paragraph there, Paragraph 2 on the first

16 page, it states that Wolfgang Omee (phonetic) is the subject of an

17 arrest warrant issued on July 3, 1995 by judicial authorities in

18 Munich Germany.

19      Proceeding to Page 2, the applicant here, who is Jeff

20 Sloman of our Fort Lauderdale office, the U.S. Attorney's Office in

21 Fort Lauderdale, states in Paragraph 3:

22        "According to an investigation by authorities of the

23        requesting state, Mr. Omee established a company known as

24        Pegasus Investment Consulting Corporation on behalf of

25

8

Alexander Herman, and in the period between June 1992 and

March 1993, Pegasus used various agents in Germany to

offer loans.  The amount of the loan was entirely within

the client's discretion.  The term was to be ten years

and a day with an interest rate of 4.5 percent.

The loans were granted on condition that a

deposit of 1.5 percent of the loan

amount was paid in advance.

A portion of the loan amount was to be reinvested through

another corporation in Miami, which was established by Wolfgang Omee.

The investment was supposed to generate enough

profit by the end of the loan period to cover

all the interest and redemption payments so that the

person borrowing the money would end up with an interest

free, redemption free loan.

As premeditated by Wolfgang Omee and others, no loan

money was ever paid out to these investors.  No loan

money was invested in Florida by I.C. Holding.  Only a

small amount of the deposits were repaid."

Going on here, it says 129 clients paid to Pegasus a

great deal of money, 7 million Deutsche marks, over 2 million in U.S.

dollars, 2 million Belgian francs, and 56,000 Swiss francs.

The payments were made in cash and handed to agents who

transmitted the money into accounts here in the United States.

The complaint goes on to seek the arrest of Mr. Omee and

9

the seizure of documents and other items of evidence, including the

forfeiture of any items that might have been purchased by Mr. Omee.

And Magistrate Judge Lurana Snow signed that warrant on

the 29th day of August 1996 with respect to Mr. Omee.

The next report pertains to Mr. Omee waiving extradition

to the United States and states that on September 13th he was

arrested in Boca Raton.  On November 7th he waived extradition to

Germany.

And Agent Puff (phonetic), who is the case agent in

Germany, William Puff, has advised us that Mr. Omee received a seven-

year sentence in Germany.

The next customs report relates to two scheduled meetings

with Randy Sweers regarding a 33-foot Advance vessel, which was

seized from Mr. Omee.  And in this report, Agent Puff writes that on

September 17th a vessel, a 33-foot Advance vessel, was seized that

belonged to Mr. Omee.

On October 10, 1996, at about 10 a.m. Special Agent Puff

received a telephone call from an individual  who identified himself

as Randy Sweers, and inquiring about the seized vessel.

During the interview, Sweers claimed that the vessel was

his.  At the conclusion of the interview, Sweers and Puff scheduled

to meet to discuss the matter further on October 17, 1996 at 10:30.

On October 17, 1996, Agent Puff received a telephone call

from an individual identifying himself as Sweers.

Sweers stated he was unable to meet that day, and the

1  meeting was rescheduled for October 22nd at 10:30 a.m.

2       On October 22, 1996, Sweers failed to appear for the

3  scheduled interview.

4       The next report is a report by Agent Puff detailing the

5  substance of the telephone conversation that he had with Mr. Sweers.

6  Agent Puff writes that on October 10, 1996 at 10 a.m. he received a

7  telephone call from an individual identifying himself as Randy

8  Sweers, and inquiring about the seized vessel.

9       Sweers stated the vessel was his, and that Omee was an

10  investor in Florida Power Boat Brokerage, Inc.

11       Sweers stated that Omee loaned him, Sweers, money to

12  purchase boats and he, Sweers, has documents to prove that he

13  received funds from Omee, and dispensed the funds to purchase boats.

14       Regarding the 33-foot Advance vessel, Sweers stated that

15  Omee paid lease for storing the vessel, and when Puff questioned

16  Sweers regarding Florida Power Boat Brokerage, Inc., Sweers stated

17  that Tracy Wood was the secretary for a very short time, and as of

18  April 4, 1996 she had no interest in the company.

19       Sweers stated he met Omee four or five years ago when he

20  was employed elsewhere.  And he said he knew Omee from Florida Power

21  Boat Club, Inc.

22       The next report is a report about this vessel which was

23  seized, and Agent Puff writes:

24       "On September 17, 1996 Omee's 33-foot vessel was seized

25       at Hide-Away Yacht Sales.  During an inventory of the

11

1    vessel, there was a document titled "Sales Contract for

2    new or Used Boat" found in a cabinet."

     The contract indicated that Omee purchased the vessel for

3    $69,475.

4    According to the contract, a $15,000 deposit was paid by

5    check, and the balance was paid by cashier's check.

6    At the bottom of the contract was a signature above the

7    purchaser's signature, which represents Omee's signature, and the

8    signature above the sales contract appears similar to T. Wood, Thomas

9    Wood, which was Omee's alias Puff learned.

10   Also found in the vessel was Florida Power Boat

11   Brokerage, Inc. business cards displaying the name of Thomas Wood,

12   Omee's alias.

13   It's my understanding that Mr. Sweers' company is Florida

14   Power Boat Brokerage, Inc.

15   The next report also pertains to the seizure of the

16   vessel, and what's notable about that report is, on September 13 Mr.

17   Omee was arrested in Boca Raton, Florida for his participation in a

18   5.8 million dollar international fraud.

19   Prior to Omee's arrest, he attempted to hide two bags

20   containing bank statements and records.  And after he was arrested

21   those bags were recovered.  And it was in a search of those bags

22   where Agent Puff and the other agents found the documents relating to

23   the 33-foot Advance vessel.

24   And there's a purchase and sale agreement among those

25

1    documents dated June 25, 1995, indicating the vessel was purchased by

2    Florida Power Boat Brokerage, Inc.

3            The agreement indicates the vessel was sold by Hide-Away

4    Yacht Sales, Inc., located at 750 South Federal Highway in Pompano.

5            The address displayed on the agreement for Florida Power

6    Boat Brokerage, Inc. was a P.O. Box 1041007 North Federal Highway,

7    Fort Lauderdale, Florida.

8            This address is a post office box at Mail Boxes, Etc.,

9    which was utilized by Tracy Wood, Omee's wife.

10            The agreement indicates the vessel was purchased for

11    $50,000.  The deposit was paid with a check, and then on page 3 of

12    the agreement, a signature appears that resembles T. Wood.

13            So at that time Agent Puff advised he went out to

14    investigate this company, Florida Power Brokerage, Inc., and found

15    that its address was for a Mail Boxes, Etc.

16            The next report is an interview that Agent Puff did with

17    a Mr. Gaudreau, G-A-U-D-R-E-A-U, pertaining to his knowledge of Mr.

18    Omee and the transfer of the vessel.          Mr. Gaudreau stated

19    he met Omee three and a half years ago and, according to Gaudreau,

20    Omee wanted to rent office space at Hide-Away Yacht Sales but he said

21    it was too expensive.

22            Regarding the 33-foot Advance vessel, Gaudreau stated he

23    received the vessel on a trade.

24            Omee first looked at the 33-foot Advance then purchased

25    in June of 1995 for $50,000.

13

1    Gaudreau stated Omee purchased the vessel to sell at a

2    later time, and the vessel was purchased by Florida Power Boat

3    Brokerage, Inc.

4        When questioned regarding Florida Power Boat Brokerage,

5    Inc., Gaudreau stated that it came from Florida Power Boat Club,

6    which sponsors trips to the islands in the Keys.

7        During the interview Gaudreau was referred to Omee

8    utilizing the name Wood.  At this time Gaudreau referred to Omee

9    utilizing the name Omee.

10        When Puff questioned Gaudreau about this Gaudreau stated

11    that he knew Omee by both names.  Gaudreau stated Omee had problems

12    with the police and changed his name and was hiding in North Miami

13    for a while.

14        Gaudreau stated that Omee had a cigarette vessel that was

15    repossessed because of police problems.

16        Gaudreau stated that Omee and an individual identified

17    as Randy Sweers utilized the vessel.  The last time the vessel was

18    used was approximately two months ago.         According to

19    Gaudreau, the vessel was put in the water and Omee cleaned the

20    vessel.

21        The last paragraph says that there was -- in Omee's bag

22    was a checkbook for a First Union cap account in the name of Thomas

23    Wood.  And those checks had the address of Thomas Wood at 1007 North

24    Federal Highway, Suite 104, Fort Lauderdale.

25        The aforementioned address is the post office box at Mail

Boxes, Etc. utilized by Tracy Wood, Omee's wife, and that's the

address for Florida Power Boat Brokerage.

So what concerned the government here was that Mr. Sweers appeared to be involved with this gentleman, Mr. Omee, that he stated to Agent Puff that he received funds from Mr. Omee for his business, that this boat that was seized, Mr. Sweers claimed was his, but, yet, he missed two meetings with the agent, and never appeared to contest the forfeiture and the boat was ultimately forfeited.

The boat was evaluated at about $100,000, which, to the government's way of thinking, for a person to call and say, "This is my boat," and then never appear to challenge the forfeiture of a $100,000 boat, that's a lot of money to write off.

And, in addition, Mr. Omee using business cards with Mr. Sweers' business, and having this person, Tracy Wood, who is Mr. Sweers' ex-wife,  employed there and using mail box drops, we felt obligated to bring this information to your attention since you have decided, based on the last hearing, that he could be a surety in the amount of $500,000.

So I'd like to cross examine Mr. Sweers relating to these documents.  Unless you decide at this point that he would not be a proper surety.

THE COURT:  Okay.

Mr. Srebnick, would you like --

MR. SREBNICK:  I'd like to call --

THE COURT:  Would you like to take some testimony from

him first, or do you prefer the government cross examine him?

1

          MR. SREBNICK:  Sure.  I'll call Mr. Sweers right now.

2

3

          THE COURT:  Okay.

4

          MS. VORPE-QUINLAN:  Your Honor, I also have some

5

information about Ms. Caravano, but I thought we could deal with this

6

first and then Mr. Sweers (inaudible, no microphone).

7

          THE COURT:  Hold on, Mr. Srebnick.

8

          Why don't we hear about Ms. Caravano and then we can just

9

move on.

10

          I've read the pleading about it, that she -- it is the

11

government's position that she is not residing with the defendant,

12

rather has a relationship with another gentlemen?

13

          MS. VORPE-QUINLAN:  Yes, and we filed the affidavit of

14

Mr. Andre Zammerano, and Mr. Zammerano pleaded with us because he had

15

a vacation planned --

16

          THE COURT:  I don't have any affidavit.

17

          MS. VORPE-QUINLAN:  We filed the original with the court,

18

and here's a copy.

19

          THE COURT:  Okay.

20

          MS. VORPE-QUINLAN:  May I approach?

21

          THE COURT:  Please.

22

          MS. VORPE-QUINLAN:  Mr. Zammerano (phonetic) is a duly

23

licensed attorney.  He's a civil trial attorney here in Miami, and he

24

had a long-standing vacation planned to go on a cruise in the

25

Mediterranean, and he had a plane leaving this past Saturday.  So I

could have given him a subpoena, but I talked to Mr. Srebnick, gave

Mr. Srebnick Mr. Zammerano's phone number, and I elected to proceed

by affidavit.

        THE COURT:  Okay.

        MS. VORPE-QUINLAN:  And in that affidavit he basically

states that he was under the impression that Ms. Caravano was in a

relationship with him, and that when Ms. Caravano began the

relationship with him, she moved out of the defendant's house, or the

defendant's apartment, and moved into another apartment in the same

building.

        He said Ms. Caravano's mother came to visit and it was

his understanding when the defendant was arrested that Ms. Caravano's

mother told her not to have anything to do with the defendant, not to

sign anything, and then, of course, at the hearing you had ordered

the defendant to live with her.

        THE COURT:  Right.

        MS. VORPE-QUINLAN:  And for her to be a custodian.

        What the agents did when they -- after the hearing, they

went and interviewed Mr. Zammerano, and that's how we received this

affidavit.  And he clearly said all this was news to him.  So we felt

that, again, the conflicting information about this person, who's

been presented as a responsible surety, should be reported to the

court.

        THE COURT:  Okay.

1    MS. VORPE-QUINLAN:  And we still believe that pretrial

2  detention is the best thing here, Your Honor, with this person's

   international ties.  And I think this information today further

3  supports that position.

4    THE COURT:  Okay.

5    MS. VORPE-QUINLAN:  Thank you.

6    THE COURT:  Mr. Srebnick.

7    MR. SREBNICK:  I note that the so-called boyfriend, Mr.

8  Zammerano, is out vacationing in the Mediterranean without his

9  girlfriend, but we'll get to that when she testifies under oath.

10    I'll be prepared to call both.

11    (Inaudible, off microphone) Caravano (inaudible) she has

12  nothing to do with Mr. Sweers?

13    THE COURT:  I believe so, yeah.  Unless the government

14  doesn't object to her sitting here.

15    MS. VORPE-QUINLAN:  (Inaudible)

16    THE COURT:  Okay.

17    MR. SREBNICK:  Maybe Mr. Sweers should take the witness

18  stand.

19    THE COURT:  Yeah, if you'd come up here, Mr. Sweers,

20  please.  Would you raise your right hand, please.

21    RANDALL SWEERS, DEFENDANT'S WITNESS, SWORN

22    THE CLERK:  Please be seated.  State your name for the

23  record and spell your last name.

24    THE WITNESS:  Randall A. Sweers, S-W-E-E-R-S.

25

DIRECT EXAMINATION

BY MR. SREBNICK:

Q    Mr. Sweers, if you could just, again, introduce yourself to

Judge O'Sullivan.  From our last week he's had other hearings, so --

A    Okay.

        THE COURT:  I remember him.

        THE WITNESS:  Okay.

        THE COURT:  This is the guy with all the boats.

        MR. SREBNICK:  Right.  And the basketball player, I

should add, Judge.  Canadian Junior Basketball team.

        THE COURT:  That's right. Canadian Junior --

BY MR. SREBNICK:

Q    Mr. Sweers, today we've been discussing a gentleman by the name

of Wolfgang Omee.  You and I had a conversation last week where I

brought this matter to your attention?

A    Yes.

Q    Okay.  Tell Judge O'Sullivan, basically, how you knew Mr. Omee,

what your relationship was with him, what was his relationship to

your business, and then we'll get into some of the details.

A    Okay.  Mr. Omee I met through a girl I know from Toronto,

Canada, who he actually ended up marrying her.  Her name is Tracy

Woods.

        I seen Mr. Omee around the marina that I worked at at

that time quite often.

        THE COURT:  What time period was that?

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida  33130**

THE WITNESS:  This was about 1993, I guess, 1993, '94.

THE COURT:  Okay.

BY MR. SREBNICK:

Q    Was this before you started your business?

A    Yes.

Q    Florida Power Boat?

A    Yes.  I worked for Sunny Isles Marina & Yacht Sales in North Miami Beach, Florida.

Q    Who did Mr. Omee represent himself to be, what was his background so far as you were aware?

A    I knew that he was from Germany, and he had a consulting business in, I believe it was Bal Harbour, if I'm not mistaken.

Q    Okay.  And he was either dating and later marrying a woman by the name of Tracy Wood?

A    Correct.

Q    And you knew her from when you lived in Canada?

A    Correct.

Q    Okay.  Tell us a little more about how you got into business, if at all, with Mr. Omee.

A    A friend of mine, also from Canada, who lives down here now, started doing what's called poker runs, which is they get a bunch of high-performance boats together and they do trips down to the Keys, trips to the Bahamas, things like that.  It's a group of boats.  And he started a company called Florida Power Boat Club, which my friend Stu Jones still owns today.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

I was involved selling boats, spec buying boats, just in

the -- at a very small level. I was just, basically, starting in the

business, and I would see Mr. Woods quite often, and would see his

wife quite often, join them on poker runs, brought other boats of

mine and customers and stuff like that on poker runs with them. And

we ended up opening up a company called Florida Power Boat Brokerage,

which is a company that I currently own today.

Tracy Woods was a -- the secretary, I believe, of the

company at that point in time.

THE COURT:  Secretary as on the corporate papers, or a

secretary --

THE WITNESS:  Secretary on corporate papers.

THE COURT:  Okay.

THE WITNESS:  The company was going to -- I had a little

bit of money at that given time, and there was always boat deals

because the marina that I worked at, there was always trade-ins

coming in, things of that sort.

Mr. Omee said that this would be a way that we could buy

and sell some boats, split some profits, and go from there.

We did that on a couple of occasions.  I guess this was -

- I believe I opened the company in -- I think '94, I think June of

'94.  But the company didn't really do much business.  I was still at

Sunny Isles Yacht Sales.  And --

BY MR. SREBNICK:

Q      What was the physical address of the company when you first

started?

A     I believe it was 5870 Northeast 22nd Avenue.

Q     Did you work out of a --

A     No, that was -- sorry.  That was later.

Q     Do you recall a mail box drop that was used for the company address?

A     I'm trying to remember now where it was.

Q     Do you recall using like a Mail Box USA?

A     Yeah, early on.  That's correct.

Q     Is that before your company was able to afford a physical address?

A     Correct.

        MS. VORPE-QUINLAN:  Objection to leading.

        THE COURT:  Overruled.

BY MR. SREBNICK:

Q     Tell the Court about that in terms of when you got started with your business, how it was that you operated.

A     Well, when the business was actually opened up, I didn't really do very much with it.  I was working for Sunny Isles Yacht Sales.  It wasn't like, you know, I stopped working for another company.  I had opened the company up with intentions of making the company a full-blown company by the time, within the next couple of years.  But at that given time I wasn't in a financial position to go on my own yet.

Q     Sort of like when Microsoft opened up in a garage of somebody's home?  Something like that?

A     Same thing, I'm sure.

Q     Same idea, maybe not the same level of success.

      Okay.  So is that why you ended up -- Well, without being leading, tell us why you then used a mail box address for your company that was first getting started with very little capital.

A     Because I didn't have an office or anything like that.

Q     Okay.

A     And I didn't want to -- I was still working another company, Sunny Isles Yacht Sales, and --

Q     Did you know anything about Mr. Omee being involved international fraud out of Germany?

A     None whatsoever.

Q     And, to your knowledge, did Mr. Omee appear to you to be somebody that had the financial ability to go into business with you?

A     Correct.  Yes, he did.

Q     So tell us a little bit more about how the company developed, leading up to what you later learned to be Mr. Omee's arrest and his legal problems in Germany.

A     Basically, we had bought and sold a couple of boats over a period of maybe a year and a half or so.  I would see Mr. Omee all the time.

      At the same time Mr. Omee was involved in promoting the Florida Power Boat Club, which, when I was at the marina, I would -- customers of mine that would buy a cigarette boat from me, a scarab, whatever -- I would direct them towards Florida Power Boat Club.  It

would do events where we would all go and we'd have helicopters that

would come and videotape, and we had people that did professional

video that would send the customers videotapes of their boats running

in the water to music, and aerial photography and stuff like that.

        The company still does that today. I still work with them

very closely today. And, basically, Mr. Wolfgang -- Mr. Omee -- had

a cigarette top gun that was kind of used as -- we called it the pace

boat, so he would be like the lead boat.  He knew his way down to the

Keys and stuff like that.

        That went on for, you know, a couple of years or

whatever.

        After that, I come to find out that there was a boat that

-- I have dealer numbers.  This whole -- I guess the whole thing

started over -- I have what's called dealer numbers, which is, when

you're a boat dealer you apply to the State of Florida and we get an

FL number that I can take -- it's on a placard, and when I want to

sea trial a boat, or use a boat, or anything like that, I put that FL

number on the side of the boat.

        THE COURT:  It's like a car dealer's plate?

        THE WITNESS:  Right.  Same thing.  But it's registered to

my company.  And Mr. Omee had bought a center console boat, asked me

-- because he had not registered the boat or anything of the sort --

and asked me if he could use my dealer numbers to operate the boat.

BY MR. SREBNICK:

Q     Would that be the 33-foot Advance?

A      That's correct.

Q      Tell the Judge then what developed with regard to that vessel.

A      I received a phone call from -- I don't know if it was customs, or actually I guess I come to find out it was customs now.  I didn't know if it was the police or customs, whoever it was.  And they said to me that they had confiscated or seized this vessel, and asked me if knew anything about it, or if I owned it or what the situation was, if I had any claim to it.  And at that given time I didn't know what the -- what had happened or what was going on as far as why they had the boat or anything like that.

       So they said they -- I don't know if I asked them to make an appointment, or if they wanted to make an appointment with me.  Anyway, to make a long story short, nobody, after that given time, ever -- I mean, they knew where I lived, you know, telephone numbers or cell phone numbers, office numbers.  I was never contacted by anyone from that office, questioned.

Q      Who had actually paid for the vessel?

A      Mr. Omee had paid for the vessel.

Q      Your -- I think you already told us that your dealer number was affixed to the vessel.

A      That's correct.

Q      When the customs, or whoever it was from law enforcement that contacted you, did you inform them that you had an interest, or some sort of relationship to the vessel in response to their questions?  How did you explain your relationship to the vessel?

A      They asked me if I had any interest in the vessel, you know, as far as -- they didn't ask me if I had ownership or anything, if I had any interest in the vessel. And I said to them at that given time, that, yes, I may have. Let me check and see what the situation is.

I didn't know, you know -- I didn't step forward and say "I own the vessel. It's my boat," or anything like that. I was owed a small amount of money by Mr. Omee at that given time, and obviously I seen the vessel was being seized and stuff like that, that there were some problems going on, so my only concern was if there was any way to protect any of the monies that I was owed. I didn't know how exactly that would work.

After speaking with -- I don't know if I spoke with -- I don't know if it was Mr. Omee's attorney or a friend, or something like that -- I asked him what was going on. They basically told me that he was being -- they were trying to -- something to do with the Boca police. It wasn't so much customs, but it was the Boca police that was after him for something that a partner of his from Germany that came over here.

Later I found out they said it was money laundering or something to this extent. But at that given time nobody said, oh, Mr. Omee is being charged with this, or being charged with that. They just said they had wanted him.

At that given time I didn't proceed with claiming anything on the vessel. I figured that if anybody wanted to contact me, they had my dealer numbers, phone numbers, addresses.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

I mean, I advertised in magazines. Anyone in the boat business, with high-performance boats, just mention my name, they know where to find me.

Q   Did you actually have an ownership interest in the vessel that you would have been able to pursue?

A   No.

Q   So other than the tag pertaining to your company, of which Mr. Omee was originally an investor, was there any claim that you could have made, so far as you learned from whatever resources you were able to learn from, that you could have filed a lawsuit or somehow attached a lien to the vessel, was there anything that you thought you could do to keep a vessel which you didn't buy?

A   No.

Q   Did you know that Mr. Omee was using an alias named Thomas Wood, that he was using a fake name?

A   Well, I know that he had got -- he had been married.

Q   Right.

A   And that he had taken her last name because of the fact that he said that everybody -- nobody ever got his name right, or anything like that. I didn't really --

Q   Did you go down to the courthouse to check if he filed a legal name change or anything?

A   No. I mean her name was Wood, you know. So I didn't think it was -- I mean, I thought it was a little bit different, but, you know, the Germans are also -- you know, they have different ways of

doing things and stuff like that.

Q    Was there anything at all that, up until the time that you learned that the vessel was seized, and then you learned more about this case, was there anything at all that you had reason to believe that Mr. Omee was anything other than just a legitimate business man?

A    Not really.  I mean there was nothing that, you know.  No one ever came to me and said, you know, he's believed to be this or that or otherwise.  You know.

Q    Okay.  And my client, Mr. Matetich, did he have anything to do with any of these events?

A    No.

        MR. SREBNICK:  Tender the witness, Your Honor.

        THE COURT:  Thank you.

                    CROSS-EXAMINATION

BY MS. VORPE-QUINLAN:

Q    Mr. Sweers, what's your date of birth?

A    9/18/65.

Q    Have you ever used a date of birth, 9/18/61?

A    No.

Q    Okay.  Now, with respect to your corporation, Florida Power Boat Brokerage, Inc. --

A    Umm-hmm.

Q    -- you are the president?

A    That's correct.

Q    And Maureen Navano, vice president and secretary?

26

1    A    No, not anymore.

2    Q    Okay, who is?

     A    I am.  I'm sole -- I'm president, vice president.  I have no

3    secretary.

4    Q    So you're a one-man corporation?

5    A    That's correct.

6    Q    And Tracy Woods was the vice president and secretary, is that

7    correct--

8    A    She was --

9    Q    --at the time you incorporated?

10   A    Yes.

11            MS. VORPE-QUINLAN:  Your Honor, I'm going to mark this as

12   Government's Exhibit No. 2.

13            THE COURT:  Okay.

14            MS. VORPE-QUINLAN:  May I approach the witness?

15            THE COURT:  Yes.

16   BY MS. VORPE-QUINLAN:

17   Q    Do you recognize this person?

18   A    Yes, I do.

19   Q    Who is that?

20   A    That's Tracy Wood.

21            MS. VORPE-QUINLAN:  Your Honor, I'd like to move in

22   Government's Exhibit 2 for purposes of this hearing.

23            THE COURT:  Have you shown it to defense counsel?

24            MS. VORPE-QUINLAN:  Yes, he has seen it.

25

29

(Government's Exhibit 2 admitted into evidence.)

1    BY MS. VORPE-QUINLAN:

2    Q    Now you say that Mr. Omee married this woman who's depicted

3    there in Government's Exhibit No. 2?

4    A    That's correct.

5    Q    And that he took her last name?

6    A    That's correct.

7    Q    So he was using two different names, Omee and Thomas Wood,

8    during the time that you knew him?

9    A    Well, after he got married he just used Wood, to my knowledge.

10   Q    Was he buying boats in both names?

11   A    Was he buying boats in both names?  I don't know.  He didn't --

12   the only boats that we bought -- if we bought a boat it was done in

13   Florida Power Boat Brokerage.

14   Q    Okay.  So you don't know whether he bought and sold boats

15   between the name Omee and Woods?

16   A    No, I do not.

17   Q    Okay.  Now let me ask you, who is Axel Haydash?

18   A    Axel Haydash is the attorney that originally incorporated the

19   company.

20   Q    Okay.  And he's also -- he was also affiliated with Florida

21   Power Boat Club, and Wolfgang Omee was a director of that as well,

22   correct?

23   A    Correct.

24   Q    Where is he an attorney?

25

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

A    In Miami.

Q    Now the time that you learned that Mr. Omee was arrested was about September 13th, in September of 1996?

A    I don't remember the exact dates.

Q    Do you remember the date that the vessel was seized?

A    No, I do not.

Q    You called customs on October 10, 1996, did you not, and stated that the boat was your boat.

A    No, I never stated that the boat was my boat.

Q    Did you tell customs agents that Mr. Omee had invested money in your company?

A    Yes, I did.

Q    And at that time how much money had he invested in your company?

A    At that point in time?

Q    Umm-hmm.

A    I don't remember exactly how much at that point in time.

Q    Well approximate.

A    I don't -- changed from if we had boats and what we had in inventory.  But at that given time, I don't think we had very much in inventory.

Q    So about how much would it have been?

A    About how much would it have been?

Q    About how much would Mr. Omee have invested in your company?

A    At that point in time maybe $25,000.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

31

Q    Only $25,000?

A    Umm-hmm.

Q    Now you said that you met Mr. Omee during these poker runs, is that correct?

A    No, I met him prior to those.

Q    Prior to that, but that you and Mr. Omee went on poker runs to the Keys.

A    Correct.

Q    Are those excursions in which people go on these boats down to the Keys -- are they called "poker runs" because they play poker and gamble?

A    They're playing cards -- each location you go to you-- might have five stops, and at each stop you get a playing card and we have companies that put up storage for their boats, repairs, propellers, you know.  It's basically for marketing.

Q    And how much money did you have invested in your company at the time that Mr. Omee had only invested $25,000?

A    I probably had 50,000 and a lot of man hours.

Q    Where did the 50,000 come from?

A    The $50,000 I had?

Q    That you had invested in your company in what -- 1996?

A    It came from monies I had made from other boat deals working for Fort Apache Marina, Champion Marine, Sunny Isles Yacht Sales.

Q    Now you said that you sold Scarab vessels, is that correct, and other go-fast type cigarette boats?

A    Correct.

Q    Are Scarabs made by Wal-Craft (phonetic)?

A    Yes, they are.

Q    Are you a licensed Wal-Craft franchisee?

A    No. I don't have to be a licensed franchisee.

Q    So you buy boats on the secondary market then?

A    Correct.

Q    Now when did you -- you also told customs that Tracy Wood no longer had anything to do with your business, when you talked to customs in October, is that correct?

A    In October of --

Q    Of 1996.

A    Not to my knowledge, no.

Q    What did you tell customs about Tracy Wood?

A    I don't -- 1996, I don't remember exactly what I had said.

Q    Well, didn't the customs agent ask if they could meet with you again to further interview you about your business and Ms. Wood?

A    To my knowledge the first that I've heard of this is that there was supposedly two appointments that I made or didn't make.

        The customs agents knew exactly where I lived, where I worked. If they needed to speak with me, I was very easily accessible.

Q    So that's the position that you're taking today, that even though you made appointments to meet with them and you failed to appear, they knew where you were, so they could come track you down.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

                    MR. SREBNICK:  Objection.  That's assuming her facts that

1    are not in evidence.  He's not admitted that he made any appointments

2    that he failed to appear at.

3                    THE COURT:  Well, let the witness answer the question:

4    Did you make any appointments that you failed to show up for?

5                    THE WITNESS:  To my knowledge, no.  I don't remember

6    making any specific appointments or anything of the sort.

7    BY MS. VORPE-QUINLAN:

8    Q    Well, now if you learned that an investor in your company had a

9    boat seized and was ultimately deported from this country for

10   international money laundering, did you go to the police and offer to

11   give them any information that might assist them in that

12   investigation?

13   A    No.

14   Q    Even though you had talked with them you didn't go offer your

15   assistance?

16   A    I figured that if they had required my assistance, they would

17   contact me.

18   Q    Now did you also try to import boats across the border from

19   Canada at Buffalo, New York?

20                   MR. SREBNICK:  Objection, beyond the scope.

21                   MS. VORPE-QUINLAN:  Well, this is a Nebbia inquiry as to

22   the source of the collateral.

23                   THE COURT:  Overruled.  Go ahead.

24   BY MS. VORPE-QUINLAN:

25

                    **Accurate Reporting Services, Inc.**
                            Third Floor
                       172 West Flagler Street
                       Miami, Florida  33130

Q    Have you also imported boats from Canada?

A    Yes, absolutely.

Q    And have you had any problems importing those boats across the border into Buffalo?

A    I always have problems.

Q    Tell the Court about that.

A    Which boat would you like to know about?

Q    You can pick one.

A    I had a 40-foot Skater that came in one time that they checked all the paperwork and stuff like that, and we didn't have the proper bonds.  It was being sold to a Canadian citizen in Canada.  We didn't have the proper bonds and stuff like that for it.  But that has, you know, nothing to do with any wrongdoing that I've done or the owner of the boat, or anything of the sort.  This is Canada customs.

Q    Apart from that, you've had some other problems, is that correct, getting boats over the border with your paperwork?

A    I always have problems getting boats over with the paperwork.  That's just -- I mean, Canadian border is common, ask anybody that ships boats back and forth between Canada.  It's normal.

Q    Have you been to the Bahamas a great deal?

A    The Bahamas?

Q    Umm-hmm.

A    Yes, I have.

Q    Have you gone over there with Mr. Omee?

A    Have I gone over there with Mr. Omee?

Q    Umm-hmm.

A    Yes, I have.

Q    And did you bring Mr. Omee back on a boat and then not clear customs on your way back with Mr. Omee?

A    Did I do that?

Q    Umm-hmm.

A    No.

Q    You've never done that?

A    No.

Q    Did you ever attempt to get Mr. Omee in this country without clearing customs?

A    No, I did not.

Q    What is your boat inventory at this moment?

A    I gave a list to the courts earlier.

Q    You gave a list to the courts earlier?

MR. SREBNICK:  I think he means he gave it to me.

THE WITNESS:  I'm sorry, I gave it to --

MR. SREBNICK:  (Inaudible, no microphone) tender it to the court (inaudible) have a list if the Court would like it.

BY MS. VORPE-QUINLAN:

Q    Do you actually have titles to these boats?

A    Yes, I do.

Q    Okay.  Now what other accounts do you have?  Do you have a savings account?

A    I have stock brokerage accounts.

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida  33130**

Q    And how much money is in that account?

A    Ahh -- in total probably $60,000.

Q    Did Mr. Omee ever loan you any other money for your business besides the $25,000 that you mentioned earlier?

A    No.  And that wasn't a loan, that was just money that was invested for paperwork and brochures and things like that.  He never gave me a loan to my company.

Q    You never received any money from him?

A    No.  Not specifically as a loan or anything like that.

Q    Have you ever received any money from Mr. Matetich?

A    Have I ever received any money?

Q    Yes.

A    No.

Q    Has he ever given you any money?

A    No.

Q    Are you paying his attorney's fees?

A    Am I paying his attorney's fees right now?  Yes, I am.

Q    And then you're also willing to sign on a $500,000 bond and a $100,000 bond.

A    That's correct.

Q    How much is your boat inventory at this moment?

A    Ahh -- over $500,000.

Q    In addition to the savings -- or the money market account that you have $60,000 in, do you have a checking account?

A    Yes, I do.

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

Q    And how much is in that account?

A    Today?

Q    Yes.

A    Probably about $45,000.

Q    Do you own any stocks or bonds?

A    Yes, I do.

Q    Tell the Court about that.

A    I don't -- I can't give you specifics.  I know I own Sysco,

FUTR.  I have a stock broker in New York that trades my account.  I

also have one here in Fort Lauderdale.

Q    And how much money is in the account in New York, in bonds?

A    Bonds?

Q    How much are the bonds worth?

A    Bonds?

Q    Yes -- well, stocks and bonds combined.

A    Are you talking about personal or combined with my corporation?

Q    No, personal.

A    Personal?  I think I have about 25,000 right now.

Q    In stocks and bonds in your account in New York?

A    Correct.

Q    And what about in the account in Fort Lauderdale?

A    I think I have about -- I think about 18, 20.

Q    Where is Mr. Omee right now?

A    Where is Mr. Omee?

Q    Yes.

1    A    I don't know where he is now.

2    Q    When was the last time you saw him?

3    A    The last time I saw Mr. Omee was, I guess, October or whatever
of '96, whenever it was -- prior to when he was arrested.

4    Q    Have you had any other contact with him at all?

5    A    No.

6            MS. VORPE-QUINLAN:  May I have just a moment?

7            THE COURT:  Yes.

8        (Brief pause.)

9    BY MS. VORPE-QUINLAN:

10    Q    Let me just clarify one thing with you.  You testified on

11    direct that this 33-foot Advance vessel, you did not own that vessel?

12    Is that your testimony on direct, that you did not have an ownership

13    --

14    A    I personally did not own the vessel, that's correct.

15    Q    Okay.  So you did not tell customs that you owned the vessel?

16    A    To my knowledge, no.

17    Q    What does that mean, to your knowledge?

18    A    To my knowledge, no.

19    Q    Did you ever tell them that?

20    A    I don't -- to my knowledge, no.  I don't remember the exact

21    situation.  With that particular boat, I don't remember if Mr. Omee

22    had bought it through -- used a check from Florida Power Boat, or how

23    he'd have done it.  You know, whether it was money that he put in the

24    account and then wrote a check for it, or how exactly it was.

25

**Accurate Reporting Services, Inc.**
**Third Floor**
**172 West Flagler Street**
**Miami, Florida 33130**

Q    Did you ever go back and look at the documents relating to that vessel to see?

A    Did I ever go back?

Q    Yes.  After you talked to customs.

A    I don't remember if I ever did.  I'm sure I must have looked at the documents to figure out exactly how this had transpired or whatever.

All I knew was that the boat was seized, okay, and that if there was any wrongdoings, or anything of the sort, they would, by all means, come and contact me.  I knew I had done nothing wrong.  I would assume that they had arrested Mr. Omee, you know, and deported him, or whatever it was that they were doing with him, and that was really not anything that I had done or been involved with.  And at that point in time -- like anybody else, I mean, if you're -- somebody who you've known for a while and has been an investor in your company, gets arrested or gets deported, or whatever the situation is, I mean, I just figured if they wanted any information from me, or if they needed to talk to me about anything, they knew exactly where I was.  I wasn't hiding or anything of the sort.  I was available for questioning.

They never contacted me, never came to see me.  And, quite honestly actually I was quite surprised about that.

Q    Now -- you were surprised about it, but you never called them and asked them if you --

THE COURT:  Now let's move along.  We've already--

40

MS. VORPE-QUINLAN:  Let me --

1

THE COURT:  That answer's been given already.  He never

2

called them.  He testified to that already.

3

Anything further?

4

MS. VORPE-QUINLAN:  Just one other question.

5

BY MS. VORPE-QUINLAN:

6

Q    If you looked at the boat documents for that Advance vessel,

7

and you saw that there were documents in the name of Omee,

8

transferring it back to a person by the name of Thomas Wood and

9

Thomas Wood, and Thomas Wood transferring it back to Omee, wouldn't

10

that have caused you to have some concern about the vessel?

11

A    Well, I can tell you -- if that's what you're saying has

12

happened, I never seen those documents.

13

My main concern was whether the boat was in Florida Power

14

Boat Brokerage's name.  That was my only concern.

15

Q    Okay.

16

MS. VORPE-QUINLAN:  Thank you, Judge.

17

THE COURT:  All right.

18

MR. SREBNICK:  Nothing further, Judge.  We're prepared to

19

call the next witness.

20

THE COURT:  Thank you.  Step down, sir.

21

MR. SREBNICK:  May he remain in the courtroom now that

22

he's done?

23

THE COURT:  Yeah.  You're not calling him -- I assume no

24

one is calling him as a witness again.

25

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

41

```
1          MR. SREBNICK:  (Inaudible) Ms. Caravano.
2     (Brief pause.)
3          MR. SREBNICK:  Would the Court like her to sit up front
4  or --
5          THE COURT:  Yeah, come on up here if you would.
6          MR. SREBNICK:  Go right up and sit next to the Judge.
7          THE COURT:  You need to raise your right hand, please.
8      MARIE ANGE CARAVANA, DEFENDANT'S WITNESS, SWORN
9          THE CLERK:  Please be seated.  State your name for the
10  record, spelling your last name.
11         THE WITNESS:  My name is Marie Ange Caravano.  My last
12  name is spelled C-A-R-A-V-A-N-O.
13         MR. SREBNICK:  May I proceed, Your Honor?
14         THE COURT:  Yes.
15                     DIRECT EXAMINATION
16  BY MR. SREBNICK:
17  Q    Ms. Caravano, you were in court last time in front of Judge
18  O'Sullivan.  Do you remember being there?
19  A    Yes.
20  Q    Have you been -- you know the defendant, Mr. Matetich, Charlie
21  Matetich?
22  A    Yes.
23  Q    How long have you known him?
24  A    Four years and two months.
25
```

42

Q    Okay.  Did you have a romantic/fiancee, girlfriend type relationship with him?

A    Yes, we were engaged.

Q    Okay.  When you were in court last time, do you recall that you were asked whether you'd be willing to live with Charlie Matetich during the period of his -- while this case is pending?

A    Yes.

Q    And you told the Judge you would be willing to, right?

A    Yes.

Q    Okay.  At present, do you live in the same building as Charlie Matetich's residence?

A    Yes.  Same address.

Q    Different apartment?

A    Different apartment.

Q    And what is the status of your relationship today, are you still friends?

A    Yeah, we're very good friends.  We just -- we had an argument about two weeks before his arrest and I wanted to break up with him.  And now we're trying to reconcile our differences.

Q    Have you had a relationship with a gentleman by the name of Andre Zammerano -- and I'm sorry to get into your personal life, but the government's making an issue of it.

A    Andre is a really good friend of mine and I started seeing him, dating him, about a couple of days before Charlie got arrested.

Q    Umm-hmm.

43

A     And last  week we just -- we had an argument and we broke up,

and now -- but he remains my really good friend.

Q     I see you're not vacationing with him in the Mediterranean.

A     No, no.

Q     He didn't invite you?

A     No.

              MS. VORPE-QUINLAN:  Objection, Your Honor.

              THE COURT:  Overruled.

BY MR. SREBNICK:

Q     You were in court the very first appearance in front of Judge

Dubé, do you recall being in court?

A     Yes.

Q     Do you recall your mother was in court?

A     No, she -- she stayed outside.

Q     Okay.  What I mean in court, she was at the courthouse?

A     Yes.  She took the bus with me. She don't want me to come

alone.

Q     You introduced her to me?

A     Yes.

Q     At that time did I explain to both you and your mom what was

involved in the bail process?

A     Yes.

Q     Did I explain to you that by signing on a bail you'd be

guarantying Charlie -- we call him Charlie -- Mr. Matetich's

appearance in court?

44

A     Yes.

Q     Did I explain to you and your mom that by signing on a bail, should Charlie not come to court that you could lose whatever the bail would be set by the Judge?

A     Yes.

Q     Do you remember at that time there was no bail set yet.

A     Yes.

Q     We didn't know how much it would be, correct?

A     Umm-hmm.

Q     Correct.

A     I remember.

Q     Speak right into the microphone.

A     Yes, it's correct. I remember.

Q     But did I explain to your mom, long before you came to see Judge O'Sullivan, both to you and your mother, exactly what was involved in the process?

A     Yes, you did.

Q     Did your mom tell anybody that you should -- did she tell me that you should not participate in the bail process?

A     No, she didn't tell you, but she give me advices.

Q     Okay.  And whatever advice she gave you, did you decide on your own that you wanted to sign the bail?

A     Yes.

Q     The date we came to court --

            MS. VORPE-QUINLAN:  Your Honor, I'm going to object to

45

the leading questions.

        THE COURT:  Yeah, I agree. Sustained.

        MR. SREBNICK:  I can rephrase.

BY MR. SREBNICK:

Q    We came to court last  time before Judge O'Sullivan.  Did we have a conversation outside the courtroom?

A    Yes.

Q    Who was present -- you don't have to give all the names, but were -- without trying to lead -- were all the other people who came to court --

A    Yes.

Q    -- sitting?

A    All Charlie's friends and Randy and me.

Q    And did I go through the exact same discussion with all of them that I had gone through with you and your mom?

A    Yes, you did.

Q    And did -- What did I explain generally about the bail process?

A    Yes.

Q    And explained that the Judge might set a bail?

A    Umm-hmm.

        MS. VORPE-QUINLAN:  Objection, leading.

        MR. SREBNICK:  Judge, I don't have to lead if -- this is --

        THE COURT:  Well, you are leading.

        MR. SREBNICK:  There's no question.  I'm just trying to

get to the meat and potatoes.

1          THE COURT:  What are you trying to get to?

2          MR. SREBNICK:  The government's alleging she didn't

3    understand what was involved in the process.

4          THE COURT:  Okay, well, I think it's clear that you

5    described the process to her --

6          MR. SREBNICK:  Okay.

7          THE COURT:  --and she --

8          THE WITNESS:  I --

9          THE COURT:  --had a discussion with her mother and

10   decided on her own what she wanted to do.

11         THE WITNESS:  The thing I didn't understand was, because

12   I don't own anything, I didn't really understand how -- but now I do.

13    Now I do.  If one day I own something, then the government could go

14   after whatever I own.

15   BY MR. SREBNICK:

16   Q    And that was actually explained to you by Judge O'Sullivan

17   himself in court that day, right?

18   A    Yes.

19   Q    Did you have any questions about what was involved in the bail

20   process when you told Judge O'Sullivan, here in court, that you were

21   willing to sign?  You understood?

22   A    Yes.  I understood.  It was clear.

23   Q    Let's talk about today.  Today are you willing to sign the bail

24   for Charlie Matetich?

25

47

A     Yes.  Yes.

Q     And if the Judge requires that you live together so that you can, essentially, monitor his compliance with the bail, are you still willing to do that?

A     Well, if it's a condition of him getting out on bail I will just move to his apartment, which is next door.

Q     Okay.  And, again, I hate to get into your personal life, how are you going to deal with this Andre Zammerano who's vacationing in the Mediterranean when he comes back?

A     We decided to stay good friends, so hopefully, you know, we'll work it out.

         MR. SREBNICK:  Your witness.

                    CROSS-EXAMINATION

BY MS. VORPE-QUINLAN:

Q     Ms. Zammerano, how old are you?

A     Caravano.

Q     Caravano.  I'm sorry.

A     I'm 23.

Q     When did you turn 23?

A     August 6th.

Q     So you just turned 23.  And you grew up mostly in France?

A     Yes.  All my life.

Q     All your life.

         Now what assets do you own personally?

A     Ahh -- I own a car in Paris, and that's it.  And my furnitures.